James P. Flynn, Esquire
Daniel Levy, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
*Counsel for Novartis Pharmaceuticals Corporation*

Russell Beck, Esquire
Stephen D. Riden, Esquire
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
(617) 500-8660 (phone)
(617) 500-8665 (fax)
*Of Counsel for Novartis Pharmaceuticals Corporation (Pro Hac Vice Pending)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: _____ |
| v. | ) ) ) | |
| ALISHA ALAIMO, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Novartis Pharmaceuticals Corporation ("Novartis"), by and through its

undersigned counsel, hereby brings the following Complaint for Injunctive and Other Relief

against Defendant Alisha Alaimo ("Alaimo") for: (1) misappropriation of trade secrets (under

state and federal law); (2) breach of contract; and (3) breach of fiduciary duties.

## NATURE OF THE CASE

After six weeks of concealing from Novartis, and misleading Novartis as to, the identity

of her new employer, Novartis has learned that Alaimo has accepted a position with a direct,

head-to-head competitor of Novartis, Biogen, Inc. – in violation of her Employment Agreement

and Employment Offer Letter (collectively, the "Agreement").  In that role, Alaimo will

necessarily use the confidential and trade secret information to which she was exposed during

her time at Novartis to unfairly compete with Novartis.  Alaimo's conduct constitutes

misappropriation of trade secrets, and violates the noncompetition obligation in the Agreement

that she signed while working for Novartis.  Alaimo also breached her fiduciary duties to

Novartis by continuing to attend and participate in high level executive committee meetings, in

which she was repeatedly and consistently exposed to Novartis' trade secret information, during

the period of time when she was actively interviewing with, and likely had already accepted – or

determined to accept – a job with, one of Novartis' head to head competitors, Biogen.

## PARTIES

1.      Plaintiff Novartis is a Delaware corporation with its principal place of business

located at One Health Plaza, East Hanover, New Jersey 07936.

2.      Upon information and belief, Defendant Alaimo is a resident of New Jersey, with

an address at 837 Jersey Avenue, Apartment 15B, Jersey City, New Jersey 07310.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

there is a federal question under the Defend Trade Secrets Act (DTSA) (18 U.S.C. § 1836, et

seq.) (which amended the Economic Espionage Act of 1996 (18 U.S.C. §§ 1831-39)).

4.      Section 9 (e) of the Agreement provides that New Jersey shall be the exclusive

jurisdiction for any disputes relating to the Agreement, stating:

> I agree that the state and federal courts located in New Jersey will
> have exclusive jurisdiction in any action, suit or proceeding based

on or arising out of this Agreement.

5.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and because Defendant is a resident of New Jersey.

## STATEMENT OF FACTS

### NOVARTIS' BUSINESS AND TRADE SECRETS

6.      Novartis provides innovative healthcare solutions in the U.S. that address the evolving needs of patients and societies.

7.      In the United States, the Novartis Group of Companies (including separate affiliated entities, such as the generics company, Sandoz Inc., and the surgical eye-care device company, Alcon Laboratories, Inc., among others) employs more than 22,000 people at 24 sites across the country with four main campuses:  East Hanover, New Jersey; Princeton, New Jersey; Fort Worth, Texas; and Cambridge, Massachusetts.

8.      The Pharmaceuticals division of Novartis is structured according to disease area (Cardiovascular, Neuroscience, Immunology and Dermatology, Respiratory, and Ophthalmics), each with its own Franchise Head.

9.      In order for them to grow and direct the company, Novartis provides its Franchise Heads with large amounts of confidential and trade secret information.  Such confidential and trade secret information includes, but is not limited to, product testing and specifications, strategic planning for keys drugs and brands (across franchises, and including drugs in the pipeline), strategic vision and direction of the franchises and organization as a whole, field force statistics, financing and marketing decisions, challenges faced by franchise's products in both

use and competition, and steps (and evaluation of those steps) Novartis has implemented and is considering implementing to address those challenges.

10.     Due to the extremely competitive nature of the pharmaceutical industry, Novartis takes extensive measures to protect its trade secrets and other confidential information by, among other things, requiring a keycard to access its physical sites and buildings; password-protecting and encrypting its computers, email accounts, and information systems (and requiring password changes every 90 days); limiting access (electronically and physically) to sensitive information to those employees whose positions warrant them having such access; and clearly communicating to employees that Novartis' confidential information is to be kept confidential.

11.     Novartis also requires, as a condition of employment and as a condition of access to Novartis' trade secrets and confidential information, that appropriate employees sign noncompetition, nonsolicitation, and confidentiality agreements.  The company also maintains a Confidentiality Policy, which applies to all employees of Novartis.

12.     Novartis takes other measures to protect its information as well.  For example, in its open floor working environments, Novartis has a strict clean desk policy and guidelines on securing its highly sensitive competitive and confidential information in locked file cabinets. Management regularly performs audits to ensure compliance with these policies.  Alaimo was subject to these requirements and responsible for their enforcement in her franchises.

### ALAIMO'S POSITION AT NOVARTIS

13.      In 2014, Ms. Alaimo was hired as the Vice President and U.S. Head of the Neuroscience Franchise ("U.S. Head of Neuro").  In that role, Alaimo was responsible for the entire operation of the U.S. Neuroscience franchise, focused heavily on drugs for Multiple Sclerosis ("MS") including, primarily, its oral therapy Gilenya®.

14.     Gilenya® was the first pill proven to treat relapsing forms of multiple sclerosis.  It currently competes with other MS therapies (in particular, Biogen's Tecfidera®, Tysabri®, Avonex®, Plegridy®, Zinbryta®, and Fampyra®).

15.     In 2016, Alaimo transitioned to the role of Vice President and U.S. Head of the Cardiovascular Franchise ("U.S. Head of Cardio").  In both of these positions, Alaimo was among the top 13 executives in the company's U.S. Pharmaceuticals division and reported directly to Novartis' U.S. President.

16.     Alaimo's compensation at the time of her departure included a base salary of $365,000, annual bonuses totaling $185,500, and the potential for up to $237,250 in restricted stock grants annually. Alaimo also received a substantial retention bonus when she was installed as US Head of Cardio.

17.     Alaimo's work for the Novartis Group of companies, which spans approximately 17 years, has always been on the business side (operations, sales, sales training, marketing, strategy, etc.).

18.     Alaimo has never worked in research and development for Novartis, nor is she a physician or other licensed professional.

### ALAIMO'S EMPLOYMENT AGREEMENT

19.     On September 23, 2014, in connection with her employment with Novartis, Alaimo signed the Agreement, which contains certain restrictive covenants and other post-employment obligations.

20.     Section E of the Agreement contains a noncompetition provision, which precludes Alaimo from, among other things, accepting employment with a company in "substantial

competition" with Novartis, for a term of six-months after her termination of employment with Novartis (the "Restricted Period").

21.     Section 6 of the Agreement addresses confidential information.  Alaimo is restricted under the terms of her Agreement from using or disclosing any confidential or trade secret information, except as required in the course of her duties for Novartis.

### ALAIMO'S ACCESS TO CONFIDENTIAL AND TRADE SECRET INFORMATION

22.     As U.S. Head of Neuro, Alaimo's knowledge of confidential and highly sensitive competitive information regarding the Neuroscience franchise was both broad and deep.

23.     When she transitioned to U.S. Head of Cardio last year, Alaimo remained current on much of her knowledge through her active participation (until she resigned in June) in many frequent executive level committee meetings, including the Novartis Pharma Executive Committee ("PEC") (which meets monthly), the Product Development Advisory Board ("PDAB") (which meets quarterly), the Commercial Excellence Team ("CET") (which meets monthly), and periodic business reviews and strategic planning meetings with higher level executives.

24.     Through these meetings, Alaimo received confidential information about corporate goals, strategic planning, culture and talent, financial performance and planning, competitive challenges, brand action plans, pipeline news and decision-making, field force allocation and other critical issues for the brands and franchises.

25.     Alaimo continued to receive the materials in advance of these executive meetings, and attended and participated in these meetings, until her resignation.

26.     The last of these meetings that she attended was the PEC meeting on May 17, 2017.

27.     Alaimo never recused herself from any of the above-referenced executive meetings in the time leading up to her resignation and departure from Novartis, despite the fact that all of the information discussed at these meetings is highly confidential and competitively sensitive, and that she was about to resign to commence work with a direct, head-to-head competitor.

### ALAIMO'S MISAPPROPRIATION OF TRADE SECRETS

28.     Alaimo resigned from Novartis on June 2, 2017.  Her last day in the office was June 9, 2017.

29.     In accordance with the notice provision contained in her Agreement, Alaimo remained a Novartis employee until August 2, 2017.

30.     In the time leading up to her last day in the office and during her notice period, Alaimo refused to disclose the identity of her new employer to Novartis.  Further, Alaimo falsely stated that she was not going to be working for a competitor and attempted to mislead Novartis as to the identity of the company, affirmatively implying that it was not Biogen.

31.     On July 24, 2017, Biogen released a press release, announcing that it had hired Alaimo as its new Vice President of US Therapeutic Operations.  In this position Alaimo will lead "sales and marketing, market access, patient services, and commercial operations and strategy."

32.     Biogen is a head to head competitor with Novartis in the neuroscience space.  In particular, Biogen's multiple sclerosis drugs (Tecfidera®, Tysabri®, Avonex®, Plegridy®, Zinbryta®, and Fampyra®) compete directly against Novartis' Gilenya® for market share.

33.     Alaimo cannot help but use in her new position with Biogen the trade secrets and confidential information to which she was repeatedly and extensively exposed at Novartis.

## COUNT I

### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE DEFEND TRADE SECRETS ACT

34.     Novartis hereby re-alleges and incorporates by reference the allegations of paragraphs 1 through 33 of the Complaint, inclusive, as though set forth in full.

35.     Much of Novartis' information to which Alaimo had access constitutes trade secrets protected by the DTSA.

36.     Novartis has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

37.     Novartis takes reasonable measures to maintain its trade secrets, including its customer contact, financial, and account information, including by password-protecting its computer systems on which it stores its confidential information, limiting access to the information to employees whose position warrants access to the information in order to perform their jobs, disseminating and enforcing policies addressing the treatment of its confidential information, requiring all Executives to sign an Employee Agreement, which contains restrictive covenants designed to protect Novartis's confidential information, and requiring employees to return all confidential information upon their termination.

38.     Novartis derives significant economic benefit from maintaining the secrecy and confidentiality of the above-described trade secrets.

39.     This information derives independent economic value by not being accessible, through proper means, to competitors like Biogen, which can profit from its use or disclosure. Further, this information is not readily available to the public or to Novartis' competitors.

40.     Alaimo's conduct as described above constitutes a misappropriation and misuse of Novartis's trade secrets and confidential information in violation of the DTSA because

Alaimo's position with Biogen threatens to use and/or disclose Novartis's trade secrets and confidential information without Novartis's consent and despite the fact that Alaimo's knowledge of the information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Alaimo owed Novartis both contractually and as an employee of Novartis.

41.    Alaimo's knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy.

42.    Alaimo will inevitably use Novartis's trade secret information in the course of her employment at Biogen.

43.    As a consequence of the foregoing, Novartis has suffered and will continue to suffer damages, loss of competitive position, and irreparable harm.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT

44.    Novartis repeats and incorporates by reference the allegations of paragraphs 1 through 33 of the Complaint, inclusive, as though set forth in full.

45.    The above-alleged facts constitute threatened misappropriation of trade secrets by Alaimo pursuant to the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-3(a), and applicable common law.

46.    Novartis' trade secrets are not generally known, and are not readily ascertainable by proper means.

47.    Novartis derives a significant economic and competitive advantage in the pharmaceutical industry from maintaining the secrecy and confidentiality of its trade secret information.

48.     Novartis' trade secret information is developed through Novartis' substantial investment of time, money, and effort and is subject to reasonable efforts by Novartis and its employees to maintain its secrecy and/or confidentiality.  As described in greater detail above, Novartis, among other things, maintains its trade secret information on password-protected computers, limits access to the information, mandates that employees follow its confidentiality policies, and requires employees to sign employee agreements.

49.     Alaimo's knowledge of the information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Alaimo owed Novartis both contractually and as an employee of Novartis.

50.     Alaimo cannot help but improperly use Novartis trade secret information for the unauthorized purpose of competing with Novartis and/or attempting to divert Novartis customers to her new employer.

## COUNT III

### BREACH OF CONTRACT

51.     Novartis realleges and incorporates by reference the allegations of paragraphs 1 through 33 of the Complaint, inclusive, as though set forth in full.

52.     Novartis and Alaimo entered into the Agreement on or around September 23, 2014.

53.     The Agreement is a valid and enforceable contract between Novartis and Alaimo, and is supported by adequate consideration.

54.     Alaimo breached her Agreement by the above-described conduct.  Specifically, pursuant to the terms of the Agreement, Alaimo agreed that, "for a period of six (6) months following [her] termination, [she would] not, within the continental United States, directly or

indirectly, own, manage, operate, control or finance; or participate in the ownership,

management, operation, control or financing of; or be connected as an officer, director,

employee, partner, consultant or in any other capacity with; any business with which [Novartis]

is in substantial competition and in which [Alaimo] could use or disclose any of [Novartis'] trade

secrets or confidential information that [she] utilized during employment with [Novartis]  or

which were otherwise disclosed to [her] as a result of that employment."

55.     Alaimo has accepted employment with Biogen, a company in substantial

competition with Novartis.  In her role with Biogen, Alaimo will necessarily use or disclose

Novartis' trade secrets or confidential information.

56.     Upon information and belief, Alaimo has further breached her Agreement with

Novartis by using and/or disclosing Novartis' trade secret and confidential information beyond

the course of her duties for Novartis.

57.     Alaimo continues to violate her contractual obligations, and will continue to

violate these obligations in the future.

58.     Novartis fully performed its material obligations under the Agreement.

59.     Novartis has clearly ascertainable rights and protectable interests in its

confidential information and its fair competitive position.

60.     The Agreement, including the confidentiality and nonsolicitation provisions

therein, is reasonably necessary and narrowly-tailored to protect Novartis's ascertainable rights

and legitimate business interests.

61.     The covenants in the Employee Agreement do not pose an undue hardship on

Alaimo.

62.     The covenants in the Employee Agreement do not violate any applicable public

interest.

63.     As a consequence of the foregoing, Novartis has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

64.     In her Agreement, Alaimo expressly agreed that "breach of any provision in this Agreement will result in irreparable injury to Novartis' . . . business, and that Novartis' remedy at law for damages in the event of such breach will be inadequate."

65.     Unless Alaimo is enjoined from the foregoing conduct, Novartis will be irreparably harmed by:

a.   Disclosure of Novartis' trade secret information, and other confidential information that is solely the property of Novartis; and

b.   Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable, but in no event less than $75,000 exclusive of interest and costs.

## COUNT IV

### BREACH OF FIDUCIARY DUTIES

66.     Novartis realleges and incorporates by reference the allegations of paragraphs 1 through 33 of the Complaint, inclusive, as though set forth in full.

67.     As a senior executive of Novartis, Alaimo owed fiduciary duties of loyalty to Novartis.

68.     Alaimo breached her duty of loyalty by acting contrary to Novartis' interests and by continuing to attend executive level meetings in which confidential and proprietary information was discussed with the knowledge that she was actively pursuing employment with

a competitor.

69.    Alaimo was unjustly enriched by her breach of fiduciary duties.

## PRAYER FOR RELIEF

For the reasons set forth above, Novartis respectfully requests relief as follows:

A.    Entry of a temporary restraining order and a preliminary injunction, pending

further order of this Court;

B.    Entry of a permanent injunction prohibiting Alaimo from using Novartis'

proprietary/confidential information and trade secrets;

C.    Entry of an award of damages to Novartis, including actual damages and any

profits Alaimo has achieved as a result of this misappropriation;

D.    Pre-judgment interest for any damages awarded;

E.    The costs of suit occurred herein;

F.    Novartis' attorneys' fees reasonably expended in this action; and

G.    Such other and further relief as the Court deems just and appropriate under the

circumstances.

Respectfully submitted,

/s/ James P. Flynn
James P. Flynn, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)

*Counsel for Novartis Pharmaceuticals Corporation*

*Of Counsel*:

Russell Beck (*pro hac vice* to be filed)
Stephen Riden (*pro hac vice* to be filed)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Tel (617) 500-8660
Fax (617) 500-8665

Dated: August 7, 2017


## CERTIFICATION UNDER L.CIV.R 11.2

This matter in controversy is not the subject of another action pending in any court, or any other pending arbitration or administrative hearing.


_____/s/James P. Flynn_____
James P. Flynn

DATED:  August 7, 2017