IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: _____ |
| v. | ) ) | |
| ALISHA ALAIMO, | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER
SEEKING AN ORDER TO SHOW CAUSE WITH TEMPORARY
RESTRAINTS AGAINST DEFENDANT ALISHA ALAIMO**

James P. Flynn, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 973-642-1900 (phone)
(973) 973-639-8931 (fax)

*Counsel for Novartis Pharmaceuticals
Corporation*

*Of Counsel*:

Russell Beck (*pro hac vice* to be filed)
Stephen Riden (*pro hac vice* to be filed)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Tel (617) 500-8660 (phone)
Fax (617) 500-8665 (fax)

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................1

FACTUAL BACKGROUND ...................................................................2

   A. Novartis' Business and Protection of its Confidential Information ...............2

   B. Ms. Alaimo Joins Novartis and Agrees to Restrictive Covenants as Part of
      Her Employment................................................................................4

   C. Ms. Alaimo's Employment at Novartis Gave Her Access to Confidential and
      Trade Secret Information....................................................................7

   D. Ms. Alaimo Terminates Her Employment With Novartis, Provides
      Misleading Information About Her Plans, and Accepts Employment With
      Biogen, In Violation of the Agreement ................................................11

   E. Novartis and Biogen are Direct Competitors ................................................12

   F. Forensic Analysis Reveals Suspicious Activity ...........................................13

ARGUMENT ........................................................................................14

  I.   Legal Standards For Granting A Temporary Injunction ..............................14

  II.  Novartis Will Likely Succeed On The Merits Of Its Claims ......................15

     A. Novartis Has A Strong Likelihood Of Success On Its Claim for Alaimo's
        Breach of Her Employment Agreement..................................................15

        1. The Parties' Agreement Serves Legitimate Business Interests, Is
           Reasonable in Duration And Scope, And Are Fully Enforceable
           Under New Jersey Law ..............................................................16

             a.  The Agreement is Necessary to Protect Novartis'
                Legitimate Business Interests..........................................16

             b.  There is No Undue Hardship on Alaimo Because the
                Scope of the Agreement is Limited and Reasonable ........23

    c. Enforcement of the Agreement Is Consonant With The Public Interest ................................................................... 26

   2. Ms. Alaimo Has Breached Her Agreement, Causing Damage To Novartis ............................................................................ 27

B. Novartis Has A Strong Likelihood Of Success On Its DTSA Claim ....... 29

III. Novartis Will Suffer Irreparable Harm For Which There Is No Adequate Remedy At Law If Ms. Alaimo Is Not Enjoined Immediately .................... 32

IV. Injunction Will Not Harm Others And Public Interest Supports Injunctive Relief ............................................................................................ 37

V. Request For Expedited Discovery ................................................. 39

CONCLUSION ....................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

### <u>State and Federal Decisions</u>

*A.T. Hudson & Co., Inc. v. Donovan*,
    216 N.J. Super. 426, 524 A.2d 412 (App.Div. 1987).....................................24

*Bausch & Lomb Inc. v. Smith*,
    630 F.Supp. 262 (W.D.N.Y.1986)..................................................................34

*Campbell Soup Co. v. Desatnick*,
    58 F. Supp. 2d 477 (D.N.J. 1999)..........................................17, 19, 23, 35, 39

*Cmty Hosp. Grp, Inc. v. More*,
    838 A.2d 472 (N.J. Super. Ct. App. Div. 2003),
    aff'd in part, rev'd in part (869 A.2d 884) (N.J. 2005) .................................24

*Cmty. Hosp. Grp., Inc. v. More*,
    869 A.2d 884 (N.J. 2005) .............................................................................16

*Coskey's Television & Radio Sales and Service, Inc. v. Foti*,
    602 A.2d 789 (N.J.Super.Ct.App.Div. 1992) ...............................................27

*Esquire Deposition Servs., LLC v. Boutot*,
    Civ. No. 09–1526 (JAG), 2009 WL 1812411 (D.N.J. June 22, 2009)..........24

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d. Cir. 1988) ........................................................................33

*Fres-co Sys. USA, Inc. v. Hawkins*,
    No. 16-3591, 2017 WL 2376568 (3d Cir. June 1, 2017) ........................29, 32

*Gucci Am., Inc. v. Daffy's, Inc.*,
    No.Civ.A.00–4463, 2000 WL 1720738 (D.N.J. Nov. 14, 2000) .................39

*HR Staffing Consultants LLC v. Butts*,
    627 F. App'x 168 (3d Cir. 2015).............................................................22, 23

*HR Staffing Consultants LLC v. Butts*,
    Civ. No. 2:15–3155, 2015 WL 3492609 (D.N.J. May 29, 2015)......27, 37, 38

*Ingersoll-Rand Co. v. Ciavatta*,
    542 A.2d 879 (N.J. 1988) ..........................................................17, 18, 19, 27

*Jackson Hewitt, Inc. v. Barnes*,
    Civil No. 10–cv–05108 (DMC)(JAD), 2011 U.S. Dist. LEXIS 4823
    (D.N.J. Jan. 18, 2011) ....................................................................................14

*Jackson Hewitt Inc. v. Cline*,
    No. CV 14-6931, 2015 WL 6687545 (D.N.J. Oct. 29, 2015) .....................37

*Karlin v. Weinberg*,
    390 A.2d 1161 (N.J. 1978) ...........................................................................16

*Kos Pharm., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) .........................................................................38

*Laidlaw, Inc. v. Student Transp. of Am., Inc.*,
    20 F. Supp. 2d 727 (D.N.J. 1998)................................................................34

*Manhattan Assocs., Inc. v. Ruderman*,
    No. Civ. 05-3928 (GEB),
    2005 WL 2290297 (D.N.J. Sept. 20, 2005)................................24, 34, 37, 39

*Murphy v. Implicito*,
    920 A.2d 678 (N.J. Super. Ct. App. Div. 2007) .....................................15, 16

*Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*,
    530 A.2d 31 (N.J. App. Div. 1987) ...................................................33, 36, 37

*Nat'l Reprographics, Inc. v. Strom*,
    621 F. Supp. 2d 204 (D.N.J. 2009)......................................20, 21, 22, 23, 33

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3d Cir. 1998) .........................................................................34

*Scholastic Funding Grp., LLC v. Kimble*,
    Civil Action No. 07-557 (JLL), 2007 WL 1231795
    (D.N.J. Apr. 24, 2007) ....................................................................24, 25

*Solari Indus., Inc. v. Malady*,
    55 N.J. 571 (1970) ....................................................................16

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001) ....................................................14

*Trico Equip., Inc. v. Manor*,
    *Civil No. 08–5561(RBK)*,
    *2009 WL 1687391 (D.N.J. June 15, 2009)*...........................24, 25, 26, 27, 34

*U.S. Food Serv., Inc. v. Raad*,
    No. BER-C-82-06, 2006 WL 1029653
    (N.J. Super. Chanc. Ct. Apr. 12, 2006) ....................................33

*Whitmyer Bros., Inc. v. Doyle*,
    58 N.J. 25, 274 A.2d. 577 (1971) ............................................16, 29

## Statutes, Rules, Regulations

18 U.S.C.A. § 1835 ....................................................................32

18 U.S.C.A. § 1836(b)(3)(A)(i) ................................................29

18 U.S.C.A. § 1839(3) ..............................................................30

18 U.S.C.A. § 1839(5) ..............................................................30

Plaintiff Novartis Pharmaceuticals Corporation ("Novartis"), pursuant to Federal Rule of Civil Procedure 65, submits this Memorandum of Law in support of its Emergency Motion for a Temporary Restraining Order and Order to Show Cause enjoining Defendant Alisha Alaimo from: (1) violating her contractual noncompetition and nonsolicitation obligations by working for a direct competitor of Novartis; and (2) disclosing any of Novartis' trade secrets or other confidential information to any third party.

## INTRODUCTION

Plaintiff seeks temporary and permanent injunctive relief in this matter to prevent Ms. Alaimo from unfairly competing against Novartis on behalf of its competitor Biogen Inc. ("Biogen") in violation of her employment agreement and from using Novartis' trade secrets and confidential information.

Ms. Alaimo is a former highly-compensated, high-level executive of Novartis and, in the past two years, was the Vice President and Head of two significant business units.  Ms. Alaimo recently resigned to work for direct competitor Biogen, leaving a trail of suspicious computer activity that includes wiping all data from two of her Novartis-issued devices, secretly inserting an unaccounted-for USB thumb drive into Novartis' laptop two days *after* she gave notice of her resignation, refusing to tell Novartis where she was going – claiming

falsely that it was not a competitor and attempting to mislead Novartis as to the identity.

In the absence of immediate injunctive relief, Novartis will be left to suffer irreparable harm as its trade secrets and confidential information will be compromised and made available to a competitor as a result of Defendant's unlawful acts and unfair competition.  Such injunctive relief is necessary to prevent immediate irreparable harm to Novartis.

## FACTUAL BACKGROUND[1]

### A. Novartis' Business and Protection of its Confidential Information

Novartis provides innovative healthcare solutions in the U.S. that address the evolving needs of patients and societies.  Declaration of Caryn Parlavecchio, ¶ 4. In the United States, the Novartis Group of Companies (including separate affiliated entities, such as the generics company, Sandoz Inc., and the surgical eye-care device company, Alcon Laboratories, Inc., among others) employs more than 22,000 people at 24 sites across the country with four main campuses:  East Hanover, New Jersey; Princeton, New Jersey; Fort Worth, Texas; and Cambridge, Massachusetts.  *Id.*

---

[1] The facts recited herein are summarized from the following papers simultaneously filed herewith: Declarations of Alexander Barnett, Caryn Parlavecchio, Lisa Deschamps, Thomas Losco, and Richard Reig.  These declarations are hereby incorporated into this Memorandum by reference.

The Pharmaceuticals division of Novartis is structured according to disease area (Cardiovascular, Neuroscience, Immunology and Dermatology, Respiratory, and Ophthalmics). *Id.,* ¶ 5. It has five commercial franchises across these disease areas that are responsible for marketing, sales, and strategic account management. *Id.* These franchises are bolstered by business support functions including: medical, market access, finance, legal, human resources, and ethics & compliance, among others. *Id.*

Due to the extremely competitive nature of the pharmaceutical industry, Novartis takes extensive measures to protect its information by, among other things, requiring a keycard to access its physical sites and buildings; password-protecting and encrypting its computers, email accounts, and information systems (and requiring password changes every 90 days); limiting access (electronically and physically) to sensitive information to those employees whose positions warrant them having such access; and clearly communicating to employees that Novartis' confidential information is to be kept confidential.[2] *Id.,* ¶ 13.

---

[2] Novartis takes other measures to protect its information as well. For example, in its open floor working environments, Novartis has a strict clean desk policy and guidelines on securing its highly sensitive competitive and confidential information in locked file cabinets. Management regularly performs audits to ensure compliance with these policies. Parlavecchio Dec., ¶ 15. Ms. Alaimo was subject to these requirements and responsible for their enforcement in her franchises. *Id.*

Novartis also requires, as a condition of employment and as a condition of access to Novartis' trade secrets and other highly sensitive competitive and confidential information, that appropriate employees sign noncompetition, nonsolicitation, and confidentiality agreements.  Novartis also maintains a Confidentiality Policy, which applies to all employees, a true and accurate copy of which is attached to the Parlavecchio Declaration as Exhibit C.  *Id.*, ¶ 14.

## B. Ms. Alaimo Joins Novartis and Agrees to Restrictive Covenants as Part of Her Employment

In 2014, Ms. Alaimo was hired as the Vice President and U.S. Head of the Neuroscience Franchise ("U.S. Head of Neuro").  Parlavecchio Dec., ¶ 6.  In that role, Ms. Alaimo was responsible for the entire operation of the U.S. Neuroscience franchise, focused heavily on drugs for Multiple Sclerosis ("MS") including, primarily, its oral therapy Gilenya®.  *Id.*  In 2016, Ms. Alaimo changed positions and became Vice President and U.S. Head of the Cardiovascular Franchise ("U.S. Head of Cardio").  *Id.*, ¶ 7.  In both of these positions, Alaimo reported directly to the company's U.S. President. *Id.*, ¶ 8.  In addition, Alaimo worked for Novartis in other positions, as well as for other Novartis Group companies in other countries (Novartis Pharmaceuticals UK Limited in the United Kingdom, and Novartis Pharma AG in Switzerland) before taking over as the U.S. Head of Neuro.  *Id.*, ¶ 10.  Ms. Alaimo's work for the Novartis Group of companies, which spans

approximately 17 years, has always been on the business side (operations, sales, sales training, marketing, strategy, etc.).  *Id.*, ¶ 10

Alaimo was among the top 13 executives in the company's U.S. Pharmaceuticals division, reporting directly to the U.S. President of Novartis.  *Id.*, ¶ 9.  Her compensation at the time of her departure included a base salary of $365,000, annual bonuses totaling $185,500, and the potential for up to $237,250 in restricted stock grants annually.  *Id.*

On September 23, 2014, in connection with her promotion to U.S. Head of Neuro, Ms. Alaimo signed both an Employment Offer Letter (the "Letter") and an Employment Agreement (the "Employment Agreement," and together, the "Agreement"), true and accurate copies of which are attached to the Parlavecchio Declaration as Exhibit D.  *Id.*, ¶ 16.  The Agreement contained nonsolicitation, noncompetition, and confidentiality provisions designed to protect Novartis' trade secrets and other confidential information to which Alaimo was extensively exposed.  *Id.*

Ms. Alaimo agreed to maintain the confidentiality of Novartis' information as follows:

> Except as required in the course of my duties for Novartis, I will not, without Novartis' prior written consent, disclose to anyone outside Novartis nor use in any way other than in Novartis' business as authorized by Novartis, any Confidential Information, or any information or material received in confidence from third parties for or on behalf of the Company.  I acknowledge that this obligation

continues throughout my employment with Novartis and after the termination of my employment with Novartis.  I further acknowledge that Confidential Information is unique, extraordinary in character and of great value to the Company.

Employment Agreement, ¶ 6(b), Parlavecchio Dec., Exhibit D.

Ms. Alaimo agreed that she would not work for a competitor of Novartis for

6 months following the end of her employment with Novartis:

> During the term of the Executive's employment with the Company and for a period of six (6) months following his or her termination, he or she shall not, within the continental United States, directly or indirectly, own, manage, operate, control or finance; or participate in the ownership, management, operation, control or financing of; or be connected as an officer, director, employee, partner, consultant or in any other capacity with; any business with which the Company is in substantial competition and in which the Executive could use or disclose any of the Company's trade secrets or confidential information that he or she utilized during employment with the Company or which were otherwise disclosed to him or her as a result of that employment.  Any post-employment limitation shall be determined by the activities of the Company as of the time of the termination.

Employment Letter, Appendix 1, ¶ E, Parlavecchio Dec., Exhibit D.

Ms. Alaimo agreed that, for a period of one year after the end of her

employment, she would not solicit Novartis' employees to work elsewhere:

> During my employment with Novartis and for one (1) year thereafter, I will not, directly or indirectly, solicit or encourage any person to leave his or her employment with the Company or assist in any way with the hiring of any Company employee by any other business.

Employment Agreement, ¶ 6(d), Parlavecchio Dec., Exhibit D.

6

Further, Ms. Alaimo agreed that Novartis is entitled to obtain equitable relief to enforce the Agreement as follows:

> In the event of the Executive's breach or threatened breach of his or her obligations to refrain from post-employment competition and non-solicitation, the Executive and the Company have agreed that Company's ordinarily available legal remedies would be inadequate to protect it.  As a result, the Company, without posting any bond, would be entitled to obtain equitable or other appropriate relief against this actual or threatened breach in the form of specific performance, temporary restraining order, a temporary or permanent injunction or any other remedy to stop the violation which may be obtainable from any court with jurisdiction to grant this relief.

Letter, Appendix 1, ¶ H, Parlavecchio Dec., Exhibit D.

### C. Ms. Alaimo's Employment at Novartis Gave Her Access to Confidential and Trade Secret Information

During Ms. Alaimo's tenure as U.S. Head of Neuro, she had complete access to all information and involvement in all areas regarding the franchise, including, among other therapies, its growth-driving MS drug, Gilenya®. Parlavecchio Dec., ¶ 16.  As U.S. Head of Neuro, Alaimo's knowledge of confidential and highly sensitive competitive information regarding the Neuroscience franchise was broad and deep.  *Id.*, ¶ 18.  These valuable and competitively-sensitive trade secrets and other confidential information included the following:

- product testing and specifications;
- strategic planning for the Neuroscience franchise's drugs and for the other Novartis franchises' products;
- all drugs in the pipeline (whether publicly disclosed or not);

- strategic vision and direction of the franchise as a whole and within the larger Novartis organization;
- field force statistics;
- financing and marketing decisions; and
- challenges faced by the franchise's products in both their use and in the competitive marketplace, as well as steps (and the evaluation of those steps) Novartis implemented and is considering implementing to address those challenges.

*Id.*, ¶ 17.

When Ms. Alaimo transitioned to U.S. Head of Cardio last year, her knowledge of the Neuroscience franchise remained fresh through her active participation (until she resigned in June) in many frequent executive level committee meetings, including the Novartis Pharma Executive Committee ("PEC") (which meets monthly), the Product Development Advisory Board ("PDAB") (which meets quarterly), the Commercial Excellence Team ("CET") (which meets monthly), and periodic business reviews and strategic planning meetings with higher level executives. *Id.*, ¶ 19.

The PEC consists of each franchise leader in the U.S., along with the heads of the other support functions, such as medical, market access, finance, legal, ethics & compliance, and human resources, among others. *Id.*, ¶ 20. On average, meetings were attended by approximately a dozen of Novartis' top executives from its Pharmaceuticals division, and presided over by the U.S. President of Novartis. *Id.*, ¶ 20. Alaimo attended PEC meetings from September 2014 until her departure. *Id.*, ¶ 20. At the monthly PEC meetings, attendees

8

discuss the strategic direction of Novartis' Pharmaceuticals division in the U.S., including corporate goals, strategic planning, and action plans for key brands. Members of the PEC are expected to (and do) actively participate in the discussions surrounding both their own brands and the brands of other PEC members.  *Id.*, ¶ 21.  In particular, MS treatments, especially Gilenya®, were regularly discussed at great length during the PEC meetings.  *Id.*, ¶ 22.  PEC members focused on strategies for effectively competing in the marketplace against other MS drugs, including the oral MS pill Tecfidera®, made by Novartis' most direct head-to-head competitor in the MS space, Biogen.  *Id.*, ¶ 22.  Novartis competes aggressively with Tecfidera® and members of the PEC, including Alaimo, regularly discussed how to increase market share of Gilenya® over Tecfidera®, how to overcome certain specific challenges associated therewith, pricing and contracting strategies, competitive intelligence, and other market strategies.  *Id.*, ¶ 22.  The information discussed during these meetings is highly confidential and proprietary to Novartis. *Id.*, ¶ 22.

Alaimo also participated in the PDAB, which are meetings attended by approximately 20 high level employees at which the global team and new product team come together to discuss early pipeline projects on new experimental therapies and make decisions about which products are worth investing in.  *Id.*, ¶ 23.  Discussions in the PDAB guide business strategy across franchises and

facilitate U.S. input into global pipeline decision-making.  *Id.*, ¶ 23.  At these
meetings, Ms. Alaimo was exposed to, and was expected to weigh in on,
confidential and highly sensitive, competitive information for all Novartis
experimental therapies, including new technologies in the MS and Spinal Muscular
Atrophy ("SMA") fields.  *Id.*, ¶ 23.

Ms. Alaimo was a member of the CET.  *Id.*, ¶ 24.  Approximately 10 - 15
high-level executives attended each CET meeting.  *Id.*, ¶ 24.  The CET is a subset
of Novartis' commercial leaders who discuss tactical matters for their teams
(including sales incentives, President's club, patient services quality, marketing
and sales competencies, etc.).  Declaration of Lisa Deschamps, ¶ 25.   The last
CET meeting that Ms. Alaimo attended occurred as recently as May 17, 2017 – the
same day as the last PEC meeting that she attended.  Deschamps Dec., ¶ 26.
Portions of the presentation at that meeting focused on Novartis' three market
leading drugs (Gilenya®, Cosentyx®, and Entresto®), including confidential
programs regarding those drugs.  Deschamps Dec., ¶ 26.

In addition to the PEC, PDAB, and CET meetings, Alaimo also participated
in periodic meetings with high level global executives.  Deschamps Dec., ¶¶ 28-30.
In the first half of 2017, Ms. Alaimo participated in at least three such meetings.
*Id.*  At each of these meetings, the focus was on three drugs: Gilenya®, Cosentyx®,
and Entresto®. *Id.*

In addition to the discussions at the meetings summarized above, members of those groups received information concerning the issues to be discussed in advance of the meeting.  Parlavecchio Dec., ¶ 25.  Ms. Alaimo never recused herself from any of the above referenced executive meetings in the time leading up to her resignation and departure from Novartis despite that all of the information discussed at these meetings is highly confidential and competitively sensitive. *Id.*, ¶ 28.  If Ms. Alaimo works for Biogen in her anticipated role, Novartis' information (including the information that Alaimo learned from her participation in each of the above-referenced meetings) will be in jeopardy and Novartis will be placed at a significant, unfair competitive disadvantage.  *Id.*, ¶ 29.

### D. Ms. Alaimo Terminates Her Employment With Novartis, Provides Misleading Information About Her Plans, and Accepts Employment With Biogen, In Violation of the Agreement

Ms. Alaimo gave notice of her resignation on Friday, June 2, 2017. Parlavecchio Dec., ¶ 30.  Novartis promptly and repeatedly reminded Ms. Alaimo of her obligations under the Agreement.  *Id.,* ¶ 32, 38, 41.  Ms. Alaimo, for her part, gave Novartis false assurances that her new employer was not in competition with Novartis.  *Id.,* ¶ 32.  Ms. Alaimo was asked multiple times where she would be working, but she refused to disclose the name of her new employer, even stating at one point that "You all keep assuming it's Biogen.  I never said it was Biogen." *Id.,* ¶¶ 39, 40.

Ms. Alaimo's last day in the office was June 9, 2017, and her last day as a Novartis employee was August 2, 2017. *Id.*, ¶ 37.   On July 24, while Ms. Alaimo was still employed by Novartis, Biogen issued a press release announcing that she would be joining Biogen as "Senior Vice President of US Therapeutic Operations, where she will lead sales and marketing, market access, patient services and commercial operations and strategy." Parlavecchio Declaration, Exhibit G.

### E. <u>Novartis and Biogen are Direct Competitors</u>

Biogen is one of Novartis' biggest competitors in neuroscience, particularly in the multiple sclerosis (MS) and spinal muscular atrophy (SMA) markets.[3] Deschamps Dec., ¶ 36; Parlavecchio Dec., ¶ 22.   During Ms. Alaimo's tenure as U.S. Head of Neuro, the leading drug in the neuroscience portfolio was Gilenya®, the first oral MS treatment.   Deschamps Dec., ¶ 5.   Novartis' Gilenya® and Biogen's Tecfidera® are alternative treatments – administered the same way, for the same disease, at the same stages of the disease. *Id.*, ¶ 7.   The products directly compete, going head-to-head in the highly competitive market. *Id.*, ¶ 7.

In an April 2017 PDAB meeting, which Ms. Alaimo was invited to and received materials for, a presentation was made about Novartis's pipeline drug

---

[3] Novartis' Long Term Incentive Plan ("LTIP") (a copy of which is attached to the Parlavecchio Declaration as Exhibit A), was accessible to all Novartis executives at Ms. Alaimo's level, including Ms. Alaimo, calculated bonus awards based in part on Novartis' performance compared to a group of its competitors, which specifically includes Biogen.  Parlavecchio Dec., ¶ 9.

LMI070, which is for the treatment of SMA.  Deschamps Dec., ¶ 24.  Ms. Alaimo

received a copy of the detailed presentation outlining the market for LMI070, as

well as the development plan, financials, and risks associated with the drug.

LMI070 will compete directly with Biogen's Spinraza®.

Based on Biogen's press release, it appears that Ms. Alaimo will be working

directly to ensure successful commercialization of Biogen's portfolio of

neuroscience therapies, including Spinraza® and Tecfidera®, among others.

Deschamps Dec., ¶ 36.  Both of these products, and other Biogen drugs, are

directly in competition to Novartis' MS current and pipeline drugs.  *Id.*

### F.  <u>Forensic Analysis Reveals Suspicious Activity</u>

On Ms. Alaimo's last day in the office, she returned her Novartis-issued

laptop, iPad, and iPhone.  Parlavecchio Dec., ¶ 41.  Before Ms. Alaimo returned

the Novartis-issued iPad and iPhone, both devices were wiped clean of *all*

information.  Declaration of Thomas Losco, ¶¶ 4, 5.

Ms. Alaimo did not return any USB "thumb drives," external hard drives, or

other electronic storage devices.  Parlavecchio Dec., ¶ 41.  Ms. Alaimo's failure to

return any such external storage devices is significant, because forensic analysis

shows that at least four USB storage devices were connected to her Novartis

computer between March 12, 2017 and June 9, 2017 (Ms. Alaimo's last day in the

Novartis office).  Declaration of Alexander Barnett, ¶ 15.  Significantly, Ms.

Alaimo evidently plugged in one USB device on June 4, 2017 – two days *after* she had resigned from her position at Novartis.  *Id.*, ¶ 16.  Further, preliminary forensics analysis shows evidence that Ms. Alaimo copied certain potentially relevant files to USB devices.  *Id.*, ¶¶ 20-22.  Although further forensic analysis will be required to know for certainty what files Ms. Alaimo might have taken (including analysis of the electronic storage devices that remain in her possession), the limited information gathered to date shows that Ms. Alaimo may have copied and/or may currently possess Novartis' documents.  *Id.*, ¶¶ 24, 25.

## **ARGUMENT**

## I.    **LEGAL STANDARDS FOR GRANTING A TEMPORARY INJUNCTION**

Injunctive relief is warranted where, as here, the moving party establishes: (a) the movant has shown a reasonable probability of success on the merits; (b) the movant will be irreparably injured by denial of the relief; (c) the granting of the relief will result in relatively greater protection for the moving party than harm for the non-moving party; and (d) the granting of the preliminary relief will be in the public interest.  *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001); *Jackson Hewitt, Inc. v. Barnes*, 2011 U.S. Dist. LEXIS 4823, at *2 (D.N.J. Jan. 18, 2011).

As demonstrated below, Novartis has amply satisfied this standard.  Novartis has a strong likelihood of success on the merits of its claims, and, absent an immediate TRO, it will suffer immediate irreparable harm if Ms. Alaimo begins

14

working for Biogen in breach of her noncompete agreement, and if its trade secrets and other confidential information are not protected. On the other hand, Alaimo cannot show that the noncompetition and confidentiality provisions of her Agreement are unenforceable or unreasonable. Indeed, the relative balance of hardships undoubtedly tips in favor of granting Novartis' application for injunctive relief.

New Jersey courts routinely grant injunctions barring employees from violating their noncompete agreements and from using their former employers' trade secrets and confidential information. Further, Novartis is entitled to injunctive relief for the independent reason that, as proscribed by the Federal Defend Trade Secrets Act ("DTSA"), Ms. Alaimo's work for Biogen threatens the use or disclosure of Novartis' trade secrets and confidential information.

## II.   NOVARTIS WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.   Novartis Has A Strong Likelihood Of Success On Its Claim For Alaimo's Breach of Her Employment Agreement

As demonstrated below, the Agreement is valid and enforceable, and Alaimo has breached it.

*Legal Standard*

A cause of action for breach of contract has three elements: (1) a valid contract, (2) a material breach, and (3) damages. *See, e.g., Murphy v. Implicito*,

920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007). As discussed below, the Agreement contains valid and binding restrictive covenants; Ms. Alaimo acceptance of employment with Biogen has violated the express terms of the restrictive covenants; and Novartis will be immediately and irreparably harmed by Ms. Alaimo's unlawful conduct.

### 1. The Parties' Agreement Serves Legitimate Business Interests, Is Reasonable in Duration And Scope, And Is Fully Enforceable Under New Jersey Law

Under New Jersey Law, a restrictive covenant between an employer and an employee is enforceable to the extent that "it is reasonable under all of the circumstances of [the] particular case." *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 32 (1971) (citing *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576 (1970)). A restrictive covenant will generally be found to be reasonable if it (1) protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee, and (3) is not injurious to the public. *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (citing *Karlin v. Weinberg*, 390 A.2d 1161, 1166 (N.J. 1978)). Here, the restrictive covenant meets these requirements and, given that Ms. Alaimo is planning to work for Novartis' direct competitor, should be enforced.

### a. The Agreement is Necessary to Protect Novartis' Legitimate Business Interests

16

New Jersey courts considering noncompete covenants "'recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations.'" *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (quoting *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (N.J. 1988)).  They also acknowledge that employers have other legitimate interests, such as preventing the use and disclosure of "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment." *Ingersoll*, 542 A.2d at 894.  Further, New Jersey courts recognize the "business reality that modern day employers are in need of some protection against the use or disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enterprise." *Id.*  Thus, "[t]hrough contract, an employer may protect its legitimate interest in preventing employees from using the thoughts and ideas generated by the employee and fellow workers while being paid by and using the resources of the employer to invent [or manufacture, sell, promote, etc.] a product that directly competes with the employer's product." *Id.* at 893.

17

New Jersey courts also appreciate the "competing public interests" in "safeguarding fair commercial practices and in protecting employers from theft of piracy of trade secrets, confidential information or . . . knowledge and technique in which the employer may be said to have a proprietary interest" and in "fostering creativity and invention and in encouraging technological improvement and design enhancement of all goods in the marketplace." *Id.* at 894. "In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive covenant." *Id.* at 892.

The purpose of the restrictive covenants here (*i.e.*, the noncompete covenant and the confidentiality restrictions contained in the Agreement) are to protect, *inter alia*, Novartis' trade secrets and confidential information and competitively sensitive plans and strategies – not to stifle competition. The highly confidential information Alaimo learned, while working on Novartis' behalf, is exactly the type of information the *Ingersoll* court deemed entitled to protection – the employee's "thoughts and ideas generated by the employee . . . while being paid by and using the resources of the employer." *Ingersoll*, 542 A.2d at 894.

Ms. Alaimo was given comprehensive access to Novartis' confidential information in connection with, and in support of, her leadership roles at the company, starting with her tenure as US Head of Neuro, and later as US Head of Cardio. Parlavecchio Dec., ¶ 16-18. This information, to which Ms. Alaimo was

exposed solely by virtue of her employment at Novartis, was "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished" by Novartis. *Ingersoll*, 542 A.2d at 894. Novartis has a legitimate interest in the protection of such information from disclosure to Biogen, its direct competitor.

One of the ways that Ms. Alaimo learned about Novartis' confidential and highly sensitive competitive information was through her participation in myriad high-level meetings. Parlavecchio Dec., ¶¶ 19-24; Deschamps Dec., ¶¶ 25-30. Through such meetings, Ms. Alaimo was exposed to the inner workings of Novartis' business and products, which is not generally known throughout the industry or to the public, and to its marketing plans, and the overall goals and plans of Novartis. *Id*. It is well established that all such confidential and competitively sensitive matters that Ms. Alaimo learned about during her tenure at Novartis are entitled to protection under New Jersey law. In *Campbell Soup*, 58 F. Supp. 2d at 490-91, for example, the court found a noncompete agreement enforceable where the former employee was exposed to, *inter alia*, information discussed at team meetings that was more detailed than that which was disclosed in publicly available sources, including business strategies, advertising, brand positioning, pricing in the marketplace, plans for resource allocation among product lines, and its perceptions of the brands' strengths and vulnerabilities.

19

Similarly, in *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 226–27 (D.N.J. 2009), the Court granted injunctive relief to an employer where the "knowledge and information [the employer sought] to protect through the Agreement [went] beyond the mere identity of customers or general skills learned in the trade" but rather sought "to protect [the employee's] knowledge of [the employer's] marketing plans, sales projections, production strategies, customer buying habits, and internal methods to bring profitability to the company."  In *Nat'l Reprographics*, the departing employee attended at least six so-called Strategic Business Planning Committee meetings for three years prior to his departure.  *Id.*, at 213.  Such meetings involved "discussions that touch[ed] on all core aspects of the business," (*id.*, at 209); copies of agendas and planning documents were delivered to each meeting participant (*id.*, at 209-10); and managers presented "confidential presentations and distribute[d] written reports . . . regarding, *inter alia*, their region's overall business issues and strategies, and specific strategies for pricing, customer information, future sales initiatives, and marketing" (*id.*, at 210).  The former employee's attendance at the company's Strategic Business Planning Committee meetings was integral to the court's analysis, as discussed here:

> When [the employee] joined the [employer], he came into a key position that of necessity would expose him to sensitive [company] information.  [He] was privy to high-level confidential discussions of such matters as [company's] strategic planning, financial performance, specific customers, products, services, customer proposals and approaches, revenue trends, marketing plans, and the

20

> overall goals and plans of [the company].  Much of the information
> discussed at the . . . meetings was more detailed information than that
> which is disclosed to customers, competitors, or any other publicly
> available source, and [the employee] understood that this information
> was confidential and not to be disclosed outside of [the company].
> [The employee] also had access to [the company's] pricing models
> and strategies, including concepts for deriving additional revenues
> from customers and the "various and sundry ways" to price,
> competitive strategies of [the company] not publicly known.

Id., at 226-27.

The *Nat'l Reprographics* defendant's attendance of at least six Strategic

Business Planning Committee meetings is analogous to Ms. Alaimo's routine

attendance of high-level planning and strategy meetings, like the PEC, PDAB, and

CET meetings, in that both sets of meetings addressed many of the same types of

wide-ranging, enterprise-wide subjects relating to confidential matters concerning

corporate operations, planning, and strategy.  The difference here is that Ms.

Alaimo's attendance at such high-level meetings was more frequent – indeed, she

attended or received information for five such meetings during just the *last month*

(May 2017) before she announced her resignation from Novartis – and,

accordingly, her exposure to Novartis' trade secrets and confidential information

was far greater than the circumstances present in *Nat'l Reprographics*.  Just as Ms.

Alaimo has attempted to minimize involvement in Novartis' high level meetings in

response to Novartis' post-departure correspondence, the defendant in *Nat'l*

*Reprographics* sought "to minimize his duties in terms of exposure to strategic

21

planning information, and to trivialize the competitive importance of information that he received in the course of his duties." 621 F. Supp. 2d at 212. However, notwithstanding the defendant's efforts in that regard, the court in *Nat'l Reprographics* ruled that the evidence showed that the former employee "was exposed to a considerable amount of highly sensitive competitive information that is entitled to protection under New Jersey law," and granted the plaintiff's application for a preliminary injunction. *Nat'l Reprographics*, 621 F. Supp. 2d at 212–13, 230.

The Third Circuit's ruling in *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172 (3d Cir. 2015), is also instructive in analyzing Novartis' legitimate business interest in enforcing the restrictive covenants contained in the Agreement. In that case, the court stated that the plaintiff "has a legitimate interest in preventing the disclosure of confidential information" and upheld enforcement of the employer's noncompete agreement for the purpose of protecting the plaintiff's "interest in safeguarding confidential information." *Id.* The court's conclusion was based on the fact that the departing employee "was privy to confidential information about" the plaintiff's strategic business initiatives and, notwithstanding "[t]he fact that these plans were in an early stage of development," disclosure of the confidential information would still harm the plaintiff because the employee "would be in a position to inform [his new employer] of [plaintiff's] plans and

22

undermine these plans for [the new employer's] benefit." *Id.* (internal quotations and ellipses omitted).

Like the defendants in and *HR Staffing, Nat'l Reprographics,* and *Campbell Soup*, Alaimo was privy to a broad and sweeping range of Novartis' trade secrets and confidential information across myriad segments of the company, so the restrictive covenants in the Agreement are necessary to protect Novartis' legitimate business interests in preventing Alaimo from using this information to its detriment and for the benefit its direct competitor, Biogen.  *See HR Staffing Consultants LLC*, 627 F. App'x at 172; *Nat'l Reprographics*, 621 F. Supp. 2d at 226-27; *Campbell Soup*, 58 F. Supp. 2d at 490-91.

> b.    There is No Undue Hardship on Alaimo Because the Scope of the Agreement is Limited and Reasonable

"To minimize the hardship imposed on the employee, the geographic, temporal and subject-matter restrictions of an otherwise enforceable agreement not to compete will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests." *Campbell Soup Co.*, 58 F. Supp. 2d at 489.  Here, the Agreement between Novartis and Alaimo does not create an undue hardship on Alaimo, because it is reasonable as to time and place, and is no greater than necessary to protect Novartis' legitimate interest in safeguarding its trade secrets and confidential information.

First, the post-employment noncompete restriction is limited to a period of six months.  Agreement, ¶ E.  Generally, restrictive periods of this length and longer are held to be reasonable under New Jersey law.  *See Cmty Hosp. Grp, Inc. v. More*, 838 A.2d 472, 484-85 (N.J. Super. Ct. App. Div. 2003), *aff'd in part, rev'd in part* (869 A.2d 884) (N.J. 2005) (collecting cases and ruling that a two-year period of restriction has generally been upheld as reasonable by New Jersey courts); *Esquire Deposition Servs., LLC v. Boutot*, No. CIV.A. 09-1526, 2009 WL 1812411, at *6 (D.N.J. June 22, 2009) (enforcing a 6-month noncompete period); *Trico Equip., Inc. v. Manor*, No. CIV.08-5561, 2009 WL 1687391, at *9 (D.N.J. June 15, 2009) (enforcing a one-year noncompete restriction); *Scholastic Funding Grp., LLC v. Kimble*, No. CIV A 07-557, 2007 WL 1231795, at *5 (D.N.J. Apr. 24, 2007) (finding a one-year noncompete restriction reasonable); *Manhattan Assocs., Inc. v. Ruderman*, No. CIV. 05-3928, 2005 WL 2290297, at *4 (D.N.J. Sept. 20, 2005) (finding six-month noncompete restriction reasonable); *A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426 (App.Div. 1987) (enforcing two-year restriction).

Second, Alaimo's post-employment non-compete restriction is limited to the continental United States.  Agreement, ¶ E.  Given the worldwide reach of Novartis' business (including that of its affiliates outside the U.S.), and the business of its competitors like Biogen, the geographic limitation contained in the

Agreement is reasonable.  In *Scholastic Funding Grp., LLC*, 2007 WL 1231795, at

*5, the subject noncompete agreement contained no geographic limitation

whatsoever.  Nevertheless, the court ruled that the noncompete agreement was

enforceable, given that "the telemarketing industry is broad-ranging in its scope by

the nature of its business (placing nationwide telephone calls), the geographic

scope of the covenant, or lack thereof, is likely a reasonable restriction."  *Id.*

Further, the geographic scope is reasonable in light of the fact that Ms.

Alaimo resigned from her position at Novartis (as opposed to being terminated by

Novartis).  In this regard, the reasoning in *Trico Equip., Inc.,* is apt:

> In considering whether the geographic scope of a non-compete
> agreement imposes an undue hardship, a court should consider "the
> likelihood of the employee finding work in his field elsewhere" and
> whether the employee ended the employment relationship, thus
> bringing the hardship on himself.  *Karlin v. Weinberg*, 77 N.J. 408,
> 390 A.2d 1161, 1169 (N.J.1978).  A showing of personal hardship
> alone is insufficient to establish undue hardship.  *Id.*  There does not
> seem to be any New Jersey case which imposed a per se limit on the
> geographic scope that a covenant not to compete may cover, and some
> courts have enforced non-compete clauses with wide geographic
> scopes.

2009 WL 1687391, at *7.

Finally, the noncompete provision contained in the Agreement does not

impose any undue hardship on Ms. Alaimo due to its narrowly-tailored scope,

which boils down to a short-term (6 month) restriction limited to Novartis'

competitors, and – more specifically – positions with those competitors where she

could use or disclose Novartis' trade secrets or confidential information.  Further,
the noncompete covenant, by its terms, shall be "determined by the activities of
[Novartis] as of the time of the termination."  Agreement, ¶ E.  Prior to the
expiration of her noncompete covenant on February 2, 2018, Ms. Alaimo is not
restrained from working for a company that is not "in substantial competition"
with Novartis.

For these reasons, the restrictive covenants are not unreasonably restrictive
and do not impose an undue burden on Ms. Alaimo – who is planning to work at a
direct, head-to-head competitor in a role that directly threatens Novartis' trade
secrets and other confidential information.

c.   Enforcement of the Agreement Is Consonant With The Public Interest

Given that New Jersey recognizes and enforces restrictive covenants and
that there is nothing unusual in this case, the public policy of permitting a company
to protect itself from unfair competition supports the enforcement of the
Agreement, and there is no conceivable injury to the public from enforcing the
Agreement.  According to *Trico Equip., Inc.,* although the public interest test is
important in cases that affect the 'public's "'access to the advice of professionals
licensed by the state,'" in cases (like this one) that do not involve licensed
professionals, "courts consider the demand for services offered by the employee
and the likelihood that those services can be provided by others working in the

26

area." 2009 WL 1687391, at *8, quoting *Coskey's Television & Radio Sales and Service, Inc. v. Foti*, 602 A.2d 789, 793 (N.J.Super.Ct.App.Div. 1992). Here, Ms. Alaimo is not a licensed professional and she is far from the only person in the pharmaceutical industry who is qualified to lead a business unit at Biogen. Parlavecchio Dec., ¶ 11.

Further, the public has an interest "in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and techniques in which the employer may be said to have a proprietary interest." *Ingersoll*, 542 A.2d at 894. The public also "has an interest in upholding reasonable, bargained-for provisions of contracts." *HR Staffing Consultants LLC v. Butts,* Civ. No. 2:15–3155, 2015 WL 3492609, at *13–14 (D.N.J. May 29, 2015). Accordingly, not only will there be no injury to the public interest by the enforcement of the restrictive covenants at issue, the public interest will be served by protection of Novartis' trade secrets and confidential information, and by the enforcement of its Agreement.

## 2.     Ms. Alaimo Has Breached Her Agreement, Causing Damage To Novartis

Ms. Alaimo breached her obligations under the Agreement when she accepted employment with Biogen, a direct competitor of Novartis, in a position that overlaps with her prior position at Novartis and that places Novartis' trade

secrets and other confidential information directly at risk.  This is a clear violation

of Ms. Alaimo's post-employment noncompete covenant.  Agreement, ¶ E.

In addition, based on the limited evidence that Novartis has been able to

gather at this point, forensic analysis of Ms. Alaimo's Novartis computer shows

that she attached multiple external electronic storage devices to the computer.

Barnett Dec., ¶¶ 15-22.  Significantly, forensic analysis reveals that Ms. Alaimo

attached at least one external electronic storage device to her Novartis computer

two days *after* she resigned and appears to have copied her Outlook mail file from

Novartis.  *Id.*, ¶¶ 16, 22.  Ms. Alaimo has concealed and obliterated some of her

computer activity, because she failed to turn over any electronic storage devices

that were attached to the Novartis laptop and, disconcertingly, she evidently wiped

all of the data from her Novartis-issued iPhone and iPad.  Losco Dec., ¶¶ 4, 5;

Parlavecchio Dec., ¶ 41.  Novartis expects to learn more about Ms. Alaimo's

computer activity through discovery, but any misappropriation of Novartis'

information would be a direct breach of the Agreement.  Employee Agreement, ¶¶

6, 8.

Simply put, whether Ms. Alaimo's agreement to work for Biogen is

considered separately, or is coupled with the immediate threat of disclosure of

Novartis' trade secrets and confidential information, Ms. Alaimo is unfairly

competing with Novartis in breach of the noncompete covenant in her Agreement.

*See Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971) (employer has "a patently legitimate interest in protecting his trade secrets as well as his confidential business information"). As discussed in Section III below, if Ms. Alaimo is allowed to continue to violate the restrictive covenants of her Agreement, Novartis will suffer irreparable harm that goes beyond just monetary loss, and will be difficult to quantify. For these reasons, Novartis has shown a strong likelihood of success on the merits of its breach of contract claim.

**B.     Novartis Has A Strong Likelihood Of Success On Its DTSA Claim**

Novartis is likely to succeed on its claim for misappropriation of trade secrets pursuant to the DTSA because Ms. Alaimo had extensive access to Novartis' trade secrets and confidential information, and she is planning to immediately start working for Biogen, where there is an imminent threat that she will use or disclose such information. Under the DTSA, "misappropriation of trade secrets need not have already occurred to warrant injunctive relief; threatened misappropriation is sufficient." *Fres-co Sys. USA, Inc. v. Hawkins*, No. 16-359, 2017 WL 2376568, at *3 (3d Cir. June 1, 2017), citing 18 U.S.C. § 1836(b)(3)(A)(i) (a court may grant an injunction "to prevent any actual or threatened misappropriation"). Accordingly, given that this Court can enjoin actual or threatened misappropriation of trade secrets, Novartis need not wait until the actual use or disclosure of a trade secret to move for injunctive relief.

A "trade secret" is defined by DTSA as follows:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C.A. § 1839(3).

According to this definition, Novartis' confidential information discussed herein constitutes protectable trade secrets under federal law.

The DTSA defines "misappropriation" as:

disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret []derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

18 U.S.C.A. § 1839(5).

It cannot be credibly disputed that Ms. Alaimo has extensive knowledge of Novartis's trade secrets (in particular, trade secrets pertaining to Novartis'

Neuroscience franchise), and that – as expressly stated in her Agreement and as an implied consequence of her employment with Novartis – she acquired knowledge of such trade secrets "under circumstances giving rise to a duty to maintain the secrecy" of such information.  Moreover, based on the forensic evidence adduced at this early stage, Novartis has grave concerns about Ms. Alaimo's access to, and handling of, its information, given reports showing, *inter alia*, that she wiped all information off of two of her Novartis-issued electronic devices, and that she attached multiple external electronic storage devices to her Novartis laptop, including at least one external electronic storage device that was attached two days *after* she resigned.  Indeed, she also appears to have taken a copy of her Novartis email, all while actively concealing where she would be working.

As described in the Factual Background section above and the declarations filed herewith, Novartis' trade secret information is kept confidential and has been developed over a long period at great expense to Novartis.  As explained above, Novartis instituted effective measures to safeguard the information.  These steps include maintaining its trade-secret data on password-protected computers, providing access to such information only to those employees whose jobs require access to the data, and maintaining confidentiality policies, educating its employees on the policy, and requiring employees, including Ms. Alaimo, to sign Employee Agreements in which each employee agrees not to use or disclose

31

Novartis' confidential information outside of Novartis.  Further, Novartis does not provide its trade-secret data to competitors, and Novartis employees are not permitted to take with them, use, or disclose any trade secrets when they leave.

Despite the steps Novartis has taken to keep its information confidential, if Ms. Alaimo begins working for Biogen in her anticipated role, the secrecy of Novartis' information will be immediately jeopardized, thereby placing Novartis at a significant, unfair competitive disadvantage.  Accordingly, in light of this immediate threat, Novartis has demonstrated a likelihood of success on its claim for misappropriation of trade secrets under the DTSA.  *See Fres-co Sys. USA, Inc.*, 2017 WL 2376568, at *3.  The DTSA provides that, in connection with enforcement of a DTSA claim "the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of . . . Civil Procedure, the Federal Rules of Evidence, and all other applicable laws."  18 U.S.C.A. § 1835 ("Orders to preserve confidentiality").  Accordingly, Novartis is entitled to entry of an order to preserve the confidentiality of its information.

## III.   NOVARTIS WILL SUFFER IRREPARABLE HARM FOR WHICH THERE IS NO ADEQUATE REMEDY AT LAW IF MS. ALAIMO IS NOT ENJOINED IMMEDIATELY

Novartis is facing imminent risk of irreparable harm to its business due to the wrongful conduct of Ms. Alaimo in (a) violating her restrictive covenants, and

(b) actually or imminently exploiting Novartis' confidential information in competition with Novartis.

The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that it will experience harm that cannot be adequately compensated after the fact by monetary damages. *See Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-103 (3d. Cir. 1988). It is generally accepted under New Jersey law that improper use of trade secrets constitutes irreparable harm. *See U.S. Food Serv., Inc. v. Raad*, No. BER-C-82-06, 2006 WL 1029653, *7 (N.J. Super. Ct. Ch. Div. Apr. 12, 2006). Courts in this district routinely find that the sort of intangible which is being impaired here, *i.e.* the threatened disclosure of trade secrets and confidential information, is not economic loss that can be fully compensated by a damage award and can only be prevented by injunctive relief. *See Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 158 (App. Div. 1987) (finding inference of a substantial threat of irreparable harm where employee knew former employer's trade secrets, reasoning that "[d]amages will not be an adequate remedy when the competitor has obtained secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss."); *Nat'l Reprographics*, 621 F. Supp. 2d at 229-230 (finding irreparable harm to former employer would result where defendant had access to former employer's business strategies that defendant

33

would inevitably use for the benefit of his new employer, who was a direct competitor of plaintiff); *Trico Equip.*, 2009 WL 1687391, at *9, (finding plaintiff proved it would suffer serious irreparable injury by virtue of the disclosure of its confidential and customer information to a direct competitor by former employee who learned such information while working for plaintiff).

According to *Manhattan Assocs.*, "[i]n the context of non-competition agreements, irreparable injury may be shown if the former employee may 'avail himself of sensitive product strategies both as to development and marketing,' which may be of extreme value to the competitor."  2005 WL 2290297, at *6, quoting *Bausch & Lomb Inc. v. Smith*, 630 F.Supp. 262, 265 (W.D.N.Y.1986). Additionally, the loss of market opportunities and goodwill constitutes irreparable harm.  *See, e.g.*, *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm.").

Here, there is imminent risk that Novartis will suffer irreparable harm caused by Ms. Alaimo unless a temporary injunction is issued.  In particular, there

34

is a substantial likelihood of the use and disclosure of Novartis' trade secrets and

confidential information, which will cause substantial and irreparable harm to

Novartis.  Ms. Alaimo has already shown deliberate willingness to mislead others

at Novartis about her intention to work for Biogen (Parlavecchio Dec., ¶¶ 32, 39,

40), and, thus, there is no credibility to any assurances that she might provide

concerning her intention to preserve the confidentiality of Novartis' information if

she goes to work for Biogen during the restrictive period.  *See Campbell Soup Co.*,

58 F. Supp. 2d at 488 (noting that "the evidence of [individual defendant's] lack of

candor . . . disinclines this court away from seeking to equitably cobble together

some sort of duties that [individual defendant] might perform at [the new

employer] while scrupulously adhering to his duties under the non-compete

clause.").

Novartis expends significant resources on the development of confidential

information and trade secrets concerning, *inter alia*, product testing and

specifications, strategic planning for the neuroscience franchise's drugs and for the

other Novartis franchises' products, drugs in Novartis' pipeline (whether publicly

disclosed or not), strategic plans for the pipeline drugs, the strategic vision and

direction of the franchise as a whole and within the larger Novartis organization,

and field force statistics and decisions.  Parlavechhio Dec., ¶ 17.  Ms. Alaimo has

extensive knowledge of the foregoing confidential and highly sensitive competitive

information, and she is also fully-informed about challenges faced by the

neuroscience franchise's products in both their use and in the marketplace, to steps

(and the evaluation of those steps) Novartis implemented and is considering

implementing to address those challenges.  Parlavechhio Dec., ¶ 17, 18.  Much of

this information is extremely competitively-sensitive and valuable, and provides

Novartis with a significant competitive advantage.  Parlavechhio Dec., ¶ 17. Of

course, the prerequisite for Novartis' willingness to share its confidential and trade

secret information with Ms. Alaimo was her agreement to abide by the restrictive

covenant obligations contained in her Agreement, including the covenants not to

disclose such information to third parties or work for any of Novartis' competitors

for a short (6-month) period following the termination of her employment.

If Ms. Alaimo is permitted to immediately start working for Biogen – mere

days after her last day of formal employment with Novartis – it is inevitable that

she will use or disclose Novartis' trade secrets and confidential information, which

will cause incalculable harm to Novartis' competitive advantage in the

marketplace.  New Jersey courts enforce restrictive covenants to prevent, among

other things, precisely this type of inevitable disclosure of confidential information

and trade secrets.  For example, in *Nat'l Starch & Chem. Corp.*, the court upheld

the enforcement of a 15-month noncompete restriction because the former

employee had knowledge of plaintiff's trade secrets and "there was sufficient

36

likelihood of 'inevitable disclosure,'. . . with consequent immediate and irreparable harm to [plaintiff], to warrant interlocutory relief preserving the status quo pending trial."  219 N.J. Super. at 162 (concluding in this regard that "[i]t is sufficient that the circumstances give rise to an inference that substantial threat of disclosure exists.").  In reliance upon *Nat'l Starch & Chem. Corp.*, this Court entered a preliminary injunction in *Jackson Hewitt Inc. v. Cline*, No. CV 14-6931, 2015 WL 6687545, at *4 (D.N.J. Oct. 29, 2015), based on the reasoning that "[w]here a party is in possession of another party's confidential information and is poised to use or disclose such information, there is a likelihood of irreparable harm."

As the cases discussed above demonstrate, Novartis faces multiple threats of irreparable harm and the requested injunctive relief should be granted.

## IV.    INJUNCTION WILL NOT HARM OTHERS AND PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF

The benefit of injunctive relief to Novartis far outweighs any detriment to Ms. Alaimo.  Where injunctive relief would merely require the defendants to obey existing law and their existing duties and/or contractual obligations, the balance of the hardships favors the employer.  *See Manhattan Assocs.*, 2005 WL 2200297, *6.

The court's reasoning in *HR Staffing Consultants, LLC*, 2015 WL 3492609, at *15–16, is particularly applicable here.  In that case, the court reasoned that equity favored granting injunctive relief because, during the restrictive period, the employee was permitted to seek employment anywhere outside of the restricted

37

geographic area, and – upon the expiration of the one-year restrictive period – the employee would be permitted to seek employment with the plaintiff's competitor, or any other entity for that matter. *Id.* The court further analyzed the balance of harms by noting that, "[a]t the time of [the employee's] resignation, [he] was aware of his non-compete and knew that [the plaintiff] did not formally waive it. He took a calculated risk in resigning . . . , and it did not pay off." *Id.* The court concluded therefrom that "[a]ny hardship [the employee] may endure was brought upon himself." *Id.*, citing *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.").

Novartis is not attempting to prevent Ms. Alaimo from obtaining gainful employment. Instead, it asks only that Ms. Alaimo be ordered to comply with her contractual obligations. Enforcing Ms. Alaimo's Agreement and issuing an injunction is consistent with public policy and serves the public interest.

Injunctive relief also serves the public interest: An injunction would protect Novartis' valuable trade secrets, goodwill, business reputation, and contract rights. *See, e.g.*, *HR Staffing Consultants, LLC*, 2015 WL 3492609, at * 14 (explaining that "[t]he public has an interest in upholding reasonable, bargained-for provisions of contracts. The public has an interest in safeguarding an employer's confidential information. And the public has an interest in protecting [plaintiff's] business

38

model.") (internal citation omitted).  Similarly, New Jersey recognizes a public

interest in "safeguarding fair commercial practices and in protecting employers

from theft of piracy of trade secrets, confidential information or … knowledge and

technique in which the employer may be said to have a proprietary interest."

*Campbell Soup Co.*, 58 F.Supp.2d at 489.  "Moreover, the public has a great

interest in upholding and enforcing freely negotiated reasonable contracts entered

into between employees and the employers."  *Manhattan Assocs.*, 2005 WL

2290297, *7.  In addition, New Jersey's adoption of the New Jersey Trade Secrets

Act evidences a public policy of strongly protecting employer trade secrets.

## V. REQUEST FOR EXPEDITED DISCOVERY

In addition to seeking a TRO and preliminary injunction, Novartis is also

requesting expedited discovery.  This Court should grant Novartis' request because

such requests are routinely granted where, as here, the threat of immediate and

irreparable harm exists.  *See Gucci Am., Inc. v. Daffy's, Inc.,* No. CIV.A. 00-4463,

2000 WL 1720738, at *9 (D.N.J. Nov. 14, 2000) (citing standard for grant of

expedited discovery, denying request based on facts of case).

As detailed in the proposed Temporary Restraining Order, Novartis requests

that this Court grant expedited discovery as set forth in the Proposed Order to

Show Cause with Temporary Restraints, filed herewith.

## <u>CONCLUSION</u>

For the foregoing reasons, Novartis respectfully requests that this Court issue a TRO as proposed and permit Novartis to take expedited discovery pending a hearing on Novartis' request for a Preliminary Injunction.

Respectfully submitted,

/s/ James P. Flynn
James P. Flynn, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 973-642-1900 (phone)
(973) 973-639-8931 (fax)
*Counsel for Novartis Pharmaceuticals Corporation*

*Of Counsel*:

Russell Beck (*pro hac vice* to be filed)
Stephen Riden (*pro hac vice* to be filed)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Tel (617) 500-8660 (phone)
Fax (617) 500-8665 (fax)

Dated: August 7, 2017