James P. Flynn, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
*Counsel for Novartis Pharmaceuticals Corporation*

Russell Beck, Esquire
Stephen D. Riden, Esquire
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
(617) 500-8660 (phone)
(617) 500-8665 (fax)
*Of Counsel for Novartis Pharmaceuticals Corporation (Pro Hac Vice Pending)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | ) | |
| | ) | |
| NOVARTIS PHARMACEUTICALS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| ALISHA ALAIMO, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF RICHARD REIG**
**AUTHENTICATING DOCUMENTS**

I, Richard Reig, affirm as follows:

1.      My name is Richard Reig.  I am over the age of 18.  All statements of fact made

herein are based on my personal knowledge, or, where indicated, based on my investigation, in

which case I believe them to be true.

2.      I make this declaration on behalf of Novartis Pharmaceuticals Corporation, a

Delaware corporation with its principal place of business in East Hanover, New Jersey ("Novartis") in support of its emergency motion for order to show cause with temporary restraints.

3.      I am Vice President and Legal Section Head – Human Resources at Novartis, residing in the company's Legal department.  I am a member of the bar of the State of New Jersey and I am the head employment lawyer for Novartis.

4.      Attached hereto as <u>Exhibit A</u> is a true and accurate copy of a letter I sent on July 20, 2017 to Jo Ann Taormina, VP, Chief Employment Counsel at Biogen, Inc.

5.      Attached hereto as <u>Exhibit B</u> is a true and accurate copy of a letter I received on July 24, 2014 from Ms. Taormina.

6.      Attached hereto as <u>Exhibit C</u> is a true and accurate copy of a letter I sent on July 24, 2017 to Ms. Taormina.

7.      Attached hereto as <u>Exhibit D</u> is a true and accurate copy of an email I received on July 27, 2017 from Alisha Alaimo, defendant in the above-captioned litigation.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 3ʳᵈ day of August 2017 at East Hanover, New Jersey.

Richard Reig

# EXHIBIT A

 **NOVARTIS**

**Richard S. Reig**
Vice President, Legal Section Head –
   Human Resources
Legal Department

**Novartis Pharmaceuticals Corporation**
One Health Plaza
East Hanover, NJ  07936-1080

Tel 862-778-6052
Fax 973-781-2469
richard.reig@novartis.com

July 20, 2017

VIA OVERNIGHT DELIVERY

Ms. Jo Ann Taormina
VP, Chief Employment Counsel
Biogen
Legal Department
225 Binney Street
Cambridge, MA 02142

Re:    Alisha Alaimo

Dear Ms. Taormina:

Thank you for your telephone call to our General Counsel, Elizabeth McGee, yesterday, responding to her June 5 email and phone message to Susan Alexander concerning Alisha Alaimo.  During the call, you disclosed to Ms. McGee that Ms. Alaimo will be employed by Biogen.

Based on your discussion with Ms. McGee, it is our understanding that Biogen will respect and not interfere with Ms. Alaimo's contractual obligations to Novartis Pharmaceuticals Corporation ("Novartis"), which includes her non-compete obligation.

So that there is no confusion over what those obligations are, under her agreement with Novartis, Ms. Alaimo's non-compete obligation lasts for six (6) months from her last date of employment with the Company.  Her last day of employment with Novartis will be August 2, 2017, which means that her non-compete obligation remains in force until **February 2, 2018**.

For ease of reference, the text of her Non-Competition obligation is reprinted directly below:

**E. NON-COMPETITION**

During the term of the Executive's employment with the Company and for a period of six (6) months following his or her termination, he or she shall not, within the continental United States, directly or indirectly, own, manage, operate, control or finance; or participate in the ownership, management, operation, control or financing of; or be connected as an officer, director, employee, partner, consultant or in any other capacity with; any business with which the Company is in substantial competition and in which the Executive could use or disclose any of the Company's trade secrets or confidential information that he or she utilized during employment with the Company or which were otherwise disclosed to him or her as a result of that employment. Any post-employment limitation shall be determined by the activities of the Company as of the time of the termination.

Ownership of not more than five percent of the capital stock of any company having a class of securities registered pursuant to the Securities Exchange Act of 1934, as amended, is not considered to be competition with the Company. The Executive will not be considered in competition with the Company if he or she works for a consulting firm, agency or other business providing services to companies in the industry sector in which the Company

Initials:  Alisha Alaimo                    Page 7

competes so long as, for the period that this provision is in effect, he or she does not function in any capacity for or on behalf of any company or business with respect to any product, which is in competition with a Company product.

During her tenure with Novartis, Ms. Alaimo served as the Head of our Multiple Sclerosis/Neuroscience Business Unit, with primary responsibility for the success of our Company's multiple sclerosis products in the United States.  She was also a member of the Company's US Pharma Executive Committee, where she was exposed to additional confidential information regarding those products throughout her time on the Committee.  Given Biogen's substantial product portfolio in the area of multiple sclerosis, it's clear that Biogen is in "substantial competition" with Novartis in precisely the line of business headed by Ms. Alaimo.  Accordingly, the non-competition requirements referenced above are applicable here.

Additionally, please be advised that Ms. Alaimo has a twenty-four (24) month non-solicitation obligation, which also begins to run on her last day of employment with Novartis.  The text of this non-solicitation requirement is reprinted directly below:

**G. NON-SOLICITATION**

During the term of the Executive's employment and for a period of twenty-four (24) months following his or her termination, he or she shall not, directly or indirectly knowingly cause or encourage any current Associate of the Company or any of its affiliates to leave the employ of the Company (or affiliate) or to accept employment with him or her or any other person, firm, association or company, if the Associate  was or becomes employed by the Company or any of its affiliates during the Executive's employment with the Company. The Executive is not in violation of the no-solicitation requirement simply because he or she provides personal references or recommendations for individuals in connection with an application for employment or association with, a person, firm, business or company if (x) he or she is not affiliated or otherwise associated with such person, firm, association or company and (y) the personal reference or recommendation was requested by such person, firm, association or company without initiation by him or her.

Ms. Alaimo has been reminded both verbally and in writing of these restrictions, as well as of her general confidentiality obligations to Novartis (pursuant to her contract and state and federal trade secrets laws), which remain ongoing despite her departure from the Company.  A copy of our letter to her, dated June 9, 2017, concerning these matters is enclosed for your reference.

It is our understanding from your discussion with Ms. McGee yesterday that Biogen intends to not interfere with, and will respect, these obligations.  If this is not accurate, please contact either me or Ms. McGee.

We appreciate your professional courtesies in this matter.


Very truly yours,

Richard S. Reig

Enclosure

Cc:     Elizabeth McGee, Esq.
        Susan Alexander, Esq. (via overnight delivery)
        Ms. Alisha Alaimo (via overnight delivery)
        Ms. Caryn Parlavecchio



Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936

June 9, 2017

Ms. Alisha Alaimo
Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936

Dear Alisha,

Alisha, I am in receipt of your resignation letter confirming that on June 2, 2017 you notified the company that you are resigning from Novartis Pharmaceuticals Corporation to join another undisclosed pharmaceutical company. Based on the 60 day notice provision of your executive Employment Agreement, which you signed on September 23, 2014, your last day of employment with NPC will be August 2, 2017.  Additionally, please be reminded that under the terms of your contract, you are prohibited from working for another employer during the entirety of the 60 day notice period.

We also want to remind you of your Non-Competition obligation, which lasts for 6 months following your last day of employment with the company, your Non-Solicitation commitment, which lasts for 24 months after your last day with NPC, as well as the Confidentiality requirements set forth in your contract.

Sincerely,

Caryn Parlavecchio
VP, Head of Human Resources

# EXHIBIT B



July 24, 2017


**VIA FEDEX AND EMAIL**

Richard S. Reig, Esq.
Vice President, Legal Section Head – Human Resources
Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, New Jersey 07936-1080

**Re:    Alisha Alaimo**

Dear Mr. Reig:

Following my telephone call on July 19th with your colleague, Elizabeth McGee, Esq., I received your letter, dated July 20th, concerning Alisha Alaimo, who has accepted an employment position with Biogen, Inc. ("Biogen"). We have reviewed the letter, dated September 17, 2014 and titled "Employment Agreement," from Novartis Pharmaceuticals Corporation ("Novartis") to Ms. Alaimo, along with the five-page, single-spaced Appendix attached thereto, setting forth additional terms and conditions of employment, including non-competition and non-solicitation provisions (collectively, the "Agreement"). Also, we have discussed the Agreement with Ms. Alaimo and advised her to review the terms of the Agreement carefully.

Per Biogen's policy and practice, Biogen respects the intellectual property and confidential information of other companies, consistent with our expectation that other companies will respect ours. We also respect any ongoing, lawful contractual obligations that may exist between an employee of Biogen and her former employer. That said, with respect to the restrictive covenants set forth in the Agreement, Biogen has not acknowledged nor admitted the asserted validity or enforceability of such covenants, whether in whole or in part.

With respect to secret or confidential information, and/or trade secrets of Novartis, Ms. Alaimo has been instructed, and we are confident that she understands, that she may not disclose or use any secret or confidential information, and/or trade secrets of Novartis. Ms. Alaimo has confirmed that she is not in possession of any Novartis property, including secret or confidential information, and/or trade secrets and no such information has been disclosed to Biogen. Moreover, as you are aware, in our industry, a great deal of information is publicly known. Novartis and Biogen have access to the same market information regarding patients and prescribers.

Further, as to the specific concerns raised in your letter as to confidential information, Biogen does not want or need other companies' confidential information and we ensure our employees are aware of that. We also understand that Ms. Alaimo ceased working in Novartis' Neuroscience Business Unit eighteen months ago -- in February 2016 -- and, as a result, does not possess any current, non-publicly available information regarding that business unit. Indeed, since February 2016, Ms. Alaimo has not been working for Novartis in any area in which Biogen does business. In fact, we understand that Novartis released Ms. Alaimo from work on June 9, 2017 and took steps to exclude Ms. Alaimo from Novartis' business activities since that date. Likewise, we understand that Ms. Alaimo's participation on Novartis' US Pharma Executive Committee did not expose her to confidential information and/or trade secrets outside of her particular business unit, which, as noted above, is not a business area in which Biogen operates.

Based on the above, Biogen believes that Ms. Alaimo does not possess any confidential information and/or trade secrets that she could use or disclose to Biogen. Moreover, and importantly, Ms. Alaimo is expected to perform work at Biogen in an area that is completely unrelated to any of her work at Novartis during the past eighteen months – a period of time that far exceeds the six-month restraint period contained in Novartis' non-competition provision. Notably, Novartis has already obtained the benefits of a two-month restraint as Ms. Alaimo, as discussed above,has been sidelined by Novartis since June 9. Biogen believes that Ms. Alaimo's employment with Biogen will not violate any of the purported restraints referenced in your letter. In that regard, if your letter is suggesting that, during the call with Ms. McGee, I acknowledged that Novartis' non-competition provision applies to Biogen and Ms. Alaimo's employment, please be advised that I did not do so.

I trust this addresses your concerns. Thank you.

Sincerely,

Jo Ann Taormina / MJH

Jo Ann Taormina, VP
Chief Employment Counsel

cc:   Alisha Alaimo

# EXHIBIT C

Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936-1080

Tel 862 778 8300

 NOVARTIS

July 24, 2017

VIA OVERNIGHT DELIVERY & E-MAIL

Ms. Jo Ann Taormina
VP, Chief Employment Counsel
Biogen
Legal Department
225 Binney Street
Cambridge, MA 02142

Re:     Alisha Alaimo

Dear Ms. Taormina:

Thank you for your letter of July 24th responding to my correspondence of July 20th.

Unfortunately, Biogen's assumption that Ms. Alaimo's participation in the US Pharma Executive Committee (PEC) "did not expose her to confidential information and/or trade secrets outside of her particular business unit" is mistaken.

The Novartis US PEC is comprised of the US business heads of each of the Pharma divisions' commercial franchises (formerly referred to as business units) as well as the heads of each function (including Legal and Compliance, among others). The PEC's monthly meetings include group discussions of sensitive non-public information, such as marketing, pricing and contracting issues, across all the franchises, with active participation of the entire committee. This format helps ensure that there is rigorous discussion, debate, and participation by the entire US executive leadership of the Novartis Pharma division on issues affecting every aspect of the business.

Given Ms. Alaimo's prior role as the US head of the MS business unit (later renamed the Neuroscience franchise), it should not be surprising that she was a very active participant in PEC discussions regarding that franchise generally and, in particular, regarding Novartis' oral MS therapy, Gilenya®, which competes directly with Biogen's product Tecfidera®. As recently as April 27th, Ms. Alaimo participated in a business review involving senior leaders, which included a detailed discussion of Gilenya. And as most recently as May 17th, she actively participated in another PEC meeting where non-public confidential information of the types described above regarding all the franchises, including Neuroscience, was discussed.

Given that Ms. Alaimo has continued to have exposure to confidential information (as well as being an active participant in PEC discussions) regarding our MS business, and in light of Biogen's press release today announcing that Ms. Alaimo "will work to drive the uptake of the company's industry-leading portfolio of multiple sclerosis (MS) therapies . . .", Novartis continues to have significant concerns regarding her upcoming employment by Biogen. We have also learned that since June 9th, Ms. Alaimo has continued to have numerous discussions with several Novartis employees. For these reasons, her six-month noncompetition obligation – which she freely agreed to when she signed her contract – is appropriate and enforceable.

In light of the foregoing, please confirm that Ms. Alaimo's start date with Biogen will not commence prior to the expiration of her six-month noncompetition obligation which, as explained in my prior letter, starts on her last date of employment with Novartis, August 2, 2017, and runs through February 2, 2018.

I look forward to hearing from you promptly.

Very truly yours,

Richard S. Reig
Vice President, Legal Section Head
 – Human Resources

Cc:    Elizabeth McGee, Esq.
       Ms. Caryn Parlavecchio
       Ms. Alisha Alaimo (via Overnight Mail)

# EXHIBIT D

**From:** Alisha Alaimo <alishaalaimo@aol.com>
**Date:** July 27, 2017 at 3:12:00 PM EDT
**To:** Richard.reig@novartis.com
**Subject: Response to letter dated 7/24/17**

Dear Mr. Reig,

I received a copy of your July 24, 2017 letter to Biogen.

It is really unfair that Novartis is singling me out in trying to enforce the non-competition restrictions, when you and I know it often has not done so in the past when men were involved. Targeting me will not help Novartis improve the morale of its female employees nor help curtail the culture of sexism that some at Novartis have been trying to stop.

It's also ironic that I was involved in discussions at PEC meetings where legal (and HR) was telling us that our non-competes were not enforceable and so there was no point in having them, and now you are threatening me about my non-compete.
Your stated concern is that I was exposed at PEC meetings to sensitive non-public information relating to marketing, pricing and contracting issues across all of the Pharma divisions. I honestly cannot think of any trade secrets or confidential information that I might have been exposed to that would be of any use to Biogen.

Ever since Fabrice has been running US Pharma, pricing and contracting strategies have never, to my recollection, been discussed during general PEC meetings. When there needed to be pricing and contracting discussions, Fabrice held these with the appropriate employees from the relevant franchise. So I would have been exposed to Neuro pricing strategies only before March 2016. As for sales and marketing data, these are not confidential; as you know, any company or analyst can and routinely does obtain these data through third party vendors.
Most of the discussions I recall from PEC meetings dealt with issues that were common to all franchises. Even when I was head of the Neurosciences BU, we primarily focused on talent retention and training, gaps in our analytical capabilities, compliance issues, and other high-level topics. Talent retention was a recurring theme because company-wide, Novartis is struggling to retain good people.

Your letter specifically states that I participated in an April 27 "business review involving senior leaders, which included a detailed discussion of Gilenya."  I do not recall a discussion of Gilenya during that meeting.  What I am certain of, however, is that during my entire time on the PEC, the Neuro franchise -- and Gilenya in particular -- have not been a priority for Novartis.  The longest Neuro discussion I can remember having during a senior management review meeting was 15 minutes, whereas Entresto and Cosentyx regularly occupied the majority of time for discussion.  I cannot remember any trade secrets or confidential information from these short discussions regarding the Neuro franchise.  It would only have been during deep dive meetings about Neuro where such information was discussed.  But, as I mentioned above, Fabrice ensured that within US Pharma such deep dives into the franchises were not held at the PEC level.  The only time that I can recall being exposed to deep dive information from another franchise was at reviews with Paul and Joe, but to my recollection that deep dive information had nothing to do with Neuro.  Because Cosentyx and Entresto were strategic priorities, we did have frequent joint reviews with the Immunology and Dermatology franchise.

Please know that I have absolutely no intention of using or disclosing any trade secrets or confidential information from Novartis in connection with my work for Biogen.  I cannot even think of a trade secret or piece of confidential information that has any relevance whatsoever to Biogen's Neuroscience business.

And yes, Novartis employees have continued to communicate with me – I am still a Novartis employee and have made many friends at Novartis over the last couple decades.  There has been nothing inappropriate about my continuing to talk to my friends, especially when I am still employed by Novartis and made clear to Novartis in my resignation letter that I was committed to ensuring a smooth transition with my departure.  Consistent with my obligations, I will not solicit Novartis employees to leave.

I have dedicated 17 years of my life to Novartis and have done nothing but a stellar job for the company.  I am grateful for my time and career there.   I am saddened and disappointed by your response to my departure.

Best Regards,

Alisha A. Alaimo