James P. Flynn, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
*Counsel for Novartis Pharmaceuticals Corporation*

Russell Beck, Esquire
Stephen D. Riden, Esquire
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
(617) 500-8660 (phone)
(617) 500-8665 (fax)
*Of Counsel for Novartis Pharmaceuticals Corporation (Pro Hac Vice Pending)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: _____ |
| v. | ) ) ) | |
| ALISHA ALAIMO, | ) ) | |
| Defendant. | ) ) | |

**<u>DECLARATION OF CARYN PARLAVECCHIO</u>**

I, Caryn Parlavecchio, affirm as follows:

1.      My name is Caryn Parlavecchio.  I am over the age of 18.  All statements of fact made herein are based on my personal knowledge, or, where indicated, based on my investigation and review of business records, in which case I believe them to be true.

2.      I make this declaration on behalf of Novartis Pharmaceuticals Corporation, a

Delaware corporation with its principal place of business in East Hanover, New Jersey

("Novartis") in support of its emergency motion for order to show cause with temporary

restraints.

BACKGROUND

3.      I am currently employed by Novartis as Vice President and U.S. Country Head of

Human Resources.  I have been in this role for five years and have been with the company for

approximately 16 years.

4.      Novartis provides innovative healthcare solutions in the U.S. that address the

evolving needs of patients and societies.  In the United States, the Novartis Group of Companies

(including separate affiliated entities, such as the generics company, Sandoz Inc., and the

surgical eye-care device company, Alcon Laboratories, Inc., among others) employs more than

22,000 people at 24 sites across the country with four main campuses:  East Hanover, New

Jersey; Princeton, New Jersey; Fort Worth, Texas; and Cambridge, Massachusetts.

5.      The Pharmaceuticals division of Novartis is structured according to disease area

(Cardiovascular, Neuroscience, Immunology and Dermatology, Respiratory, and Ophthalmics).

It has five commercial franchises across these disease areas that are responsible for marketing,

sales, and strategic account management.  These franchises are bolstered by business support

functions including:  medical, market access, finance, legal, human resources, and ethics &

compliance, among others.  Each U.S. franchise head reports directly to the U.S. President of

Novartis.

6.      In 2014, I was directly involved in hiring Alisha Alaimo ("Alaimo") as the Vice

President and U.S. Head of the Neuroscience Franchise ("U.S. Head of Neuro").  In that role,

Alaimo was responsible for the entire operation of the U.S. Neuroscience franchise, focused

2

heavily on drugs for Multiple Sclerosis ("MS") including, primarily, its oral therapy Gilenya®.

7.      I was also directly involved in the decision to later move her to Vice President and U.S. Head of the Cardiovascular Franchise ("U.S. Head of Cardio") in 2016.

8.      In both of these positions, Alaimo reported directly to our company's U.S. President.

9.      Alaimo was among the top 13 executives in the company's U.S. Pharmaceuticals division, reporting directly to the U.S. President of Novartis.  Her compensation at the time of her departure included a base salary of $365,000, annual bonuses totaling $185,500, and the potential for up to $237,250 in restricted stock grants annually.  The granting of these awards is governed by Novartis' Long Term Incentive Plan ("LTIP"), a copy of which is attached hereto as Exhibit A.  The LTIP, which was accessible to all Novartis executives at Alaimo's level, including Alaimo, calculated the awards based in part on Novartis' performance compared to a group of its competitors, including Biogen, Inc. ("Biogen").  Alaimo also received a substantial retention bonus in the form of 5,000 restricted share units (which has a value of $420,000 at today's share price) when she was installed as US Head of Cardio.

10.      Based on my review of Novartis' personnel records and knowledge of Alaimo's work for Novartis, Alaimo worked for Novartis in other positions, as well as for other Novartis Group companies in other countries (Novartis Pharmaceuticals UK Limited in the United Kingdom, and Novartis Pharma AG in Switzerland) before taking over as the U.S. Head of Neuro.  Alaimo's work for the Novartis Group of companies, which spans approximately 17 years, has always been on the business side (operations, sales, sales training, marketing, strategy, etc.).

11.      Based on my review of Novartis' personnel records and knowledge of Alaimo's

3

work for Novartis, Alaimo has never worked in research and development for Novartis, nor is she a physician or other licensed professional.

12.     A description of Alaimo's roles and responsibilities, in her own words, can be found in her resume, attached hereto as Exhibit B.

<u>NOVARTIS' PROTECTION OF ITS CONFIDENTIAL AND PROPRIETARY INFORMATION</u>

13.     Due to the extremely competitive nature of the pharmaceutical industry, Novartis takes extensive measures to protect its information by, among other things, requiring a keycard to access its physical sites and buildings; password-protecting and encrypting its computers, email accounts, and information systems (and requiring password changes every 90 days); limiting access (electronically and physically) to sensitive information to those employees whose positions warrant them having such access; and clearly communicating to employees that Novartis' confidential information is to be kept confidential.

14.     Novartis also requires, as a condition of employment and as a condition of access to Novartis' trade secrets and other highly sensitive competitive and confidential information, that appropriate employees sign noncompetition, nonsolicitation, and confidentiality agreements. The company also maintains a Confidentiality Policy, which applies to all employees of Novartis, a true and accurate copy of which is attached hereto as Exhibit C.

15.     Novartis takes other measures to protect its information as well.  For example, in its open floor working environments, Novartis has a strict clean desk policy and guidelines on securing its highly sensitive competitive and confidential information in locked file cabinets. Management regularly performs audits to ensure compliance with these policies.  Alaimo was subject to these requirements and responsible for their enforcement in her franchises.

ALAIMO'S KNOWLEDGE OF NOVARTIS' HIGHLY
<u>SENSITIVE COMPETITIVE INFORMATION</u>

16.     During Alaimo's tenure as U.S. Head of Neuro, she had complete access to all information and involvement in all areas regarding the franchise, including, among other therapies, its growth-driving MS drug, Gilenya®.  Accordingly, on September 23, 2014, in connection with her promotion to U.S. Head of Neuro, Alaimo signed both an Employment Offer Letter and an Employment Agreement (together, the "Agreement"), true and accurate copies of which are attached as <u>Exhibit D</u>.  The Agreement contained nonsolicitation, noncompetition, and confidentiality provisions designed to protect Novartis' trade secrets and other confidential information to which Alaimo was extensively exposed.

17.     These trade secrets and other confidential information ranged from product testing and specifications, to strategic planning for the Neuroscience franchise's drugs and for the other Novartis franchises' products, to all drugs in the pipeline (whether publicly disclosed or not), to the strategic plans for the pipeline drugs, to the strategic vision and direction of the franchise as a whole and within the larger Novartis organization, to field force statistics, financing and marketing decisions, to challenges faced by the franchise's products in both their use and in the competitive marketplace, to steps (and the evaluation of those steps) Novartis implemented and is considering implementing to address those challenges.  Much of this information is extremely competitively sensitive and valuable, and provides Novartis with a significant competitive advantage.

18.     As U.S. Head of Neuro, Alaimo's knowledge of confidential and highly sensitive competitive information regarding the Neuroscience franchise was incredibly broad and deep.

19.     When she transitioned to U.S. Head of Cardio last year, her knowledge of the Neuroscience franchise may not have been as deep over time.  However, Alaimo remained fresh

on much of her knowledge through her active participation (until she resigned in June) in many frequent executive level committee meetings, including the Novartis Pharma Executive Committee ("PEC") (which meets monthly), the Product Development Advisory Board ("PDAB") (which meets quarterly), the Commercial Excellence Team ("CET") (which meets monthly), and periodic business reviews and strategic planning meetings with higher level executives.

20.     The PEC consists of each franchise leader in the U.S., along with the heads of the other support functions, such as medical, market access, finance, legal, ethics & compliance, and human resources, among others.  I sat on the PEC alongside Alaimo.  On average, meetings were attended by approximately a dozen of Novartis' top executives from its Pharmaceuticals division, and presided over by the U.S. President of Novartis.  Alaimo attended PEC meetings from September 2014 until her departure.

21.     The PEC meets once a month and discusses the strategic direction of Novartis' Pharmaceuticals division, including corporate goals, strategic planning, and action plans for key brands.  Members of the PEC are expected to (and do) actively participate in the discussions surrounding both their own brands and the brands of other PEC members.  Discussions are held around items such as culture and talent, financial performance and planning, competitive challenges, brand action plans, pipeline news, and other critical issues for the brands and franchises.  Members of the PEC serve at a level of leadership at which it is expected that we will provide input and feedback beyond our specific roles, so that we can all benefit from our combined knowledge and experience.

22.     In particular, MS treatments, especially Gilenya®, were regularly discussed at great length during the PEC meetings.  PEC members focused on strategies for effectively

competing in the marketplace against other MS drugs, including the oral MS pill Tecfidera®, made by Novartis' most direct head-to-head competitor in the MS space, Biogen.  Novartis competes aggressively with Tecfidera® and members of the PEC, including Alaimo, regularly discussed how to increase market share of Gilenya® over Tecfidera®, how to overcome certain onboarding challenges associated with Gilenya®, pricing and contracting strategies, competitive intelligence, and other market strategies.  Members of the PEC are all high-level executives and very senior corporate officers who know well that information discussed during these meetings is highly confidential and proprietary to Novartis.

23.     Alaimo also participated in the PDAB, which are meetings at which the global team and new product team come together to discuss early pipeline projects on new experimental therapies and make decisions about which products are worth investing in.  I understand that, on average, PDAB meetings are attended by approximately 20 high level employees.  Discussions in the PDAB guide business strategy across franchises and facilitate U.S. input into global pipeline decision-making.  Based on my understanding, through these meetings, Alaimo was exposed to, and was expected to weigh in on, confidential and highly sensitive, competitive information for all Novartis experimental therapies, including new technologies in the MS and Spinal Muscular Atrophy ("SMA") fields.

24.     Alaimo was a member of the CET.  My participation on the CET was optional; I would attend to discuss tactical matters for the members' teams (for example, sales incentives, sales and marketing competencies, etc.).  I understand that on average, approximately 10 - 15 high-level executives attended each CET meeting.  Alaimo also met regularly with executive leaders to discuss market challenges, brand direction, and other confidential information.  Based on my review of business records, there have been at least three such meetings in 2017.

7

25.     In addition to the discussions at the meetings summarized above, members of those groups received information concerning the issues to be discussed in advance of the meeting.  The issues covered in those materials and discussed at the meetings were critical to Novartis' ongoing success across its brands.

26.     Alaimo continued to receive the materials in advance of these meetings, and attended and participated in these meetings, until her resignation.  Based on my simultaneous participation at the PEC meetings and my review of business records of attendance, the last of those meetings that she attended was the PEC meeting on May 17, 2017.

27.     Also until her resignation, Alaimo participated in global executive meetings, where she, as a senior executive, was expected to contribute knowledge and opinions, as well as to exert influence over the direction of, among other brands and franchises, the Neuroscience franchise on a global level.  Based on my review of business records of attendance, the last such meeting that she attended was on April 27, 2017 with Joe Jimenez, the Global CEO of Novartis AG.

28.     Alaimo never recused herself from any of the above referenced executive meetings in the time leading up to her resignation and departure from Novartis despite that all of the information discussed at these meetings is highly confidential and competitively sensitive.

29.     I am very concerned that if Alaimo works for Biogen in her anticipated role, Novartis' information (including the information that Alaimo learned from her participation in each of the above-referenced meetings) will be in jeopardy and Novartis will be placed at a significant, unfair competitive disadvantage.

<u>ALAIMO'S RESIGNATION AND POSITION WITH BIOGEN</u>

30.     I first learned that Alaimo was planning to resign from Novartis at approximately

8

4:00 pm on Friday, June 2, 2017.  (Alaimo also resigned in a letter dated June 2, a true and accurate copy of which is attached hereto as <u>Exhibit E</u>.)  Immediately following my conversation with the U.S. President of Novartis, Alaimo and I exchanged text messages and agreed to speak by phone on Sunday, June 4.

31.     When Alaimo and I spoke on the phone, I explained that we would like to retain her at Novartis and asked what it would take to do so.  Alaimo explained that she was getting a good opportunity with a new company and told me she would be moving for the job.  She also told me that her new employer was a U.S. company.

32.     During the course of this conversation, I became concerned that her new company could be a competitor of Novartis.  I therefore reminded Alaimo of her noncompete and other continuing confidentiality obligations.

33.     Alaimo assured me that her new employer was not in competition with Novartis. I did not know at the time that she was going to Biogen and that her representation was, therefore, not true.

34.     The next day, June 5, Alaimo shared the news of her resignation with the Worldwide Head of the Cardiovascular franchise.  At that point, it became clear to me that Novartis would not be able to retain her.

35.     I attended a meeting on June 5 with Alaimo and the U.S. President of Novartis. The purpose of the meeting was to create a communication plan for Alaimo's resignation and to work on a transition plan.  We had 60 days to work through that transition, given that Alaimo's Agreements provide for a 60-day notice period in the event of her resignation.

36.     We agreed that Alaimo would neither attend the various regular meetings nor perform work during her 60-day notice period.

9

37.     Alaimo's last day in the office was agreed to be June 9, 2017, and in accordance with the notice period, her last day as a Novartis employee was August 2, 2017.  She continued to be on the company's payroll and benefits plans through August 2, 2017.

38.      I was told by our U.S. President that he suspected, but could not confirm, that Alaimo was going to work for Biogen, our head-to-head competitor in the MS space.  We therefore reminded Alaimo once again of her obligations under her noncompete and her continuing confidentiality obligations.

39.     I and others asked Alaimo multiple times where she was going.  She continuously refused to tell me and, I understand, others as well, the name of her new employer.

40.     Further, she actively concealed the name, both by telling me that she was not going to a competitor and, following the meeting with the U.S. President, stating to me, "You all keep assuming it's Biogen.  I never said it was Biogen."

41.     On Alaimo's last day in the office, I collected her Novartis-issued laptop, iPad, and iPhone.  She did not return to me any USB "thumb drives," external hard drives, or other electronic storage devices, nor am I aware of her returning them to anyone else.  I also gave Alaimo a letter again reminding her of her ongoing obligations to the company, including her non-competition, non-solicitation and confidentiality obligations.  A true and accurate copy of this reminder letter is attached as Exhibit F.  As I was collecting her things from her, Alaimo said to me (regarding her new employer), "The company doesn't want to say anything until I am off the site and safe."

42.     I now understand that Alaimo will begin working at Biogen on August 7, 2017.  A true and accurate copy of Biogen's press release announcing her position is attached as Exhibit G.  I believe that Alaimo's anticipated position with Biogen overlaps considerably with her prior

work at Novartis and puts at risk the highly sensitive competitive information she has learned in that position and through her participation as a very senior corporate officer in the PEC, PDAB, CET, and other executive meetings. Alaimo's knowledge of Novartis' trade secrets and confidential information about, among other things, Gilenya®, other pipeline drugs in the neuroscience disease area which would compete directly with Biogen (including in the areas of MS and SMA), and strategy for the MS franchise, is fresh and highly competitively sensitive. I do not believe she can do the job outlined in the press release without using, including even unintentionally having her opinions influenced by, substantial amounts of this information. I also believe that there are other persons in the industry who could perform Alaimo's anticipated role at Biogen without unfairly capitalizing on Novartis' information. I am very concerned that her exposure to such information, particularly Novartis' business strategy and pipeline in the MS and SMA fields, will inevitably give Biogen an unfair competitive advantage.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this _3_ day of August 2017 at _Lavallette_ New Jersey.

Caryn Parlavecchio

# EXHIBIT A

# Novartis AG

# Long Term Incentive Plan

Adopted by the Board of Directors on January 22, 2014 and amended thereafter

Version effective in relation to awards made on or after January 1, 2017

Contents

**NOVARTIS AG LONG TERM INCENTIVE PLAN** ................................................................ 1

    *1.    PURPOSE OF THE PLAN* ................................................................................... 1

    *2.    GRANTING OF AWARDS* ................................................................................... 1

    *3.    DIVIDENDS AND DIVIDEND EQUIVALENTS* ........................................................ 3

    *4.    VESTING OF AWARDS* ..................................................................................... 4

    *5.    LAPSE OR FORFEITURE OF AWARDS* ............................................................... 6

    *6.    CESSATION OF EMPLOYMENT* ......................................................................... 6

    *7.    CORPORATE EVENTS* ...................................................................................... 8

    *8.    PARTICIPANT RIGHTS AND OBLIGATIONS* ....................................................... 9

    *9.    CLAWBACK* ................................................................................................... 9

    *10.  TAX, SOCIAL SECURITY AND OTHER CHARGES* ............................................. 10

    *11.  TRANSFER OF AWARDS* ................................................................................ 10

    *12.  COMPANY DOCUMENTS* ............................................................................... 10

    *13.  BOARD'S POWERS* ...................................................................................... 10

    *14.  ADMINISTRATION AND REGULATIONS* ............................................................ 11

    *15.  AWARDS NOT PENSIONABLE ETC.* ................................................................ 11

    *16.  NOTICES* .................................................................................................... 11

    *17.  DATA PROTECTION* ...................................................................................... 11

    *18.  AMENDMENT AND TERMINATION OF THE PLAN* .............................................. 11

    *19.  COMPLIANCE WITH LAW AND ARTICLES OF INCORPORATION* ............................ 12

    *20.  APPLICABLE LAW* ........................................................................................ 12

    *21.  DEFINITIONS AND INTERPRETATION* .............................................................. 13

**SCHEDULE 1 LONG TERM PERFORMANCE PLAN** ................................................ 17

    *1.    APPLICATION OF THE SCHEDULE* .................................................................. 17

    *2.    PERFORMANCE PERIOD* ................................................................................ 17

    *3.    PERFORMANCE CONDITIONS AND LTPP AWARDS VESTING* ............................. 17

    *4.    AMENDMENTS* ............................................................................................. 18

**SCHEDULE 2 LONG TERM RELATIVE PERFORMANCE PLAN** ............................. 19

    *1.    APPLICATION OF THIS SCHEDULE* ................................................................. 19

    *2.    PERFORMANCE PERIOD* ................................................................................ 19

    *3.    PERFORMANCE CONDITIONS AND LTRPP AWARDS VESTING* .......................... 19

    *4.    AMENDMENTS* ............................................................................................. 20

**SCHEDULE 3 PARTICIPANTS WHO ARE OR BECOME MEMBERS OF THE ECN .........21**

1. APPLICATION OF THIS SCHEDULE .................................................................21
2. DEFINITIONS ...........................................................................................21
3. CESSATION OF EMPLOYMENT – INTRODUCTION ...........................................21
4. CESSATION OF EMPLOYMENT AS A RESULT OF RETIREMENT ..........................21
5. CORPORATE EVENTS ...............................................................................22

**SCHEDULE 4 UNITED STATES.............................................................23**

1. APPLICATION OF THIS SCHEDULE .................................................................23
2. GRANT OF AWARDS – SHARE SUBJECT TO THE PLAN.....................................23
3. DEFINITIONS ...........................................................................................23
4. STOCK APPRECIATION RIGHTS ...................................................................23
5. CONSEQUENCES OF VESTING – RESTRICTED STOCK UNITS............................25
6. CORPORATE EVENTS ...............................................................................25
7. CODE SECTION 409A ...............................................................................25

**SCHEDULE 5 SELECT PLAN 2015.........................................................27**

1. APPLICATION OF THE SCHEDULE .................................................................27
2. PURPOSE ...............................................................................................27
3. PARTICIPANTS .........................................................................................27
4. VESTING AND OTHER CONDITIONS ..............................................................27
5. DEFINITIONS ...........................................................................................27
6. CESSATION OF EMPLOYMENT .....................................................................28
7. US SELLING RESTRICTIONS .......................................................................29
8. APPENDICES TO THE SELECT PLAN .............................................................29

**APPENDIX 1 NOVARTIS SELECT PLAN SWITZERLAND ...............................30**

1. SELECT SWITZERLAND ..............................................................................30
2. SELECT CHOICES SWITZERLAND .................................................................30
3. CESSATION OF EMPLOYMENT .....................................................................30

**SCHEDULE 6 NOVARTIS RESTRICTED STOCK UNIT PLAN – FRENCH QUALIFIED RSU PLAN..................................................................................................31**

1. FRENCH QUALIFIED RSU PLAN ..................................................................31
2. APPLICATION ..........................................................................................31
3. ELIGIBILITY .............................................................................................31
4. AWARD LIMIT ..........................................................................................31
5. NO CASH SETTLEMENT ............................................................................31
6. VESTING PERIOD......................................................................................31

7.    DEFINITIVE TRANSFER OF SHARES ......................................................... 32
8.    SALES RESTRICTIONS ......................................................................... 32
9.    CLOSED PERIODS ............................................................................... 32
10.   NON-TRANSFERABILITY OF RSUS ......................................................... 32
11.   DEATH OF A PARTICIPANT .................................................................. 33
12.   DISABILITY OF A PARTICIPANT ............................................................ 33
13.   PARTICIPANT'S ACCOUNT .................................................................... 33
14.   RESTRICTION ON GRANT TO CORPORATE OFFICERS ................................. 33
15.   ADJUSTMENTS DUE TO CERTAIN CORPORATE AND OTHER EVENTS .............. 33

SCHEDULE 7 NOVARTIS VENTURE FUND PERFORMANCE PLAN ................................. 34
1.    APPLICATION OF THE SCHEDULE .......................................................... 34
2.    PERFORMANCE CONDITIONS AND VESTING ............................................. 34
3.    DEFINITIONS ..................................................................................... 34
4.    TARGET PROCEEDS PERFORMANCE CONDITION ........................................ 34
5.    IRR PERFORMANCE CONDITION ............................................................ 35
6.    AMENDMENTS ................................................................................... 35

**NOVARTIS AG LONG TERM INCENTIVE PLAN**

**1.**   *PURPOSE OF THE PLAN*

The purpose of the Plan is to enhance the alignment of the participants in the Plan with the interests of the Company and its shareholders and to foster long term value creation.

The Rules govern the grant of Awards under the Plan and any sub-plan of the Plan, including the Long Term Performance Plan, the Long Term Relative Performance Plan, Select 2015 and other forms of long term incentive awards (including special, off cycle and ad hoc awards.

**2.**   *GRANTING OF AWARDS*

2.1   Selection of Participants

The Board may select any Eligible Employee to be granted an Award.

2.2   Timing of Awards

Subject to any Dealing Restrictions which prevent Awards being granted, the Board may grant Awards at any time during a Grant Period.

2.3   Decisions relating to Awards

In respect of any Award (whether Restricted Stock, Restricted Stock Units, SARs or other form of award) the Board will determine:

(a)   the type of Award to be granted;

(b)   where relevant, whether the Award is in respect of Shares or ADIs;

(c)   if the Award is a SAR, the base value from which the growth in value is to be measured;

(d)   if the Award does not comprise Restricted Stock, Restricted Stock Units or SARs, the form and terms and conditions of any such Award;

(e)   subject to Rule 2.4, the minimum, target and maximum number of Shares or ADIs to be subject or linked to the Award;

(f)   the Vesting Date or Vesting Dates;

(g)   whether the Award is subject to Performance Conditions and, if so, the terms of such Performance Conditions (including the applicable Performance Period);

(h)   whether the Award (or Shares or other rights comprising the Award) is subject to any holding or blocking period and if so the terms of any such period;

(i)   whether or not the Award will carry Dividend Equivalents and, if so, the form of such Dividend Equivalents;

(j)   whether the Participant is required to sell sufficient Shares to meet Taxation; and

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(k)      which, if any, Schedules to the Plan will apply to the Award.

2.4      <u>Determining the number of Shares or ADIs subject to an Award</u>

In order to determine the minimum, target and maximum number of Shares or ADIs subject to or linked to an Award, the Board shall:

(a)      divide the relevant percentage of salary (as determined by the Board) expressed as a cash sum by the Market Value of a Share or ADI (as appropriate) as at the date immediately preceding the Grant Date and then, where necessary, round up to the nearest whole Share or ADI; or

(b)      apply such other method as the Board may determine from time to time.

2.5      <u>Change of Performance Conditions</u>

Notwithstanding Rule 18 (amendment and termination of the Plan), the Board may change a Performance Condition applicable to an outstanding Award if there are circumstances which cause the Board to consider that an altered performance condition would be a fairer measure of performance.  Any such altered Performance Condition must be, in all material respects, no easier and no harder to satisfy than the original Performance Condition.

2.6      <u>Award documentation</u>

Each Award will be granted by resolution of the Board.

Each Participant shall receive a notice of the grant of an Award (either electronically or in hard copy) in such form as the Board shall determine from time to time.

The Board may determine in relation to any Award that the Participant shall be required to accept or acknowledge the grant of the Award to him.  If a Participant is so required, the Board will also determine the time within which the Participant must provide such acceptance or acknowledgement and the consequences of not doing so.

Alternatively, the Board may determine that a Participant who receives an Award is deemed (as of the time of receipt) to have agreed to the Rules (including applicable Schedules) and the terms set out in the notice of the grant of the Award.  If this is the case, a Participant may reject his Award within 14 days of receiving the notice of grant of that Award (or such longer period as the Board permits or is otherwise required by law).  If a Participant does so reject his Award, then immediately on such rejection that Award shall lapse or, in the case of Restricted Stock, the Shares under that Award shall be forfeited.

2.7      <u>Schedules to the Plan</u>

The Board may establish such schedules to the Rules as it considers necessary or appropriate.  Such schedules may be included in the Plan in such a way that they create special rules applicable to certain Eligible Employees or categories of Eligible Employees and/or to constitute sub-plans to the Plan for Eligible Employees inside and outside Switzerland.

2.8      <u>Policies etc</u>

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

Awards shall be subject to all applicable policies and procedures adopted by the Group from time to time, including without limitation the policies entitled "*Policy for the treatment of awards in the event of a new hire, modified target, assignment or transfer within the Group*" and "*Policy for the grant of equity awards under the Novartis AG Long Term Incentive Plan in circumstances where an employee may leave the Group or has received an unsatisfactory performance or behaviour rating*".

### 3.    DIVIDENDS AND DIVIDEND EQUIVALENTS

3.1    Restricted Stock Units and SARs

A Participant holding an Award of Restricted Stock Units or SARs shall not be entitled to vote, to receive dividends or to have any other rights of a shareholder in respect of such an Award unless and until the Shares comprising the Award are transferred to or acquired by the Participant.

3.2    Restricted Stock

The Board in relation to an Award of Restricted Stock may determine that the Participant must agree to surrender or waive any right to vote, receive dividends or any other rights of a shareholder in respect of such Award.

3.3    Dividend Equivalents

If the Board determines that an Award carries Dividend Equivalents:

(a)    unless the Board decides otherwise, the number of Shares (or notional Shares if the Award is a SAR) subject to the Award will be increased by the number of Shares which could have been acquired by the reinvestment in the purchase of Shares (at the market value of a Share on each relevant dividend payment date) of dividends payable between the Grant Date and the Vesting Date on that number of Shares (or notional Shares) subject to the Award that Vests; or

(b)    if the Board decides that Dividend Equivalents would not be on a notional reinvestment basis as described in Rule 3.3(a), as soon as practicable after the time an Award vests in full (and Shares are transferred or acquired or cash is paid to the Participant) the Company (or the Participant's Employer) shall pay to the Participant (in cash or Shares) (subject to all applicable tax and social security deductions) an amount equal to the aggregate dividends which would have been paid on the Award (including in respect of notional Shares for Awards that are SARs) between the Grant Date and the Vesting Date; or

(c)    the Board may decide that the Dividend Equivalents may be calculated on any other basis.

For the avoidance of doubt, the amount of a dividend, for these purposes is the amount of the gross dividend before taxes.

For the purposes of this Rule 3, "market value" shall be determined by the Board on each relevant occasion.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

Unless otherwise determined by the Board at any time or times, a Participant is not entitled to receive Dividend Equivalents with respect to the time period between the Vesting Date and the date that the relevant Shares are transferred to or acquired by him or payment in respect of the Award is made.

**4.** _**VESTING OF AWARDS**_

4.1   General

Vesting of Awards under the Plan, transfer of Shares or ADIs or payment of cash is subject to any Rules or law that may require otherwise, including Rule 4.6 (dealing restrictions), Rule 4.8 (delivery of Shares or ADIs to a deposit account), Rule 5 (lapse or forfeiture of Awards) and Rule 9 (clawback).

The Board shall determine the number of Shares (or amount of cash in respect of a SAR) comprising an Award that shall Vest on any particular day or days.

4.2   Normal Vesting

Subject to satisfying applicable Performance Conditions to which the Award is subject and the exceptions set out in the Rules, an Award shall Vest on the Vesting Date (or, if there is more than one Vesting Date, as to the relevant number of Shares or relevant cash entitlement in the case of SARs on each Vesting Date) or, if later, the date or dates on which the Performance Condition is confirmed as satisfied by the Board.

4.3   Consequences of Vesting – Restricted Stock Units

As soon as practicable after the Vesting the Company shall transfer the number of Shares (or pay or procure to be paid a cash sum if the Board has determined that the RSU is to be settled in cash) in respect of which the Award has Vested to the Participant.

4.4   Consequences of Vesting – Restricted Stock

On Vesting the restrictions applicable to the relevant Restricted Stock under the Plan shall cease to apply to the extent such Restricted Stock Vests.

4.5   Consequences of Vesting – SARs

As soon as practicable after Vesting the Company or the Participant's Employer shall pay to the Participant a sum equal to growth in the market value (as determined by the Board) of the number of Vested notional Shares comprising each SAR.

4.6   Dealing Restrictions

If the Vesting of an Award is prevented on any date by a Dealing Restriction, the Award shall Vest on the first day it is not so prevented.

If the transfer of Shares or ADIs (or payment of cash) on or following Vesting is prevented by a Dealing Restriction, the period for such transfer or payment shall start from the first date on which it is no longer so prevented.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

Shares received by a Participant on or following Vesting may be subject to Dealing Restrictions.  Subject to any such restrictions, a Participant may sell (or may be required to do so) a sufficient number of such Shares to meet Taxation (as defined in Rule 10 (tax, social security and other charges)).

4.7     Fractional entitlements

Any fractional number of Shares which arises for any reason under the Plan shall be aggregated as at the Vesting Date and rounded up to the nearest whole Share (or, in the case of a SAR, notional Share), unless the Board determines otherwise.

4.8     Delivery of Shares or ADIs to a deposit account

Subject to Board determination otherwise, all Shares and ADIs transferred to Participants under the Plan shall be transferred to and registered in one single securities account (**Securities Deposit Account**) held in trust by such service provider as is nominated from time to time by the Company.

If a Participant Ceases Employment, the Participant must dispose of or if possible transfer from the Securities Deposit Account to a private securities account all of the Shares or ADIs managed by the service provider within the period of three months.  If that is not done, the service provider will sell all of the Shares at market value without delay on behalf of the Participant or the Participant's successor and transfer the proceeds less costs of sale to the Participant's last known salary account and such transfer is in full and final satisfaction.

If a Participant Ceases Employment due to death, the period within which the Participant's personal representative or successor in title must dispose of or transfer the Shares is twelve (12) months or such longer period as the Board may determine.

If the Company's contract with the service provider for administration of the Plan ends in circumstances where the Plan continues, the Company will make arrangements for appropriate services to be provided by another service provider that the Company shall instruct at its sole discretion. In such circumstances, each participant must give all notices and take all steps necessary to end the trust or custody agreement with the old service provider and appoint a new service provider.

The procedures specified above may be altered and other procedures established by the Board.

4.9     Lock-In period

Subject to Rule 4.10, the Board may determine or a Participant may elect at any time (in such form as the Board requires) that Shares or ADIs transferred or to be transferred to him under the Plan are or will be held in the Securities Deposit Account for a fixed period of time (the **Lock-In Period**) during which time such a Participant may not alienate such Shares or ADIs or create any security interest in or encumbrance on such Shares except as may be necessary for the proper administration of the Plan.

During the Lock-In Period, the participant is entitled without restriction to the dividend and voting rights associated with the Shares or ADIs the Participant acquired.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

4.10    Cash, Share and ADI alternatives

The Board may decide to satisfy an Award (including any Dividend Equivalents) by:

(a)    paying or procuring to be paid to the Participant a sum equal to the market value (as determined by the Board) of the number of Shares that would otherwise have been transferred to the Participant following the Vesting of that Award; or

(b)    delivering to the Participant ADIs with a value equal to the market value of the number of Shares that would otherwise have been transferred to the Participant following the Vesting of that Award; or

(c)    in the case of SARs delivering to the Participant Shares or ADIs with a value equal to the cash sum that would otherwise have been paid to the Participant following the vesting of that Award.

## 5.    LAPSE OR FORFEITURE OF AWARDS

Subject to Board determination otherwise, Awards lapse or in the case of Restricted Stock are forfeited on the earlier of:

(a)    failure to meet the Performance Conditions to the extent such Performance Conditions are not met; and

(b)    the occurrence of any event described in the Rules resulting in forfeiture or lapse of Awards, including under Rule 6 (cessation of employment) and Rule 7 (corporate events).

## 6.    CESSATION OF EMPLOYMENT

6.1    Introduction

This Rule 6 applies where a Participant Ceases Employment.

Notwithstanding any other part of this Rule 6, the Board may, in its discretion with no obligation to do so, allow (on such terms as the Board decides, including, without limitation, the Participant first executing and not revoking a general release of claims acceptable to the Company) a greater proportion of an Award to Vest and/or accelerate the time at which Vesting occurs and/or treat a Participant who has Ceased Employment as having done so within Rules 6.3, 6.4 or 6.6.

In the event that Awards are outstanding pursuant to Rules 6.3 or 6.4 and the Participant dies prior to the Vesting of those Awards, then Rule 6.6 shall apply.

6.2    General

Unless Rule 6.3, Rule 6.4 or Rule 6.6 applies, an Award that has not Vested will lapse or be forfeited on the day the Participant Ceases Employment.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

6.3   Cessation of Employment as a result of Retirement

If a Participant Ceases Employment because of Retirement with the agreement of the Participant's employer his Award shall, subject to Rule 6.5 and, if so determined by the Board, the Participant first executing and not revoking a general release of claims acceptable to the Company, Vest on the Vesting Date to the extent the Performance Conditions have been met PROVIDED ALWAYS THAT if the Cessation of Employment in respect of which this Rule 6.3 applies occurs on or before the first anniversary of the Grant Date then the extent to which such Award Vests shall be reduced to take account of the proportion of the Performance Period as has elapsed when the Cessation of Employment occurs.

6.4   Cessation of Employment for other good reasons and following sale

If a Participant Ceases Employment because of:

(a)     termination of employment by the Participant's Employer (whether or not by notice) other than for misconduct or poor performance;

(b)     his Employer ceasing to be a member of the Group;

(c)     the business for which the Participant works is transferred to a person which or who is not a member of the Group,

his Award shall, subject to Rule 6.5 and, in relation to Rule 6.4(a) and if so determined by the Board, the Participant first executing and not revoking a general release of claims acceptable to the Company, Vest on the Vesting Date in respect of a proportion of the Award (corresponding to such proportion of the Performance Period as has elapsed when the Participant Ceases Employment (notwithstanding Rule 6.1)) to the extent the Performance Conditions have been met provided that the Board may determine in the case of leaving for reasons set out in Rule 6.4(b) or Rule 6.4(c) that some or all of the Awards held by relevant Participants shall be exchanged in accordance with Rule 7.2 (exchange of awards).

6.5   Lapse or forfeiture of Awards on joining a Competitor

Where either Rule 6.3 or 6.4 applies such that Awards are retained by the Participant following Cessation of Employment, in the event that the Participant, in the period commencing on such cessation and ending immediately following the relevant Vesting Date becomes an employee or director (or otherwise provides services to) a Competitor, other than as a direct result of an event within Rule 6.4(b) or Rule 6.4(c), then Awards held by that Participant shall immediately lapse (or in the case of Restricted Stock shall be immediately forfeited).

6.6   Cessation of Employment as a result of death or Disability

If a Participant Ceases Employment as a result of his death or Disability then Awards held by that Participant shall Vest immediately:

(a)     if, as at the date of Cessation of Employment, it is impractical to assess performance against the applicable Performance Conditions, at target; or

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(b)     if, as at the date of Cessation of Employment, it is practicable to assess performance against the applicable Performance Conditions, to the extent the Board determines having regard to performance against the applicable Performance Conditions up to the date of Cessation of Employment.

### 7.     CORPORATE EVENTS

7.1     Change of Control

If a Change of Control occurs or is anticipated to occur, unvested Awards shall Vest at the effective time of such Change of Control (or such earlier date or time that the Board may determine) as follows:

(a)     if, as at the proposed date of Vesting, it is impractical to assess performance against the applicable Performance Conditions, at target; or

(b)     if, as at the proposed date of Vesting, it is practicable to assess performance against the applicable Performance Conditions, to the extent the Board determines having regard to performance against the applicable Performance Conditions up to the date of proposed date of Vesting,

PROVIDED ALWAYS THAT if, in respect of an Award, the Change of Control in respect of which this Rule 7.1 applies occurs on or before the first anniversary of the Grant Date then the extent to which such Award Vests shall be reduced to take account of the proportion of the Performance Period as has elapsed when the Change of Control occurs.

Notwithstanding the preceding paragraph of this Rule 7.1, the Board may in its discretion with no obligation to do so, allow a greater proportion of an Award to Vest.

Alternatively, the Board may determine that some or all Awards will be automatically exchanged under Rule 7.2 or may allow Participants to choose Vesting and/or exchange.

7.2     Exchange of Awards

If an Award is exchanged, then:

(a)     the exchanged award will be in respect of or by reference to shares in any company determined by the company offering the exchange;

(b)     the exchanged award shall have equivalent terms to those of the Award that was exchanged;

(c)     the Board may determine that any holding or blocking periods shall continue to apply to the exchanged Award;

(d)     the exchanged award will be subject to the Plan as it had effect in relation to the old Award immediately before the exchange;

(e)     with effect from the exchange, the Rules will apply as if references to Shares are references to shares over which the exchanged award has been granted;

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(f)      the Rules shall apply with such other adjustments as the Board may decide.


7.3      Demerger, variations of share capital and other corporate events

If the Board becomes aware that the Company is or is expected to be affected by any variation of share capital, rights issue, sub-division, consolidation or reduction of share capital, demerger, distribution (other than an ordinary dividend), liquidation or other event (other than a Change of Control) which, in the opinion of the Board, could affect the current or future value of Shares, the Board may:

(a)      adjust Awards in such manner as it considers appropriate;

(b)      allow Awards (for all or some Participants) to Vest in whole or in part, subject to any conditions that the Board may impose;

(c)      require some or all Awards to be exchanged under Rule 7.2.

## 8.     *PARTICIPANT RIGHTS AND OBLIGATIONS*

The rights and obligations of a Participant under the terms of his or her office, employment or contract are not affected by becoming a Participant. These Rules do not form part of, and will not be incorporated into, any contract between a Participant and any member of the Group.

Participants do not have any right to continued employment with the Group as a result of participating in the Plan, nor are they entitled to any compensation or damages if any benefit under the Plan is reduced or cancelled as a result of applying the Rules.

Selection as a Participant refers only to the participation for the one grant year and does not guarantee a right of participation in the Plan in any subsequent year.

Nothing in this Plan confers any benefit, right or expectation on a person who is not an Eligible Employee or a Participant.

The Plan is discretionary and is not part of the any employment contract with the Employer or with any other Group company. Neither does the Plan create any contract between the Participant and Company or any other Group company, nor does the Plan give rise to a claim or legal entitlement to compensation for the Participant. The Plan may be changed or cancelled by the Board in its absolute discretion. Any future Awards may therefore be changed or cancelled at any time.

## 9.     *CLAWBACK*

Participants must adhere at all times to applicable laws, the Articles, the Company's organisational regulations, the Code of Conduct and all applicable Company, Group or Employer policies (including without limitation the "Malus and clawback policy"), procedures and guidelines. If, in the reasonable opinion of the Board, a Participant fails to comply with any such laws, Articles, regulations, Code of Conduct, policies, procedures and/or guidelines in all material respects then the Board may determine that:

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(a)     all or any Award (whether vested or unvested) held by the Participant will lapse or be forfeited; and

(b)     all or any of a Participant's Shares or ADIs transferred to him under the Plan following the Vesting of Awards will be forfeited and must be transferred to the Company; and

(c)     the Participant must pay the Company (or such other member of the Group as the Board may determine) gross proceeds from the sale of some or all of the Shares or ADIs transferred to him following the Vesting of Awards; and

(d)     pay to the Company (or such other member of the Group as the Board may determine) some or all of the gross sums paid to him under the Plan.

## 10.    *TAX, SOCIAL SECURITY AND OTHER CHARGES*

The Participant indemnifies each member of the Group against all taxes, social security contributions and other levies for which he is responsible that arise in connection with an Award (together "**Taxation**").

The Company and/or the Employer may make such arrangements which it or they consider necessary to meet any liability to pay or account for Taxation (including selling sufficient Shares to meet such liability and accounting for the proceeds of sale to the Company or the Employer).   The Participant will promptly do all things necessary to facilitate any such arrangements.  Vesting and the transfer of Shares to him can be delayed until he does so.

## 11.    *TRANSFER OF AWARDS*

Unless specifically permitted under the Plan or with the prior written consent of the Board, Awards or any rights in respect of any Award may not be transferred, assigned or otherwise disposed of.  If Awards (or any rights in respect of Awards) are transferred, assigned or otherwise disposed of or if the Participant becomes bankrupt they shall lapse or be forfeited immediately.

## 12.    *COMPANY DOCUMENTS*

The Company may (but need not) send to any Participant any documents which the Company sends to its shareholders.

## 13.    *BOARD'S POWERS*

The exercise of any power or discretion, including refraining from exercise, of the Board concerning the Plan or any Award is absolute and unlimited and may be reasonably exercised at any time, subject always to the principle of good faith.  When the Board exercises any of its powers or discretions in a way that will impact a Participant, the Board may (but need not) inform the relevant Participant in such manner as the Board shall determine.

Any decision of the Board in connection with the Plan, the interpretation of the Plan and any related documents and in connection with any dispute relating to the Plan will be final and binding.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**14.   *ADMINISTRATION AND REGULATIONS***

14.1   The Plan shall be administered by the Board.

14.2   The Board may make and vary regulations and policies for the administration and operation of the Plan.

**15.   *AWARDS NOT PENSIONABLE ETC.***

For the avoidance of doubt, Awards under the Plan are not pensionable and do not count in relation to the calculation of benefit under programmes such as life cover, income protection or continuation, medical or such other benefits as the Board may determine.

**16.   *NOTICES***

Any notice or other communication under or in connection with the Plan or any Award may be given:

(a)   by the Company to an Eligible Employee or Participant either personally or sent to him at his place of work by electronic mail or other electronic means (including the internet or the intranet) or by post addressed to the address last known to the Company (including any address supplied by the relevant member of the Group) or sent through the Company's internal postal service; and

(b)   to the Company, either personally or by post to the Company secretary.

Items sent by post shall be pre-paid and shall be deemed to have been received 72 hours after posting.  Items sent by electronic mail or other electronic means shall be deemed to have been received at the expiration of 24 hours from when they were sent.

The Board may decide the accept notices given by Participants if received after any time stipulated for receipt.

**17.   *DATA PROTECTION***

Each Participant agrees to the receipt, holding and processing of information in connection with an Award and the general administration of the Plan by the Company and any other member of the Group and any of their advisers or agents and to the transmission of any such information outside of the European Economic Area (including, without limitation, to Switzerland and to the United States of America). Each Participant acknowledges that the EU Commission considers that the United States of America (and various other jurisdictions) do not have adequate data protection laws.

**18.   *AMENDMENT AND TERMINATION OF THE PLAN***

The Board may at any time change the Plan (including amending or adding schedules to the Plan) in any way.  Changes may affect Awards already granted provided always that, unless required by law, no such change may be made which is to the material disadvantage of a Participant without that Participant's prior written consent. The Board shall give notice of any changes to any Participant. The Board may terminate the Plan at any time.  Termination will not affect existing Awards.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

*19.* *COMPLIANCE WITH LAW AND ARTICLES OF INCORPORATION*

19.1    Compliance with Law etc

The Plan is subject to all applicable laws and the Company's Articles.  If such law or the Articles require, the terms of any provision of the Plan and any Award (including any outstanding Award) shall be interpreted and/or amended and applied to the extent required to comply fully with such law or the Articles.

19.2    Swiss law with respect to the compensation of certain executives of listed companies

The Plan, in particular, is subject to any mandatory provisions of Swiss law pertaining to compensation of governing bodies derived from article 95 paragraph 3 of the Swiss Federal Constitution and the related implementing legislation (**VegüV** or later implementing Federal law).  Any interpretation and/or amendment necessary in respect of any provision of the Plan or any Award as a result of applicable law and/or the Articles (whether currently in force or in the future) to the detriment of the Participant shall not give rise to any claims by or other rights whatsoever of the Participant.  This applies in particular if the annual general meeting of the Company does not approve the compensation of the Participant which is subject to approval under the VegüV.

19.3    US Code Section 409A

If a Participant  (other than a Participant whose benefits are provided under the United States Schedule) is subject to the United States Internal Revenue Code ("**US Code**") (a "**US Participant**"), and if benefits under this Plan for such US Participant are not exempt from US Code Section 409A, it is intended that to the maximum extent permitted under all applicable law this Plan will be interpreted and administered to conform to the requirements of US Code Section 409A as they apply to such US Participant.

In furtherance of this intent, to the extent that any portion of the benefits provided under the Plan constitutes a "deferral of compensation" under United States Treasury Regulation Section 1.409A-1(b):

(a)    any election to voluntarily defer such portion shall be made in accordance with the requirements for an initial deferral under United States Treasury Regulation 1.409A-2(a),

(b)    the substantive provisions of Section 4(a) of Schedule 4 to the Plan (United States) shall apply to Awards of SARs with the "market value" in paragraphs 4(a)(i) and 4(a)(ii) of Schedule 4 determined pursuant to Rule 22 of the Plan rather than paragraph 4(a)(iii) of Schedule 4;

(c)    Section 5.2 of Schedule 4 shall apply to Restricted Stock Units, and

(d)    the provisions of Sections 6 and 7 of Schedule 4 shall apply to all such Awards.

*20.* *APPLICABLE LAW*

The Plan is governed by and construed in accordance with the laws of Switzerland, under express exclusion of any provisions of conflict of laws.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

The Board may resolve conclusively all questions of fact or interpretation concerning the Plan and has the authority to resolve any dispute of any kind that arises under or in connection with the Plan. In the event a dispute escalates to require resolution by a court, the dispute will exclusively be resolved by the Courts of Basel, Switzerland.

### 21. *DEFINITIONS AND INTERPRETATION*

In this Plan, unless otherwise required by the Rules:

21.1    Definitions

**ADIs** means American depositary instruments being either American Depositary Shares or American Depositary Receipts of the Company as specified in the Grant Notice.

**Articles** means the articles of incorporation of the Company as amended from time to time.

**Award** means an award under the Plan (which may be an award of Restricted Stock Units, Restricted Stock, Stock Appreciation Rights or such other form of award referable to the Company's equity as the Board may determine).

**Board** means the Company's Board of Directors or, to the extent permitted by applicable law, the Board's delegate or, following a Change of Control, those persons who comprised the Board immediately prior to such Change of Control.

**Cessation of Employment** occurs, for the purposes of the Plan, when a Participant ceases to hold an office or employment with any member of the Group PROVIDED THAT a Participant will not be treated as Ceasing Employment in circumstances in which that Participant is on a leave of absence where the Participant's right to re-employment is guaranteed either by statute or contract and employment is not otherwise terminated during such leave of absence (in which case the participant will Cease Employment at the time of such termination) and similar terms, such as "**Ceases Employment**" or "**Ceasing to be Employed**", shall be construed accordingly.

**Change of Control** means any of the following:

(a)    any person or group of persons who are acting together purchases or otherwise becomes the beneficial owner or has the right to acquire such beneficial ownership (whether or not such right is exercisable immediately or subject to passage of time or other conditions) of voting securities representing more than 50% of the combined voting power of all outstanding securities of the Company;

(b)    the Company's shareholders approve an agreement to merge or consolidate the Company with or into another corporation as a result of which less than 50% of the outstanding voting securities of the surviving or resulting entity are or will be owned by the former shareholders of the Company;

(c)    the Company's shareholders approve the sale of all or substantially all of the Company's business and/or assets to a person or entity which is not a member of the Group,

provided that an Internal Reorganisation shall not be a Change of Control.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**Code of Conduct** means the code of conduct adopted by the Company or any company within the Group which describes the fundamental principles concerning ethical business conduct as amended from time to time.

**Company** means Novartis AG.

**Competitor** means any company or other organisation that is, from time to time, part of the Company's comparator primary healthcare peer group.

**Dealing Day** means a day on which the Swiss Exchange (SIX) or, in relation to ADIs, the national securities exchange in the US on which ADIs are listed, is open for business.

**Dealing Restrictions** means restrictions on the dealing in Shares or the grant of Awards imposed by any law, regulation or Code of Practice (including the Novartis Global Insider Trading Policy, as amended or replaced from time to time) or otherwise.

**Disability** means the Participant is permanently incapable of performing his duties and responsibilities due to illness or accident, in accordance with applicable law, or in the absence of such applicable law, as determined by the Board.

**Dividend Equivalents** means a right to cash or Shares as described in Rule 3.

**Eligible Employee** means any member of the Executive Committee and the Corporate Executive Group or any employee or group of employees of the Group as the Board shall determine.

**Employer** means the member of the Group by or in which the Participant is or, where the context so admits, was an office holder or employed.

**Grant Date** means the date an Award is made as specified in the Grant Notice.

**Grant Notice** means a grant notice provided to a Participant in accordance with the Rules.

**Grant Period** means the period of 42 calendar days commencing:

(a)     the day on which the Plan is adopted by the Board;

(b)     the Dealing Day immediately following the day on which the Company announces results for any period;

(c)     the day on which the Company's annual general meeting is held; or

(d)     any day on which the Board resolves that exceptional circumstances exist which justify the making of an Award.

**Group** means the Company, all its direct and indirect subsidiaries and any other entity determined by the Board to be a member of the group for the purposes of the Plan.

**Internal Reorganisation** means any event, offer, scheme, share purchase, merger or arrangement whereby:

(a)     a Change of Control occurs; and

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(b)     immediately afterwards the share capital of the company then controlling (whether directly or indirectly) the Company is owned substantially by the same persons who were shareholders of the Company immediately prior to such event, scheme or arrangement in substantially the same proportions.

**Lock-In Period** has the meaning set out in Rule 4.9.

**Market Value** means in relation to a Share or ADI (as appropriate) on any given day:

(a)     if the Shares are admitted to trading on the Swiss Exchange (SIX) an amount equal to the closing price on that day (or if there is no such price on that day the last preceding day for which such price is available);

(b)     if the ADIs are listed on a national securities exchange in the US an amount equal to the closing price on that day (or if there is no such price on that day the last preceding day for which such price is available;

(c)     if the Shares are not admitted to trading on the Swiss Exchange (SIX) or the ADIs are not are listed on a national securities exchange in the US, then such value as is determined by the Board.

**Participant** means an Eligible Employee who is selected by the Board to participate in the Plan and is employed by the Group at the Grant Date.

**Performance Condition** means the condition (whether performance, time based or otherwise) set out in any Schedule or such other condition as the Board determines from time to time.

**Performance Period** means the period over which the Performance Conditions are measured, as determined by the Board.

**Plan** means the Novartis AG Long Term Incentive Plan.

**Restricted Stock** means an award of Shares subject to restrictions in accordance with the Plan.

**Restricted Stock Units** means a right to receive Shares or cash under the Plan (but subject to Rule 4.10 (cash and ADI alternative)).

**Retirement** means the Cessation of Employment:

(a)     subject, for the purposes of the Plan, to approval by the Employer, after having attained retirement age according to the law applicable to the Participant, if any; or

(b)     on early retirement in accordance to applicable local law as approved by the Employer; or

(c)     by reason of retirement provided that such retirement is approved by the Board and the Employer.

**Rules** mean the rules of the Plan (including all Schedules).

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**Schedule** means a schedule to the Rules.

**Service** means the period of continuous employment with the Group ending with the relevant Cessation of Employment for the purposes of the Plan PROVIDED ALWAYS THAT the Board may determine that prior periods of employment with the Group and/or periods of employment with entities outside the Group (but which are subsequently acquired by the Group) may be taken into account.

**Share** means a registered share of the Company with a par value of CHF -.50 or, in the case of SARs, notional Shares.

**Stock Appreciation Rights** or **SARs** means an award under the Plan, the future value of which is based on the increase in the value of Shares (from the base value set by the Board at the time an Award is made) which notionally comprises each SAR from the relevant Grant Date.

**VegüV** means the Swiss ordinance in executive compensation and is the German abbreviation for the ordinance against excessive compensation in listed companies (in full "Verordnung gegen übermässige Vergütungen bei börsenkotierten Aktiengesellschaften" or compensation of governing bodies in public companies such as members of the executive committee, the board of directors or the advisory boards).

**Vesting** means:

(a)     in the case of Restricted Stock Units, a Participant being entitled to receive Shares or cash;

(b)     in the case of Restricted Stock, restrictions under the Plan ceasing to apply;

(c)     in the case of SARs, a Participant being entitled to receive a cash sum based on the growth in value of the notional Shares comprising the Award,

 and "**Vest**" shall be construed accordingly.

**Vesting Date** means the date an Award vests as determined by the Board and specified in the Grant Notice.

21.2    <u>Interpretation</u>

Unless the context requires otherwise: words importing the singular include the plural and vice versa; the masculine includes the feminine and vice versa; the word "includes" is not a word of limitation; references to "Schedule" shall refer to the appropriate Schedule to the Plan; headings and boldings are for convenience only and do not affect the interpretation of these Rules.

**SCHEDULE 1**
**LONG TERM PERFORMANCE PLAN**

*1.* *APPLICATION OF THE SCHEDULE*

Where Awards are granted under the Long Term Performance Plan (the **LTPP**), then the Rules of the Novartis AG Long Term Incentive Plan shall apply subject to the terms set out in this Schedule.

*2.* *PERFORMANCE PERIOD*

The Performance Period is the three-year period the Performance Conditions are measured ending on 31 December of the year preceding the year in which the Vesting Date of the relevant LTPP Award occurs or such other period as the Board shall determine as set out in the relevant Grant Notice.

*3.* *PERFORMANCE CONDITIONS AND LTPP AWARDS VESTING*

LTPP Awards are subject to Performance Conditions relating both to CVA and Innovation performance. CVA Performance Condition applies to 75% and Innovation Performance Condition to 25% of an LTPP Award. The maximum number of Vested LTPP Awards is 200% of the Awards determined in the Grant Notice before any Dividend Equivalents. The above-mentioned cap applies to Awards subject to each Performance Condition individually as opposed to the total number of Vested LTPP Awards.

3.1   CVA Performance Condition

For the purposes of this Schedule 1, "**Cash Value Added**" or "**CVA**" means the measure (as determined from time to time by the Board) assesses sustainable cash flow less a capital charge on operating assets.

The achievement of CVA Performance Condition is measured by CVA Performance Ratio.

$$\text{CVA Performance Ratio} = \frac{\text{CVA Actual}}{\text{CVA Target}} * 100\%$$

Where:

**CVA Actual**        is the cumulative three-year adjusted CVA, which is measured on expiry of the Performance Period.

**CVA Target**        is the forward-looking cumulative three-year CVA determined by the Board for the respective Performance Period.

**CVA**              is Cash Value Added of the Group as defined by the Board.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

The number of LTPP Awards that shall Vest on the Vesting Date is determined by multiplying the number of granted LTPP Awards subject to CVA Performance Condition with the CVA Performance Factor. CVA Performance Factor of 100% corresponds to the CVA Performance Ratio of 100%. For each 1% of CVA target over/underachievement the CVA Performance Factor linearly increases/decreases by 3%. The Board approves the final Performance Factor and has the right to adjust it upwards or downwards depending on the overall Company's performance.

3.2     Innovation Performance Condition

The Innovation Performance Factor reflects the achievement of the three-year forward-looking Innovation Targets set out for the respective grant of an Award and is determined by the Board as a percentage.

Innovation Targets focus on key innovation program milestones that will improve future business and/or highly contribute to Company's scientific reputation and are approved by the Board under consultation with Company's CEO and Research & Development Committee of the Board.

### *4.    AMENDMENTS*

The Board may at any time change this Schedule.  Subject to Rule 2.5, changes may affect Awards already granted provided always that, unless required by law, no such change may be made which is to the material disadvantage of a Participant without that Participant's prior written consent.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

## SCHEDULE 2
## LONG TERM RELATIVE PERFORMANCE PLAN

*1.*   *APPLICATION OF THIS SCHEDULE*

Where Awards are granted under the Long Term Relative Performance Plan (the **LTRPP**), then the Rules of the Novartis AG Long Term Incentive Plan shall apply subject to the terms set out in this Schedule.

*2.*   *PERFORMANCE PERIOD*

The Performance Period is the three-year period the Performance Conditions are measured ending on 31 December of the year preceding the year in which the Vesting Date of the relevant LTRPP Award occurs or such other period as the Board shall determine as set out in the relevant Grant Notice.

*3.*   *PERFORMANCE CONDITIONS AND LTRPP AWARDS VESTING*

LTRPP Awards are subject to the Company's Total Shareholder Return (TSR) Performance Condition.

TSR is calculated using such standard published methodology as the Board may determine from time to time, including share price growth and dividends paid over the Performance Period.

TSR is measured against a comparator peer group of fifteen peer companies in the global healthcare industry, currently AbbVie, Amgen, AstraZeneca, Biogen, Bristol-Myers Squibb, Celgene, Eli Lilly & Company, Gilead, GlaxoSmithKline, Johnson & Johnson, Merck & Co., Novo Nordisk, Pfizer, Roche and Sanofi. The Board, in its discretion, may alter the constituents of the comparator group in such circumstances as it considers appropriate, including where a constituent company is no longer listed on a stock exchange.

The number of LTRPP Awards Vesting on the Vesting Date is determined by multiplying the number of granted LTRPP Awards with the LTRPP Performance Factor. The LTRPP Performance Factor is determined by the Board based on the following Vesting schedule for all positive values of TSR:

| TSR rank compared to the comparator group | LTRPP Performance Factor |
|---|---|
| 1 to 4 | 160 to 200 per cent |
| 5 to 8 | 100 to 150 per cent |
| 9 to 12 | 20 to 80 per cent |
| 13 to 16 | 0 per cent |

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

In the event of a non-positive TSR value, the Board may reduce the number of LTRPP Awards which would otherwise Vest.

The maximum number of LTRPP Awards that may Vest is 200% of the number of LTRPP Awards determined in the Grant Notice before any Dividend Equivalent.

### 4.    AMENDMENTS

The Board may at any time change this Schedule.  Subject to Rule 2.5, changes may affect Awards already granted provided always that, unless required by law, no such change may be made which is to the material disadvantage of a Participant without that Participant's prior written consent.

## SCHEDULE 3
## PARTICIPANTS WHO ARE OR BECOME MEMBERS OF THE ECN

*1.*   *APPLICATION OF THIS SCHEDULE*

This Schedule shall apply to:

(a)   Awards granted to any Participant who at the relevant Grant Date is a member of the ECN; and

(b)   Awards granted to any Participant who, after the relevant Grant Date, becomes a member of the ECN.

Where this Schedule applies relevant Awards shall be subject to all the provisions of the Novartis AG Long Term Incentive Plan save as modified below.

*2.*   *DEFINITIONS*

For the purposes of this Schedule the following definitions shall apply:

"**ECN**" means the Executive Committee of Novartis AG (including permanent attendees to that committee).

"**Retirement**" means the Cessation of Employment after:

(a)   having attained age 58 or older, or

(b)   in respect of those Participants who satisfied the Rule of 60 at December 31, 2015, having attained age 55 or older and having completed at least 10 years of Service.

"**Rule of 60**" the sum of the Participant's age plus Service being equal to 60 or more. For the purposes of this definition the Participant's age and his Service shall be whole calendar years as at December 31, 2015.

*3.*   *CESSATION OF EMPLOYMENT – INTRODUCTION*

The second paragraph of Rule 6.1 shall not apply.

*4.*   *CESSATION OF EMPLOYMENT AS A RESULT OF RETIREMENT*

4.1   Immediately following Rule 6.3 the following shall be added as Rule 6.3A:

"In determining whether to approve Retirement under Rule 6.3(a), the Board shall take into consideration the Participant's satisfaction of certain conditions, including:

(a)   whether the Participant is leaving the Group in good standing and not for "cause" (for example because of dishonesty, misconduct, gross negligence, violation of the Code of Conduct or similar reason);

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(b)     whether the Participant has returned to his Employer all company property in his possession at his termination;

(c)     whether the Participant has cooperated with his Employer in the orderly handover and transition of his duties and responsibilities prior to his date of termination;

(d)     whether the Participant has given his written commitment that for one year following his termination he will not work for a Competitor and he will refrain from soliciting other employees of the Group to terminate their employment; and

(e)     whether the Participant has affirmed his obligation not to disclose confidential information he received during his employment with the Group and to refrain from using any such information for any purpose not in Group's business interests."

4.2     At the end of Rule 6.6 the following proviso shall be added:

"PROVIDED ALWAYS THAT if, in respect of an Award, the death or Disability in respect of which this Rule 6.6 applies occurs on or before the first anniversary of the Grant Date then the extent to which such Award Vests shall be reduced to take account of the proportion of the Performance Period as has elapsed when Cessation of Employment by reason of death or Disability occurs."

## 5.     CORPORATE EVENTS

The second paragraph of Rule 7.1 shall not apply.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**SCHEDULE 4**
**UNITED STATES**

*1.    APPLICATION OF THIS SCHEDULE*

When Awards under the Plan (including but not limited to Awards under the LTPP, LTRPP and Select Schedules to the Plan) are to be granted the Board may determine that this Schedule applies, in which case such Awards shall be subject to all the provisions of the Novartis AG Long Term Incentive Plan save as modified below.

ADIs subject to the Awards under the Plan are intended to be registered under the United States Securities Act of 1933.

*2.    GRANT OF AWARDS – SHARE SUBJECT TO THE PLAN*

(a)    Subject to Rule 7.3, the aggregate number of ADIs made subject to Awards under this Schedule may not exceed 3,510,000.

(b)    Such ADIs shall be deemed to have been used in payment of Awards whether they are actually delivered or the market value equivalent of such ADIs is paid in cash. In the event any Award is surrendered or terminated, or expires or is forfeited, the number of ADIs no longer subject thereto shall thereupon be released and shall thereafter be available for new Awards under this Schedule.

(c)    ADIs comprising Awards under this Schedule or delivered by the Company in settlement of Awards under this Schedule may be derived from authorised and unissued Shares or from Shares or ADIs held in the treasury of the Company or held by another member of the Group or may be purchased on the open market or by private purchase.

**3.    DEFINITIONS**

For the purposes of this Schedule the following definitions shall apply:

"**Company**" in this Schedule means Novartis Corporation Inc., a New York corporation.

"**Retirement**" the Cessation of Employment after having attained age 55 or older and having completed at least 10 years of Service.

*4.    STOCK APPRECIATION RIGHTS*

SARs granted under this Schedule shall be subject to such terms and conditions, not inconsistent with the Plan, as the Board may impose, including, but not limited to, the following:

(a)    SARs with Participant discretion to exercise

(i)    Base Value.  The Base Value for SARs per ADI subject to a SAR shall not be less than 100% of the market value of an ADI at the Grant Date.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

(ii) <u>Payment on exercise</u>.  On the exercise of a SAR, the Company or the Employer shall pay to the Participant an amount equal to the number of ADIs subject to the SAR multiplied by the excess, if any, of the market value of one ADI on the exercise date over the Base Value.

(iii) <u>Market value</u>.  For the purposes of SARs subject to this Schedule, "market value" in paragraphs 4(a)(i) and 4(a)(ii) of this Schedule on a given date means:

(aa) if the ADIs are listed on a national securities exchange in the United States, the closing sale price reported as having occurred on the primary exchange with which the Shares are listed and traded (currently the New York Stock Exchange) on such date or, if there is no such sale on that date, then the last preceding date on which such a sale was reported;

(bb) if the ADIs are not listed on any national securities exchange but is quoted on the National Market System of the National Association of Securities Dealers Automated Quotation System ("**NASDAQ**"), the trade price of the last sale reported on such date or, if there is no such sale on that date, then the last preceding date on which such a sale was reported; or

(cc) if the ADIs are not listed on a national securities exchange nor quoted on NASDAQ, on a last sale basis the amount determined by the Board to be the fair market value based upon a good faith attempt to value the Shares accurately.

(iv) <u>Dividend Equivalents</u>.  If the Board designates Dividend Equivalents to apply to SARs pursuant to Rule 3.3(a), such accumulated Dividend Equivalents shall be paid to the Participant immediately upon Vesting.

(v) <u>No deferral of proceeds</u>.  Pursuant to the limitations of the United States Treasury Regulation Section 1.409A-1(b)(5)(i)(B)(3), a Participant may not defer the proceeds of the exercise of a SAR.

(b) <u>SARs without Participant Discretion to exercise</u>

If a SAR is granted with a fixed exercise date and the Participant has no discretion to exercise the SAR, Participants may elect to defer the payment of the proceeds of the automatic exercise of the SAR, and any accumulated Dividend Equivalents, to the date later than the payment date specified in the Award provided that the Participant makes such deferred election either as an initial deferral under United States Treasury Regulation Section 1.409A-2(a) or pursuant to the subsequent deferral provisions of United States Treasury Regulation Section 1.409A-2(b).  The Board shall determine whether such deferral is in the form of Shares (ADIs) or cash.  If deferrals are in Shares (ADIs), unless otherwise directed by the Board such Shares (ADIs), and any accumulated Dividend Equivalents, shall be delivered upon such deferred payment date.  If the deferrals are in cash, the cash proceeds of such automatic exercise of the SARs shall be transferred into the applicable non-qualified deferred compensation plan of the Group entity which employs the Participant.

**5.** **CONSEQUENCES OF VESTING – RESTRICTED STOCK UNITS**

5.1 Participants may elect to defer the payment of Restricted Stock Units, and any accumulated Dividend Equivalents, to the date later than the payment date specified in the relevant Award provided that the Participant makes such a deferred election either as an initial deferral under United States Treasury Regulation Section 1.409A-2(a) or pursuant to the subsequent deferral provisions of United States Treasury Regulation Section 1.409A-2(b). The Board shall determine whether such deferral is in the form of Shares (ADIs) or cash.  If deferrals are in Shares (ADIs), unless otherwise directed by the Board, such Shares (ADIs), and any accumulated Dividend Equivalents, shall be delivered from this Plan upon such deferred payment date.  If deferrals are in cash, the cash proceeds of such Awards shall be transferred into the applicable non-qualified deferred compensation plan of the Participant's employing Group company in the United States.

5.2 Rule 4.3 shall be amended by inserting the underlined words below:

"As soon as practicable after the Vesting (but no later than the 15th day of the third calendar month after the Vesting) the Company shall transfer the number of Shares (or pay or procure to be paid a cash sum if the Board has determined that the RSU is to be settled in cash) in respect of which the Award has Vested to the Participant".

**6.** **CORPORATE EVENTS**

Should the Board determine that adjustments be made to Awards under Rule 7, any such adjustments or modifications must be made in a manner which is consistent with the provisions of section 409A of the United States Internal Revenue Code ("**Code Section 409A**").

**7.** **CODE SECTION 409A**

7.1. Notwithstanding anything under the Plan to the contrary, to the extent applicable, it is intended that the Plan as it applies to Participants shall comply with the provisions of Code Section 409A and the Plan and all applicable Awards be construed and applied in a manner consistent with this intent.   In furtherance thereof, any amount constituting a "deferral of compensation" under Treasury Regulation Section 1.409A-1(b) that is payable to a Participant upon a separation from service of the Participant (within the meaning of Treasury Regulation Section 1.409A-1(h)) (other than due to the Participant's death), occurring while the Participant shall be a "specified employee" (within the meaning of Treasury Regulation Section 1.409A-1(i)) of the Group (as limited by Code Sections 414(b), (c), (m) and (o)), shall not be paid until the earlier of:

(a) the date that is six months following such separation from service; or

(b) the date of the Participant's death following such separation from service.

7.2   Notwithstanding any provision of the Plan to the contrary, to the extent that an Award constituting a "deferral of compensation" subject to Code Section 409A shall be deemed to be vested or restrictions lapse upon the occurrence of a Change of Control, and if such Change of Control does not constitute a "change in control event" (as defined in Treasury Regulation Section 1.409A-3(i)), then even though such Award may be deemed to be vested or restrictions lapse, payment will only be made to the extent necessary to comply with the provisions of Code Section 409A, to the United States participant on the earliest of:

(a)   the United States participant's separation from service, the date payment otherwise would have been made pursuant to the regular payment terms of the Award; or

(b)   the Participant's death.

**SCHEDULE 5**
**SELECT PLAN 2015**

*1.* *APPLICATION OF THE SCHEDULE*

Where Awards are granted under the Select Plan 2015 ("**Select Plan**"), then the Rules of the Novartis AG Long Term Incentive Plan shall apply subject to the terms set out in this Schedule.

The Select Plan applies for Select Awards made on or after 1 January 2015.

*2.* *PURPOSE*

The purpose of the Select Plan 2015 is to provide selected Eligible Employees of the Company or any member of the Group with an opportunity to receive an Award in respect of Restricted Stock and/or Restricted Stock Units, thus providing an increased incentive for such persons to contribute to the future success and prosperity of the Company and the Group, enhancing the value of the Shares for the benefit of the shareholders of the Company and increasing the ability of the Company and the Group to attract and retain individuals of exceptional skill.

*3.* *PARTICIPANTS*

(a)     Members of the ECN may not be granted Awards under the Select Plan.

(b)     Without prejudice to any subsisting Awards, the Board may, from time to time, exclude from participation under the Select Plan such category or categories of Eligible Employees as the Board may determine.

*4.* *VESTING AND OTHER CONDITIONS*

(a)     Subject to the Board determining otherwise the vesting period of the Awards under the Select Plan is 3 years.

(b)     In the event that an Award comprises Select Restricted Stock, the Participant shall be entitled to receive all dividends declared in respect of such shares (if any) and, other than in the year in which the Award is made if that Award is made after the Company's annual general meeting, to vote in any meeting of the Company's shareholders by reference to such shares.

(c)     In the event that an Award comprises Select Restricted Stock Units, during the Vesting Period the Participant shall not, in relation to any shares referable to such SRSU, be entitled to any dividends or votes.  SRSUs are not tradeable.

*5.* *DEFINITIONS*

For the purposes of this Schedule and its Appendices the following definitions shall apply:

"**ECN**" means the Executive Committee of Novartis AG (including permanent attendees to that committee).

"**Select Restricted Stock**" or "**SRS**" shall mean a Share subject to restrictions in accordance with the Select Plan.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

"**Select Restricted Stock Unit**" or "**SRSU**" shall mean a right to receive a Share (subject to the Board determining that SRSUs or any of them are to be settled in cash) in accordance with the Select Plan after the expiry of the Vesting Period.

"**U.S. Person**" has the same meaning as set out in Regulation S under the Securities Act of the United States of America provided that "U.S. Person" shall always include any person who is a resident of the United States.

"**Vesting Date**" means in relation to an Award the Vesting Date specified in the relevant Grant Notice.

"**Vesting Period**" shall mean the period between the Grant Date and Vesting Date of an Award.

## 6.   CESSATION OF EMPLOYMENT

Rule 6 shall apply save as modified as follows:

### 6.1   Cessation of Employment as a result of Retirement

Rule 6.1 shall apply as follows:

"If a Participant Ceases Employment because of Retirement with the agreement of the Participant's employer his Award shall, provided, if so determined by the Board, the Participant first executes and does not revoke a general release of claims acceptable to the Company, Vest on the date of such Cessation of Employment PROVIDED ALWAYS THAT if the Cessation of Employment in respect of which this Rule 6.3 applies occurs on or before the first anniversary of the Grant Date then the extent to which such Award Vests shall be reduced to take account of the proportion of the Vesting Period as has elapsed when the Cessation of Employment occurs."

### 6.2   Cessation of Employment for other good reasons and following sale

"If a Participant Ceases Employment because of:

(a)     termination of employment by the Participant's Employer (whether or not by notice) other than for misconduct or poor performance;

(b)     his Employer ceasing to be a member of the Group;

(c)     the business for which the Participant works is transferred to a person which or who is not a member of the Group,

his Award shall, provided, in relation to Rule 6.4(a) and if so determined by the Board, the Participant first executes and does not revoke a general release of claims acceptable to the Company, Vest on the date of such Cessation of Employment in respect of a proportion of the Award (corresponding to such proportion of the Vesting Period as has elapsed when the Participant Ceases Employment provided that the Board may determine in the case of leaving for reasons set out in (b) or (c) above that some or all of the Awards held by relevant Participants shall be exchanged in accordance with Rule 7.2 (exchange of awards)."

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

6.3    Cessation of Employment as a result of death or Disability

"If a Participant Ceases Employment as a result of his death or Disability then Awards held by that Participant shall Vest immediately."

### 7.    *US SELLING RESTRICTIONS*

The Shares subject to the Select Plan (including those received by Participants following Vesting of SRSUs) have not been and will not be registered under the U.S. Securities Act of 1933 and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. Persons except in certain transactions exempt from the registration requirements of the Securities Act. In connection with the acquisition of Shares, each Participant will represent and agree that she/he: is not a U.S. Person; is not purchasing or acquiring the Shares for the account or benefit of any U.S. Person; and has not offered or sold, and will not offer, sell or deliver, any of the Shares within the United States or to, or for the account or benefit of, any U.S. Person except pursuant to registration under the Securities Act or an available exemption from such registration.

### 8.    *APPENDICES TO THE SELECT PLAN*

The Board may establish such appendices to the Select Plan as it considers necessary or appropriate. Such appendices may be included in such a way that they create special rules applicable to certain Eligible Employees or categories of Eligible Employees and/or constitute sub-plans to the Select Plan.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

## APPENDIX 1
## NOVARTIS SELECT PLAN SWITZERLAND

### 1.   SELECT SWITZERLAND

Where Awards are granted under the Novartis Select Plan Switzerland ("**Select Switzerland**"), then the Rules of the Select Plan 2015 (forming a schedule to the Novartis AG Long Term Incentive Plan) shall apply subject to the terms set out in this Appendix 1.

### 2.   SELECT CHOICES SWITZERLAND

Select Switzerland offers Participants the choice to receive Awards in the form of either:

(a)      Select Restricted Stock (SRS); or

(b)      Select Restricted Stock Units (SRSUs).

The Board may determine that Awards in the form of SRS may be subject to a mandatory blocking period ("**Mandatory Blocking Period**").   Furthermore, the Board may offer Participants the opportunity to block Awards in the form of SRS after the expiry of the Mandatory Blocking Period ("**Additional Blocking Period**"). The blocking choices and the terms of the blocking will be determined by the Board from time to time.

### 3.   CESSATION OF EMPLOYMENT

Rule 6 as applied by Schedule 5 shall apply save as modified as follows:

3.1   General

(a)      If upon Cessation of Employment the outstanding SRS are forfeited with immediate effect, no compensation is paid to the Participant for the loss of the Award. In the event the applicable tax authorities decline to reimburse or compensate the personal income tax paid at the time of Award in respect of the forfeited SRS, the Company will compensate such cost on such basis as the Board may determine subject to receipt of such documentary proof as the Board may reasonably require.

(b)      No compensation will be paid for the forfeiture of SRSUs.

3.2   Cessation of Employment – effect on blocking periods

(a)      If paragraphs 6.1 or 6.2 of Schedule 5 apply, all SRS held by the Participant will remain blocked until the end of the Mandatory Blocking Period and/or, where applicable, until the end of any Additional Blocking Period.

(b)      If a Participant Ceases Employment as a result of his death or Disability all Mandatory and Additional Blocking Periods shall cease to apply immediately.

(c)      No further Additional Blocking periods shall be offered following Cessation of Employment.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

## SCHEDULE 6
## NOVARTIS RESTRICTED STOCK UNIT PLAN – FRENCH QUALIFIED RSU PLAN

**1.** *FRENCH QUALIFIED RSU PLAN*

This Schedule 6 sets out the terms of the Novartis Restricted Stock Unit Awards (RSUs) as they apply to participants whose RSUs Grant Notice refers to this Schedule 6 including *inter alia* awards made under the Select Plan 2015. Any RSUs subject to this Schedule 6 will be deemed French Qualified (meaning granted in compliance with the provisions of articles L.225-197-1 to L.225-197-6 of the French Commercial Code.

This Schedule 6 should be read in conjunction with the Rules of the Novartis AG Long Term Incentive Plan and any Schedule thereto which is referenced in the Grant Notice for a French Qualified RSU and is subject to those terms and conditions except to the extent that those terms and conditions differ from or conflict with the terms set out in this Schedule 6 in which event the terms set out in this Schedule 6 shall prevail.

**2.** *APPLICATION*

This Schedule 6 will apply to RSU Plan participants whose RSUs Grant Notice refers to this Schedule 6 and to French Qualified RSUs.

**3.** *ELIGIBILITY*

French Qualified RSUs shall not be granted under this Schedule 6 to an individual:

(a)     unless he is employed by a company which is a subsidiary of Novartis AG, as defined in Article L.225-197-2 of the French "Code de Commerce" in France; or

(b)     unless he is a director with a management function as defined in Article L.225-197-1 of the French "Code de Commerce" in France of a company which is a subsidiary of Novartis AG as defined in Article L.225-197-2 of the French "Code de Commerce" in France; or

(c)     who owns more than 10% of the share capital of Novartis AG.

**4.** *AWARD LIMIT*

The number of Shares that may be transferred to Participants under Awards granted under this Schedule 6 shall not exceed 10% of the Company's share capital. This threshold may be increased to 30% only if the spread between the biggest and the smallest number of RSUs granted to Participants does not exceed a 1 to 5 ratio.

**5.** *NO CASH SETTLEMENT*

Notwithstanding any other provisions of the Novartis AG Long Term Incentive Plan and any of its Schedules, only Shares can be delivered to Participants, and no cash equivalent.

**6.** *VESTING PERIOD*

The Vesting Period applicable to French Qualified RSUs may not be less than two years following the Grant Date even in case of termination of employment for any cause including Retirement and Disability of the Participant. However, notwithstanding the above, in the

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

event of death of a French Qualified RSU Participant, all of his or her outstanding RSUs shall Vest and the shares underlying the RSUs shall be transferred as set forth in paragraph 11 of this Schedule 6.

### 7. DEFINITIVE TRANSFER OF SHARES

Notwithstanding any other provisions of the Novartis AG Long Term Incentive Plan and any of its Schedules, once transferred to the Participant, the shares shall not be subject to any clawback or forfeiture provisions.

### 8. SALES RESTRICTIONS

In the event the shares underlying the French Qualified RSUs are transferred to the Participant less than four years from the Grant Date, and except in the event of death or Disability of the Participant (as set forth in paragraphs 11 and 12 of this Schedule 6), such shares shall not be disposed of prior to the expiration of a two-year period as calculated from the date the RSUs are converted into shares, or such other period as is required to comply with the minimum mandatory holding period applicable to French Qualified RSUs under Section L. 225-197-1 of the French Commercial Code.

In the event of an exchange of stocks without net balancing cash adjustment resulting from a public offer, a merger, a spin-off, a stock-split or a reverse stock split operation performed during the sale restriction period, such period remains applicable to the stocks received in exchange for the time period remaining at the date of the exchange.

Additionally, if the shares are brought to a company or an investment trust whose capital exclusively consist of shares or equities derivatives giving a right to access to share capital issued by the company or an affiliated company as defined at article L. 225-197-2 of the French Commercial Code, the holding period remains applicable to the shares received in exchange of the contribution for the time period remaining at the date of the contribution.

### 9. CLOSED PERIODS

Shares underlying French Qualified RSUs may not be sold during the following period ("Closed Periods"):

(a)     within the 10 days before the publication of the annual accounts and 3 days after such publication;

(b)     within a period beginning with the date at which executives and/or non-executive directors of Novartis AG become aware of any information which, were it to be public knowledge, could have a significant impact on the price of shares in Novartis AG and ending 10 trading days after the information becomes public knowledge.

These Closed Periods will apply to grants of French Qualified RSUs as long as and to the extent such Closed Periods are applicable under French law. In case the Novartis policies or applicable laws are more restrictive those policies or laws will prevail.

### 10. NON-TRANSFERABILITY OF RSUs

Except in the case of death, French Qualified RSUs may not be transferred to any third party.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**11.   DEATH OF A PARTICIPANT**

In the event of the death of a Participant, all unvested French Qualified RSUs held by the Participant at the time of death shall become immediately vested. Upon the Participants' heirs request made within 6 months from death, the Company shall transfer the underlying shares to the Participant's heirs. The Participant's heirs shall not be subject to the sale restriction set forth in paragraph 8 of this Schedule 6.

**12.   DISABILITY OF A PARTICIPANT**

In the event of Disability of a Participant during a sale restriction period imposed in accordance with the terms of paragraph 8 of this Schedule 6, the shares transferred shall no longer be subject to the sale restriction set forth in paragraph 8 of this Schedule 6.

The term "Disability" in this Schedule 6 shall correspond to the 2nd and 3rd categories of Article L.341-4 of the French Social Security Code.

**13.   PARTICIPANT'S ACCOUNT**

The shares transferred pursuant to the RSUs Plan shall be recorded in an account in the name of the Participant with the Company or a broker or in such other manner as the Company may otherwise determine in order to ensure compliance with the sale restrictions set forth in paragraph 8 of this Schedule 6.

**14.   RESTRICTION ON GRANT TO CORPORATE OFFICERS**

RSUs can only be granted to Corporate Officers (as defined in paragraph 3(b) of this Schedule 6) under this Schedule 6 if the following conditions are met:

(a)     RSUs or stock-options are granted in the conditions of the French Commercial Code to at least 90% of the employees of Novartis entities in France; or

(b)     A profit sharing agreement (being "*accord d'intéressement*" as defined in Article L.3312-2 of the French Labour Code, "a*ccord de participation dérogatoire*" as defined in Article L.3324-2 of the same Code or "*accord de participation volontaire*" as defined in Article L.3323-6 of the same Code) benefiting to at least 90% of the employees of Novartis entities in France is in place.

**15.   ADJUSTMENTS DUE TO CERTAIN CORPORATE AND OTHER EVENTS**

Adjustments to the terms and conditions of the French Qualified RSUs or underlying shares may be made only pursuant to applicable French legal and tax rules.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

**SCHEDULE 7**
**NOVARTIS VENTURE FUND PERFORMANCE PLAN**

**1.** *APPLICATION OF THE SCHEDULE*

Where Awards are granted under the Novartis Venture Fund Performance Plan (the "**NVFPP**"), then the Rules of the Novartis AG Long Term Incentive Plan shall apply subject to the terms set out in this Schedule.

**2.** *PERFORMANCE CONDITIONS AND VESTING*

(a)     NVFPP Awards are subject to Performance Conditions relating to:

     (i)     As to 50% of the Award, Target Proceeds compared to Cash on Cash Multiple (the "**Target Proceeds Performance Condition**") over the period of two years commencing with the 1st January immediately preceding the Grant Date (the "**Target Proceeds Performance Period**"); and

     (ii)    As to the remaining 50% of the Award, Relative IRR of the NVF (the "**IRR Performance Condition**") over the period of 10 years ending with the 1st January immediately preceding the second anniversary of the Grant Date (the "**IRR Performance Period**").

(b)     Awards shall, to the extent the Performance Conditions are met (as determined by the Board), shall Vest on the third anniversary of the Grant Date (not the expiry of the Target Proceeds Performance Period or the IRR Performance Period) subject to the rules of the Novartis AG Long Term Incentive Plan, including subject to the provisions relating to cessation of employment.

**3.** *DEFINITIONS*

For the purposes of this Schedule the following definitions shall apply:

     "**Cash on Cash Multiple**" means the multiple as determined by the Board which measures the cash return to the Group from the NVF over the applicable Target Proceeds Performance Period.

     "**IRR**" means the internal rate of return, as determined by the Board, applicable to the NVF over the relevant IRR Performance Period.

     "**NVF**" means Novartis Venture Fund.

     "**Peer Group**" means, for the purposes of the IRR, the peers to NVF determined by the Board from time to time.

     "**Relative IRR**" means the IRR ranked against the Peer Group.

     "**Target Proceeds**" means the target proceeds set in relation to each Award by the Board.

**4.** *TARGET PROCEEDS PERFORMANCE CONDITION*

The Target Proceeds Performance Condition shall apply to 50% of an Award.  The number

of Vested NVFPP Awards shall be determined by the Board by reference to the Target Proceeds Performance Condition provided that the maximum number of Vested NVFPP Awards before any Dividend Equivalents shall be as follows:

(a)    In respect of a Participant who, as at the Grant Date, was the head of the NVF, 200%;

(b)    In respect of all other Participants who receive an Award under the NVFPP, 150%.

### 5.    *IRR PERFORMANCE CONDITION*

The IRR Performance Condition shall apply to 50% of an Award.  The number of Vested NVFPP Awards shall be determined by the Board by reference to IRR Performance Condition provided that the maximum number of Vested NVFPP Awards before any Dividend Equivalents shall be as follows:

(a)    In respect of a Participant who, as at the Grant Date, was the head of the NVF, 200%

(b)    In respect of all other Participants who receive an Award under the NVFPP, 150%.

### 6.    *AMENDMENTS*

The Board may at any time change this Schedule.  Subject to Rule 2.5, changes may affect Awards already granted provided always that, unless required by law, no such change may be made which is to the material disadvantage of a Participant without that Participant's prior written consent.

LTIP rules – January 22, 2014 and amended thereafter (effective in relation to awards made on or after January 1, 2017)

# EXHIBIT B

# ALISHA A. ALAIMO
+1.862.309.6352 ♦ alishaalaimo@aol.com

## SUMMARY

Accomplished global executive with proven sales, marketing, market access, key account management, advocacy and medical leadership for large, complex organizations in the U.S. and Europe with up to $1.7B in annual revenues

Courageous and decisive P&L business head with proven track record of achieving near impossible organizational objectives- profitably turned around an underperforming UK franchise exceeding goals for three consecutive years

Influential business leader presenting to dozens of executive committees on strategic initiatives and global programs shaping and driving strategy for organizations with over 2000 employees and up to $4B in annual revenues

Insightful strategist and change agent; overcame resistance and gained buy-in to successfully launch a key brand across 22 European countries exceeding first year sales goals by 18%– product represents $1.2B Ex-US today

Passionate customer advocate skilled at balancing both internal and external priorities; eliminated barriers to access for over 38,000 Multiple Sclerosis patients reducing critical treatment delays by over 50%

Strategic collaborative partner with global, regional and local networks across a complex, matrix structure capable of establishing sponsorship and consensus under highly resistant and challenging conditions

Proven track record of building, investing in and empowering teams of up to 2000 having reinvigorated the U.S. Neuroscience Business Unit achieving unprecedented annual sales growth of 26% in the key product's fifth year

## EXPERIENCE

**NOVARTIS PHARMACEUTICALS CORPORATION**, East Hanover, NJ, 2000 – Present

Vice President & Head, Cardiovascular and Respiratory Units, 2016 – Present

Hand selected to quickly turnaround an underperforming $1.5B CV and respiratory unit following a sudden leadership change and weak launch of *Entresto*, the company's flagship heart-failure drug with projected annual revenue goals of $5B

Rebuilding a leadership team of 12 fostering empowerment, accountability and excellence across a U.S. staff of 2000 – collaborating with HR and an external consulting partner to develop and implement a cultural transformation strategy that engages a demoralized business unit, defying perceived boundaries, and unites the team behind accelerating the brand

Created and quickly tested an aggressive performance revival plan increasing sales by 30% in eight weeks while gaining vital market insights to drive future strategy– product is now on track to exceed FY 2016 sales goal of $200M

Built business unit's first-ever formal project management office identifying, prioritizing and sponsoring 10 key workstreams, including go-to-market strategy, market access for patients and sales training, assembling a crossfunctional team of over 100

Proposed and secured an additional $120MM investment from the Board gaining sponsorship and financial support to double the field salesforce by the end of FY 2016

Secured a critical milestone endorsement for *Entresto* in May 2016 from the American College of Cardiology, the American Heart Association and the Heart Failure Society of America through updated heart failure (HF) guideline

Rapidly rebuilding investor and market confidence influencing a 3% increase in stock price and a dramatic and positive shift in market analyst recommendations and projections

US General Manager– Alcon Pharmaceutical, 2016 (in role 3 weeks)

Led the integration of Alcon's $1.6B ophthalmic pharmaceutical business into the Novartis Pharmaceuticals Division – assembled and led a dedicated, cross-functional team of up to 50 resources sourced through the GenMed business

Built a robust project management office in three weeks identifying, prioritizing and resourcing eight primary workstreams

Overhauled sales strategies, processes and measures to address significant performance and retention issues facing the U.S. salesforce of over 560

Vice President & Head, Neuroscience Business Unit, 2014 – 2016

Led vision and strategy driving revenue growth and profitability for an underperforming $1.7B neuroscience business unit offering a highly specialized product designed to reduce symptoms in Multiple Sclerosis (MS) patients

  o Traveled throughout the U.S. over two months initiating discussions with key opinion leaders building external credibility, gathering market insights and gaining firsthand exposure to the patient experience

Served as a core member of the GenMed Executive Committee influencing and contributing on all strategic business decisions for the broader $3.7B U.S. business, including investment strategy, organizational design and pipeline development

Successfully rejuvenated a billion-dollar brand exceeding the 2015 revenue budget by 10% with annual growth of more than 26% in the product's fifth year of $1.7B

Decreased patient waiting time by over 50% through the optimization of initiation and onboarding processes

Invested over $2.4M in training, development and talent management fostering a diverse, skilled and highly empowered team of over 450 – assessed and rebuilt over 70% of the leadership team and maintained 'open door' policy for all

Quickly transformed culture fostering a more patient-centric, empowering and agile team model implementing a 12-member strategic decision making board accountable for streamlining approvals and driving key initiatives

## NOVARTIS PHARMACEUTICALS UK LIMITED, London, UK, 2010 – 2014

Business Franchise Head, Integrated Hospital Care & Country Pharma Organization (CPO) Board Member, 2011 – 2014

Oversaw sales, marketing, market access and medical activities for Integrated Hospital Care division driving sales, profit and market share growth across 12 in-line and pre-launch brands targeting transplantation, infection and autoimmunity

Contributing member of the Country Pharma Organization (CPO) Board providing input and oversight to franchise and brand marketing and investment strategy development, planning and execution for $500MM UK pharmaceutical business

Rapidly grew a historically underperforming franchise exceeding 2013 budgeted sales by 12% growing all seven in-line brands and establishing it as the top performing franchise in the UK – exceeding 2014 YTD budgeted sales by 10%

Secured funding for the largest-ever Phase IIIb dermatological clinical trial conducted in the UK exceeding competition in number of sites by 240% laying the foundation for one of the most successful launches in UK history (Cosentyx)

  o   Product successfully launched in September 2015 tripling the benchmark in the first month alone

Influenced unprecedented marketing and sales investment growth (168% for 2013, 126% for 2014) including approved headcount growth of more than 138%, while continuing to maintain the highest profitability across the organization

Restructured sales and marketing functions redefining roles, accountabilities and performance expectations to build a high performing team of 60 – implemented strategic staffing and training initiatives to establish bench depth and strength

Overhauled and re-launched TOBI Podhaler developing and executing a competitive market access strategy growing the number of Cystic Fibrosis patients using the product from 13 to over 800 since the December 2011 launch

Surpassed local CPO and external benchmark measures across more than 13 categories on the 2011 and 2013 global employee surveys, including engagement, retention, communication, diversity & inclusion and performance management

One of only 29 women selected globally for a year-long Pharma Executive Female Leadership Program (EFLP), a select executive sponsorship and senior management mentoring and coaching program for high-performing leaders

Strategic Business Director (SBD), 2010 – 2011

Spearheaded strategy development for key business initiative transitioning from a share of voice model to a market access model targeting Strategic Health Authorities (SHAs) and Primary Care Trusts (PCTs) across England

Leveraged global expertise leading an executive sponsored taskforce to relaunch a new strategic plan for a 24-hour COPD product establishing it as one of the UK's top three pillar brands – earned company's top award for results

Influenced Pharmaceutical Executive Committee (PEC) to invest in type II diabetes product ultimately executing a targeted sales strategy increasing market share by 20% and sales by $10M with no additional costs incurred

Negotiated and implanted first-ever sole sponsorship with NECLES (North East London, Central London and Essex) HIEC (Health, Innovation and Education Cluster) collaborating to identify over 2M COPD patients not part of the NHS

  o   Success of partnership was highlighted in Q1 2011 Health Services Journal article

## NOVARTIS PHARMACEUTICALS AG, Basel, Switzerland, 2005 – 2010

Global Associate Brand Director – Diabetes, 2009 – 2010

Oversaw $8M budget directing all global advertising, branding, medical education, internal/external communication and advocacy for key strategic brand, a dipeptidyl peptidase IV inhibitor developed to treat type II diabetes mellitus

Led development and rollout of an innovative $1.5M global patient program piloting physician and patient education, support and tools across three locations successfully driving prescription sales by more than 600% in Greece alone

Honored with one of only four 2009 CEO-sponsored *Novartis Excellence Awards for Business Results* recognizing outstanding performance in driving the successful launch of product despite significant approval delays and market resistance

Region Europe Brand Director – Diabetes, 2008 –2009

Influenced senior leadership to invest $151M to launch a key strategic brand within European region despite intense resistance following FDA's delayed approval status – region represents 68% of total global sales

Aggressively led all brand strategy, positioning and market mix execution quickly capturing buy-in and sponsorship from Region Europe senior management, CPO leaders and brand teams

Oversaw all planning and execution successfully launching across 22 European countries in under 16 months exceeding first year sales goals by 18% positioning drug within $2.7B market – 2013 Ex-US sales reached $1.2B

Hand-selected as one of four members for an executive sponsored SWAT team commissioned to analyze and recommend turnaround strategies for Austrian CPO – received 100% senior leader buy-in on recommendations

Awarded five prestigious Novartis awards for best practices, customer care and excellence in leadership

Global Brand Manager – Diabetes, 2006 – 2008
Global Advertising and Branding Manager, 2005 – 2006
Global Marketing and Sales Learning Manager, 2005

## NOVARTIS PHARMACEUTICALS CORPORATION, East Hanover, NJ, 2000 – 2005

Area Sales Manager – Cardiovascular Metabolic, Indiana/Ohio/Kentucky, 2002 – 2005

Associate Director/Neuroscience Training Manager – Sales Training, East Hanover, NJ, 2000 – 2002

**JOHNSON & JOHNSON (ORTHO-MCNEIL PHARMACEUTICAL DIVISION)**, New Brunswick, NJ, 1997 – 2000

Associate Franchise Training Manager – Analgesics, Raritan, NJ, 1999 – 2000

Hospital Representative/Sales Representative, Nashville, TN, 1997 – 1999

## EDUCATION

**EMORY UNIVERSITY** – Atlanta, GA

Bachelor of Science in Biology, 1997

**TUFTS** – Medford, MA

Post-graduate coursework in Clinical Pharmacology, Drug Development and Regulation

**HARVARD UNIVERSITY** – Boston, MA

Novartis-sponsored Business Finance II course

Novartis-sponsored Executive Leadership course

# EXHIBIT C



For Internal Use Only

| Document No | NPC 052 XD | |
|---|---|---|
| Document Name | Confidentiality Policy | |
| Effective Date | 5-11-2016 | Version: 1.1 |

## 1. Scope

This policy applies to all employees of Novartis Pharmaceuticals Corporation ("Novartis" or the "Company").

## 2. Objective and Purpose

This policy establishes a common standard on the protection of Confidential Information of the Company.

## 3. Detailed Description

### Confidential Information

### A. Definition of Confidential Information

All information, whether or not in writing, regarding the business, technology, relationships, legal or financial affairs of Novartis and/or one or more of its other affiliated entities, their predecessor companies, affiliated companies of such predecessor companies (collectively, the "Company") and their collaborators that has been acquired in prior employment or in the course of current employment with Novartis that the Company has not made generally known to the public including, but not limited to, information concerning the Company's and its collaborators' research and development activities and practices, inventions and discoveries, manufacturing processes and practices, product formulae, process and method specifications, trade secrets, computer programs, marketing activities, customer lists and other customer information, cost and pricing data, business plans, financial information and human resources practices, policies and employee data, whether or not patentable or copyrightable, as the case may be ("Confidential Information"), is and will at all times remain, the exclusive property of the Company and its collaborators, as applicable.

### B. Non-Disclosure of Confidential Information

Except as required in the course of an employee's duties for Novartis, employees will not, without Novartis' prior written consent, disclose to anyone outside Novartis nor use in any way other than in Novartis' business as authorized by Novartis, any Confidential Information, or any information or material received in confidence from third parties for or on behalf of the Company.  This obligation continues throughout employment with Novartis and after the termination of employment with Novartis.  Confidential Information is unique, extraordinary in character and of great value to the Company.  Notwithstanding the foregoing, nothing in this

**Confidentiality Policy**
**Effective Date: 5-11-2016**
**V: 1.1**

Policy, nor in any individual's Employee Agreement, prohibits or restricts Novartis employees from at any time:

(a) providing information related to alleged misconduct to the U.S. Securities and Exchange Commission, or any other federal, state or local regulatory or law enforcement body or from participating in any government investigation; or

(b) engaging in protected concerted activity under the National Labor Relations Act.

Employees are reminded that in order to help ensure prevention and detection of any potential misconduct, they are required by our Code of Conduct to immediately report to Novartis all complaints of misconduct.

## C.  Non-Disclosure of Confidential Information of Third Parties

Employees of Novartis are not permitted to bring with them to Novartis, disclose to anyone at Novartis, use in Novartis' business, or cause Novartis to use, any information or material that an employee knows or has reason to know is confidential or proprietary to any third party (such as a prior employer) and which is obtained:

(i)  prior to one's employment by Novartis, or
(ii) during one's employment by Novartis, but that was disclosed by the third party to the Novartis employee for purposes unrelated to employment at Novartis.

Further, Novartis employees will not incorporate into any product, materials, information or documentation used and/or sold by the Company, any patented invention or process, copyrighted work of authorship or trade secret of any third party, unless such incorporation by the Company has been authorized by said third party or other party having the legal authority to do so.

## D.  No Prior Employment Restrictions

Prior to commencing employment with Novartis, prospective candidates for employment must disclose fully any agreements in which they have entered into with a prior employer which could, in any way, materially prevent or restrict his or her ability to perform the full range and scope of their duties for and assignment with Novartis, either because of the subject matter covered by the pre-employment restriction, its geographical extent or its time provisions.  An employee's failure to make full disclosure to Novartis of any such pre-existing restraints prior to commencing employment will be grounds for termination for Cause.

## E.  Notice of Immunity

In accordance with the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1833, an employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  The DTSA also provides that an employee who files a retaliation lawsuit for reporting a suspected violation of law may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding if (a) the document containing the trade secret is filed under seal; and (b) the employee does not disclose the trade secret, except pursuant to court order.

**Confidentiality Policy**
**Effective Date: 5-11-2016**
**V: 1.1**

## 4.  Special Definitions and Roles

## 5.  Exhibits/Cross References

| Change History | | | |
|---|---|---|---|
| **Rev No** | **Date** | **Author** | **Change Description** |
| 1.0 | 06-08-2015 | Rich Reig | First policy |
| 1.1 | 5-11-2016 | Rich Reig | Amend policy to include Notice of Immunity as per the Defend Trade Secrets Act. |
| | | | |
| | | | |
| | | | |

# EXHIBIT D

 NOVARTIS

Novartis Pharmaceuticals Corporation
1 Health Plaza
East Hanover, NJ 07936

**PERSONAL AND CONFIDENTIAL**

September 17, 2014

Alisha Alaimo
200 Frimley Business Park GB- Frimley/Camberley
Surrey GU16 7SR UNITED KINGDOM

## RE: Employment Agreement

Dear Alisha:

Confirming our previous discussions, it is with great pleasure that I extend our offer to you to join Novartis Pharmaceuticals Corporation ("NPC" or the "Company") as Head, US Neuroscience Business Unit, at its offices based in East Hanover, New Jersey, USA, beginning on November 1, 2014 (the "Start Date").

This offer is in two parts which, hopefully, will be self-explanatory. The first details the particular aspects of our offer which apply specifically to you and will explain the next steps needed to complete your on-boarding process prior to commencing in your new role. The second consists of our standard terms and conditions of employment for executives at your level, which are attached to this letter as Appendix 1. These provisions include some further details about our plans and policies, the incentive programs in which you will be participating and our conditions and expectations regarding severance, post-employment competition and the like. Taken together, along with the documents to which I refer below, these will make up the entirety of our agreement.

### (1) FUNCTION
As stated above, you will be employed by the Company as Head, US Neuroscience Business Unit, and will have the duties, authorities and responsibilities to manage our business activities in the field of commercial management, which may be amended from time to time as required by the Company.

### (2) BASE SALARY
Your initial, gross base salary will be $256,000 per annum, ($21,333 per month), from which the Company will make applicable payroll deductions. Your base salary for subsequent years will be reviewed once a year and may be adjusted to reflect our yearly financial performance and the Company's assessment of how well you've achieved your functional objectives and reflected the Company's expectations for Associate Values and Behaviors, among other factors.

## (3) INCENTIVE PLAN PARTICIPATION

### a) Short-term Incentive Plan: Annual Incentive Plan

You will be eligible to participate in the Company's Annual Incentive Plan (the "AIP"), which is a cash-based bonus plan. Your target incentive for the performance year 2014 is 35% of your annual base salary for the year. AIP payments attributable to the performance year pro-rated in your first year of service from your Start Date will be paid on or before March 15 of the following calendar year. The Company will use its discretion to determine the actual figure you receive as a payout by taking into account the strength of your individual performance and the business results for the previous year.  This amount may vary between 0% and 225% of your target incentive. Any payout over 200% of target would be determined under the terms of the AIP.

### b) Long-Term Incentive Plan: Novartis Equity Plan "Select"

You will be nominated to participate in the Novartis Corporation 2011 Stock Incentive Plan for North American Employees, as amended (the "SIP"), at a target incentive for the performance cycle year 2014 of 30% of your annual base salary, pro-rated in your first year of service from your Start Date. Participation in the SIP is determined on a yearly basis. In each year of participation, you will receive unvested ("Select") grants based on or derived from Novartis American Depositary Shares (NYSE:NVS) ("ADSs"), which you will receive in the form of restricted stock units ("RSUs"). The actual number of Select incentive grants in a given year will be determined at the discretion of the Company, taking into account the strength of your individual performance and business results for the previous year.  As in the case of the cash-based AIP, your SIP grant may vary between 0% and 225% of your target incentive. Any payout over 200% requires the approval of the Stock Committee of Novartis Corporation, which oversees the SIP program.

## (4) EMPLOYEE BENEFITS; VACATION

### a) You will be eligible to participate in all of the Company's retirement, welfare benefit plan and executive fringe benefits available to Associates at a similar level, pursuant to the terms of each such employee benefits plan or fringe benefit arrangement.

### b) Your vacation entitlement is based on job level and will be in accordance with local US vacation policy.

### c) You will also be eligible to participate in Executive programs including the US Deferred Compensation program, US Executive Medical program, Executive Financial Planning Services, US Executive company car program, and any other programs applicable to employees at your level.

## (5) COMPLIANCE WITH COMPANY POLICIES

The Company expects all of its Associates to comply strictly with its policies, practices and guidelines for loyal, legal and ethical behavior, as it may promulgate, revise and amend from time to time, and which it regards as critical to overall acceptable job performance. Some of these, such as the obligation to keep confidential the Company's valuable, non-public information and only to use such information in the interests of the business, the use of Company property for business purposes only and the assignment of ownership to the Company of intellectual property developed with Company resources on Company time, are

Initials:  Alisha Alaimo                    Page 2

embodied in the so-called "Employee Agreement" regarding confidentiality and intellectual property ownership which you will be required to sign prior to starting your employment with the Company, and which is incorporated into this Agreement. Others, such as the Company's Code of Conduct, the Conflict of Interest Policy and the Insider Trading Policy, as examples, are readily available either in hard copy or on the Company's internet and intranet sites. A material violation of any of these undertakings is considered to be a basis for termination of employment for Cause.

## (6) TERM AND TERMINATION

This Agreement will become effective with your Start Date, which we anticipate will be November 1, 2014. Your employment with the Company is that of an employee "at will," which means that our agreement will remain in effect for an indefinite period of time until terminated at any time by either you or the Company for any lawful reason or for no reason upon sixty (60) days prior written notice to the other party (the "Notice Period), unless, e.g., terminated for "Cause," as defined in Appendix 1, Paragraph D, in which case no notice would be required. There are other special circumstances which could affect our employment relationship and the applicability of the Notice Period described above. These are detailed in Appendix 1 in Paragraph B and D, and you should familiarize yourself with the circumstances described there, even if these may never apply to you.

## (7) AMENDMENT AND MODIFICATION

This Agreement, and the terms and conditions contained in Appendix 1, attached, represent our complete agreement concerning the terms and conditions of your employment with the Company. As such, with the exception of the Employee Agreement between you and the Company which is incorporated herein, this Agreement supersedes any prior agreements or understandings of any kind concerning your employment with the Company, whether written or oral. These terms of your employment may be amended or modified subsequently only by a writing which is signed by both you and by an authorized representative of the Company.

Alisha, we are very much looking forward to having you work with us at Novartis Pharmaceuticals Corporation as a member of our senior management team. We are confident that your demonstrated talents and experience will substantially contribute to our future success as a company. Let me know if you have any questions concerning this offer or any additional information you would like me to supply as you consider our offer.

If, as we hope, you choose to accept this offer, please indicate that decision by signing and dating a copy of this letter below, as well as by initialing each page of this letter and the Appendix where indicated, and returning these to me at the address on the first page.

Very truly yours,

Christi Shaw
President, Novartis Pharmaceuticals Corporation

Caryn Parlavecchio
VP & Head Human Resources, Novartis Pharmaceuticals Corporation

Accepted and agreed to:

I have read and reviewed all the provisions of this Agreement, including those contained in Appendix 1.

Name:  Alisha Alaimo

Date: **Sept. 23** , 20**14**

Enc.:  Appendix 1

Initials:  Alisha Alaimo                    Page 4

**APPENDIX 1**
**ADDITIONAL TERMS AND CONDITIONS OF EMPLOYMENT**
**FOR**
**SENIOR MANAGERS (THE "EXECUTIVE")**
**OF NOVARTIS PHARMACEUTICALS CORPORATION**

## A. PAID LEAVE DURING NOTICE PERIOD

At any time during the sixty (60) day notice period prior to terminating employment for reasons other than Cause, the Company, at its sole discretion, may relieve the Executive of his or her duties and responsibilities and place him or her on a "paid leave" until the expiration of the period. During the paid leave, the terms of the Executive's employment agreement remain in full force and effect, except as modified by this paragraph, and the Executive will be prohibited from working for another employer. The Company will continue to pay the Executive's base salary for the leave period, but his or her right to further accruals under the Company's incentive plans, including, as applicable, the AIP, the SIP and the LTPP, will cease as of the date the leave period commences.

## B. TERMINATION OF THE EMPLOYMENT AGREEMENT DUE TO DEATH OR PERMANENT DISABILITY

Employment of the Executive will terminate automatically with immediate effect, except as to the Company's obligations to provide payment to the Executive or to his or her estate for unpaid salary or accrued and pro-rated incentive plan payments, on the date of his or her death or "Permanent Disability". For purposes of this Agreement, "Permanent Disability" means the Executive's inability to perform the essential functions of his or her position with or without reasonable accommodation due to physical or mental illness as a result of which, (a) he or she has not performed such duties for the Company for a period of six consecutive months; (b) notice has been provided to him or her under the Company's Long-Term Disability Plan ("LTD") of his or her eligibility or ineligibility to receive LTD benefits; and, (c) in the latter case, he or she has not fully resumed his or her duties hereunder within thirty (30) days after such notice has been given.

## C. PROVISIONS APPLICABLE TO THE COMPANY'S SHORT-TERM (CASH) AND LONG-TERM (EQUITY) INCENTIVE COMPENSATION PLANS

The Company's annual, cash incentive and long-term equity incentive compensation plans are written documents and the terms of those documents will always be determinative in the case of any question. In general, the plans are discretionary and results and performance-oriented. The Company, in its sole discretion, may adjust individual awards up or down within the limits set by the plans to reflect individual performance, financial results and such other factors as it considers relevant.

Subject to rights, if any, which have individually accrued under the long-term incentive plans, the Company has the right to discontinue, amend, or terminate any or all of these short or long-term incentive plans at any time without prior notice or liability to the participants.  In the case of an Executive who is hired after the beginning of a cycle period or year, awards under a plan normally based on the entire year or cycle will be determined on a pro-rated basis, unless the particular plan provides for a different result.

Initials:  Alisha Alaimo                    Page 5

In the case of termination of an Executive's employment for any reason other than death or Permanent Disability, the Company, subject to the terms of the plan concerned and the Executive's previous distribution elections, may, at its sole discretion, pay out any amounts or make any awards to him or her under any of its incentive plans.

In the case of an internal promotion, the Executive's incentives for the current performance cycle will be determined on a pro rata basis based on his or her previous target and his or her new target.

All payments from the Company's incentive plans are subject to applicable federal, state and local tax withholding.

## D. SEVERANCE FOR TERMINATED EXECUTIVES

At the time of termination, which occurs on the date he or she is separated from the Company's active payroll, or as otherwise provided in this Appendix 1,  the Executive's participation in any of the Company's employee retirement or welfare benefit plans and programs, short- or long-term bonus incentive plans, nonqualified supplemental retirement plans, fringe benefit arrangements, deferred compensation programs or any other plan, policy or program of any kind which it sponsors or otherwise provides for its active, payroll employees, their dependents and beneficiaries ceases, as does any further vesting or accrual of benefits under the employee benefits plans for which those terms are applicable.

1. However, if the Company terminates an Executive's employment for reasons other than (i) "Cause" (as defined in sub-paragraph D.5, below); or if he or she resigns for "Good Reason" (as defined in sub-paragraph D.6, below), the Executive shall be offered, in consideration for his or her execution of a general release of claims in a form acceptable to the Company and his or her satisfactory cooperation in the orderly wind-up and transition of his or her function's responsibilities prior to termination, a single, lump sum payment equivalent in gross amount to six (6) months of the Executive's monthly base salary for the year in which the termination occurs, subject to applicable tax withholding.

2. If, as of the date of his or her termination, the Executive is a "specified employee" within the meaning of Section 409A of the Internal Revenue Code, then to the extent necessary to comply with Code Section 409A and to avoid the imposition of taxes and/or penalties under that Section, payment to the Executive of any amount under this paragraph D or under the employment agreement generally which constitutes "nonqualified deferred compensation" under Section 409A and which under the terms of the employment agreement would otherwise be payable as a result of and within six (6) months following such termination shall be delayed, as provided under current regulatory requirements under Code Section 409A,  until the earlier of (i) five (5) days after the Company receives notification of the Executive's death or (ii) the first business day of the seventh month following the date of the Executive's termination.  Any such delayed payments shall be made without interest.

3. The severance payment referred to in sub-paragraph D.1, above, represents consideration in addition to the salary and benefits provided under the employment agreement for the Executive's undertaking to refrain from

Initials:  Alisha Alaimo                          Page 6

competition with the Company for six (6) months post-employment, as provided in paragraph E of this Appendix..

4. In return for receiving severance or paid leave under this Paragraph D, the Executive will have no claim for severance pursuant to any other Company plan, agreement or arrangement.

5. Termination for "Cause" Defined
   For purposes of this Paragraph D, "Cause" is defined as fraud, misappropriation, falsification of reports or work product, dishonesty, misconduct, material violation of a Company policy, including, but not limited to, the Company's Code of Conduct, material breach of the Executive's obligations under his or her employment agreement, or disregard of important, lawful instructions reasonably given to him or her in the course of employment.

6. Resignation for "Good Reason" Defined
   For purposes of this Paragraph D, "Good Reason" as used in sub-paragraph D.1, above, is defined as a reduction in the Executive's base salary, the reclassification, without the Executive's consent, of his or her position to a lower executive band resulting in a substantial diminution of his or her duties or his or her reassignment, without prior consent, to a position at a lower executive band resulting in such substantial diminution of duties; provided, however that the Executive shall not resign from employment on grounds of Good Reason unless he or she first gives written notice of his or her reasons for doing so, and, if reasonably curable, the Company has not, within thirty (30) days after receiving this notice, taken reasonable steps to correct the situation. However, no Good Reason for resignation exists if the reduction, reclassification or reassignment involved results from: a reorganization of the Executive's business unit which affects its organizational  status or reporting relationship within the Novartis Group; a reassignment of his or her job function within or between business units or corporate entities; sub-standard job performance; a relocation resignation; or a lawful disciplinary measure short of termination for Cause imposed on him or her.

## E. NON-COMPETITION

During the term of the Executive's employment with the Company and for a period of six (6) months following his or her termination, he or she shall not, within the continental United States, directly or indirectly, own, manage, operate, control or finance; or participate in the ownership, management, operation, control or financing of; or be connected as an officer, director, employee, partner, consultant or in any other capacity with; any business with which the Company is in substantial competition and in which the Executive could use or disclose any of the Company's trade secrets or confidential information that he or she utilized during employment with the Company or which were otherwise disclosed to him or her as a result of that employment.  Any post-employment limitation shall be determined by the activities of the Company as of the time of the termination.

Ownership of not more than five percent of the capital stock of any company having a class of securities registered pursuant to the Securities Exchange Act of 1934, as amended, is not considered to be competition with the Company. The Executive will not be considered in competition with the Company if he or she works for a consulting firm, agency or other business providing services to companies in the industry sector in which the Company

Initials:  Alisha Alaimo          Page 7

competes so long as, for the period that this provision is in effect, he or she does not function in any capacity for or on behalf of any company or business with respect to any product, which is in competition with a Company product.

## F. REQUEST FOR WAIVER OF NON-COMPETITION RESTRICTION; FURTHER CONSIDERATION

The Executive who is terminating from employment with the Company (1) for reasons other than Cause or (2) for resignation for Good Reason may request that the Company waive the restraint on his or her post-employment competitive activities, and the Company, in its sole discretion, will take any such request under consideration. In a case in which:

- he or she has fully disclosed to the Company the nature and extent of any potentially competitive post-employment activities in which he or she proposes to engage;
- the Company decides not to grant the waiver from the non-competition restriction which the Executive has requested; and
- the Executive will suffer a loss of earnings proportionate to his or her former base salary as a result,

in addition to the lump sum severance provided under Paragraph D , the Executive will also receive as additional consideration an amount based on his or her previous year's AIP, at target and pro-rated to correspond with the actual period of the non-competition restraint. Any required tax withholdings will be deducted from such payments.

## G. NON-SOLICITATION

During the term of the Executive's employment and for a period of twenty-four (24) months following his or her termination, he or she shall not, directly or indirectly knowingly cause or encourage any current Associate of the Company or any of its affiliates to leave the employ of the Company (or affiliate) or to accept employment with him or her or any other person, firm, association or company, if the Associate  was or becomes employed by the Company or any of its affiliates during the Executive's employment with the Company. The Executive is not in violation of the no-solicitation requirement simply because he or she provides personal references or recommendations for individuals in connection with an application for employment or association with, a person, firm, business or company if (x) he or she is not affiliated or otherwise associated with such person, firm, association or company and (y) the personal reference or recommendation was requested by such person, firm, association or company without initiation by him or her.

## H. EQUITABLE RELIEF AND OTHER REMEDIES FOR BREACH OF THE EMPLOYMENT AGREEMENT

In the event of the Executive's breach or threatened breach of his or her obligations to refrain from post-employment competition and non-solicitation, the Executive and the Company have agreed that Company's ordinarily available legal remedies would be inadequate to protect it.  As a result, the Company, without posting any bond, would be entitled to obtain equitable or other appropriate relief against this actual or threatened breach in the form of specific performance, temporary restraining order, a temporary or permanent injunction or any other remedy to stop the violation which may be obtainable from any court with jurisdiction to grant this relief.

Initials:  Alisha Alaimo                    Page 8

## I. CLAWBACK OF INCENTIVE COMPENSATION FOR VIOLATIONS OF LAW, THE CODE OF CONDUCT, OR OTHER IMPORTANT NOVARTIS POLICIES

(a)  The Executive agrees to adhere at all times to all applicable laws as well as all internal rules of Novartis such as the Code of Conduct, the Novartis Group Conflicts of Interest Policy, the Guidelines on reporting violations of law and policies and the other Novartis policies, procedures, guidelines applicable to his or her work ("Guidelines"). The Executive is aware that a violation of the law or the Guidelines could lead to disciplinary actions up to and including termination of employment for Cause, as defined in the Agreement. The Guidelines, which may be amended from time to time through publication on the Novartis intranet or otherwise, form an integrated part of this contract and the Company's payment of any future compensation incentive is conditioned on his or her compliance with these Guidelines and with applicable laws.

(b)  Accordingly, in case the Company, in the exercise of its sole discretion, determines that the Executive has violated the law, the Code of Conduct or any provision of the Guidelines in a material way (including, but not limited to, fraud, bribes, scientific misconduct, illegal marketing practices such as off-label promotion or offering kickbacks. etc.), he or she will not earn or receive any incentive compensation under the plans outlined in paragraph 3 of this Agreement for any period in which such violation(s) occurred or were discovered, and he or she agrees promptly to repay any incentive already received for any period in which such violation(s) occurred or were discovered.

(c)  In addition to any other remedy that the Company might have for damages, if the Executive fails or refuses to repay any such incentive paid to him or her, the Company may file a lawsuit against the Executive to enforce this provision and, in addition to any other remedy the Company may have, including claims for damages, the Company is entitled to recover the amount of such incentive plus costs and fees incurred in pursuing the lawsuit.

## J. REFORMATION

If it is determined by any court with jurisdiction, in applying the law of New Jersey, that any restrictions against non-competition and non-solicitation which are contained in this Appendix 1 are excessive in duration or scope or are otherwise unreasonable or unenforceable the Executive and the Company will ask the court to modify or amend the restriction to render it enforceable to the maximum extent permitted by New Jersey law.

## K. GOVERNING LAW

This Agreement shall be construed in accordance with the law of the State of New Jersey, without regard to its conflict of laws provisions.

 NOVARTIS

# EMPLOYEE AGREEMENT

Employee Agreement Contents:

1.   **Duties**
2.   **Incentive Bonus and Compensation**
3.   **Code of Conduct**
4.   **Conflict of Interest**
5.   **Personal Information Protection**
6.   **Confidential Information**
7.   **Intellectual Property**
8.   **Access to and Return of Novartis' Property**
9.   **Miscellaneous**
10.  **Employment At Will**
     **Attestation/Signature**
     **Schedule A – Prior Inventions**

In consideration of my employment or continued employment at will by Novartis Pharmaceuticals Corporation (hereinafter "Novartis"), and the salary, benefits or other compensation to be paid for my services during my employment with Novartis, I agree as follows:

### 1. Duties.

During my employment by Novartis, I will devote my best efforts and full business loyalty to my employment with Novartis. I will comply with its policies and practices, including, but not limited to, the Code of Conduct and Corporate Citizenship Policy as these policies may be revised from time to time. I acknowledge that I have received copies of the Novartis Code of Conduct and Corporate Citizenship Policy and that I have read these policies prior to executing this agreement. I will hold no other employment or engage in any other business that may adversely affect my ability to perform my job responsibilities at Novartis.

### 2. Incentive and Bonus Compensation.

I understand that my employment with Novartis and Novartis' payment to me of any incentive and/or bonus compensation I receive is conditioned on my compliance with applicable laws and with Novartis policies.

Accordingly, I understand that if I am found by Novartis, in its sole discretion, to have violated the law, the Code of Conduct or any substantial or material provision of any Novartis policy (including, but not limited to, fraud, pattern of off-label promotion, pattern of offering kickbacks or scientific misconduct, etc.), I will not earn or receive any incentive or bonus compensation for any period in which such violation(s) occurred or were discovered, and I agree to repay any incentive or bonus compensation already issued to me for any period in which such violation(s) occurred or were discovered.

I further understand and agree that, in addition to any other remedy that Novartis might have for damages, if I fail to repay any such incentive or bonus compensation paid to me, Novartis may file a lawsuit against me and is entitled to recover the amount of such incentive or bonus compensation plus costs and fees incurred in pursuing the lawsuit.

### 3. Code of Conduct.

As an employee of Novartis, I have an obligation to uphold our commitment to doing business with integrity. As part of this obligation, I am required to certify that I have read, understand and will abide by the Novartis Code of Conduct and any applicable US Supplemental Requirements. I have read, understand and am responsible to follow all provisions of the Code of Conduct and any applicable US Supplemental Requirements. I will immediately report to Novartis any violation or potential violations of the Novartis Code of Conduct upon becoming aware of such incidents. I certify that I have not been convicted of a felony, or debarred or excluded from participation in federal health care programs. I understand that Novartis and its agents may conduct ongoing checks of criminal history and other relevant government databases to confirm the foregoing, and I authorize Novartis and its agents to conduct such checks.

### 4. Conflict of Interest.

Novartis requires all employees to disclose any existing Conflict of Interest, as set forth in the applicable Conflict of Interest Policy. This certification requires me to declare any Conflict of Interest using the Conflict of Interest Disclosure Form. If a conflict currently exists, I will declare all current Conflicts of Interest (COI) using the enclosed Disclosure Form per the enclosed Conflicts of Interest Policy. (If you have previously reported a COI and have been provided guidance to mitigate the conflict, you **do not** need to resubmit the Disclosure Form unless circumstances have changed. It is your responsibility to determine if the circumstances surrounding the COI have changed.) Should a COI arise in the future, I will promptly disclose the circumstances to my manager and adhere to the disclosure process required by Novartis' COI Policy.

### 5. Personal Information Protection.

      **a.** **What Personal Information We Collect, Use and Share and Why**. I understand that in the course of my employment with Novartis and its affiliates (collectively, "Affiliated Entities"), the Affiliated Entities will collect certain information about me, such as my name, address and contact details, administrative, financial and talent management information related to my employment at Novartis and specific information such as my social security information, bank account information, performance rating and other information about me, all of which is defined as Personal Information.

Affiliated Entities will collect, use and share my Personal Information for the purpose of managing my working relationship at Novartis (such as managing my work activities and professional development, administering payroll and other benefit programs, maintaining internal employee directories, succession planning and facilitating communications with me); ensuring business continuity (such as operating IT infrastructure, allocating human resources, securing facilities and systems); managing business operations (such as strategic planning, project management, managing acquisitions and reorganizations, and engaging in research, development and sale of products); complying with Affiliated Entity policies and with legal requirements and obligations (such as conducting internal investigations, reporting to government agencies, responding to subpoenas; responding to discovery requests in the course of litigation, protecting Affiliated Entities' rights); and in general, to administer and manage current and former employees and third party associates, including service providers, consultants and contractors (collectively, "Associates") in order to enable the operations of the Affiliated Entities.

9/12

      **b.**     **With Whom Affiliated Entities Share Personal Information.**  Because of the global nature of the businesses, Personal Information may also be made available to the Affiliated Entities on a worldwide basis and in particular to Novartis International AG in Basel, Switzerland.

From time to time, Affiliated Entities may share Personal Information with other parties for purposes relevant to the operations of the Affiliated Entities. These third parties include government and regulatory authorities; accountants, auditors, lawyers and other outside professional advisors; companies that provide products and services to Affiliated Entities (such as human resources services, including personnel administration, payroll, compensation and benefits administration, performance management, information systems, and employee services); companies with which Affiliated Entities engage or may engage in corporate and commercial transactions (such as parties to joint ventures, potential acquisitions or divestitures of products or businesses, or agreements for the purchase and sale of goods and services) and companies with which Affiliated Entities engage or may engage in research, development and sales and marketing activities.

      **c.**     **Access and Correction Requests, Questions and Complaints.**  If I have any questions or concerns about how Affiliated Entities process Personal Information, or if I wish to access, rectify, remove, or request that Affiliated Entities cease using Personal Information, I understand that I should contact my local human resources representative.

If I reasonably and in good faith believe that my privacy rights have been violated, I understand that I may report the concern to the Novartis Business Practices Office (BPO) or to any representative of Novartis as defined by local Business Practices Office (BPO) procedures, including to my supervisors, my human resources representative, the Legal Department, the Novartis privacy officer, the Ethics & Compliance Department, the Corporate Security Department or employee representatives.

      **6.**     **Confidential Information; Non-Solicitation.**

      **a.**     **Definition of Confidential Information.**  I acknowledge that all information, whether or not in writing, regarding the business, technology, relationships, legal or financial affairs of Novartis and/or one or more of the other Affiliated Entities, their predecessor companies, affiliated companies of such predecessor companies (collectively, the "Company") and their collaborators that I have acquired in my prior employment or acquire in the course of my employment with Novartis that the Company has not made generally known to the public including, but not limited to, information concerning the Company's and its collaborators' research and development activities and practices, inventions and discoveries, manufacturing processes and practices, product formulae, process and method specifications, trade secrets, computer programs, marketing activities, customer lists and other customer information, cost and pricing data, business plans, financial information and human resources practices, policies and employee data, whether or not patentable or copyrightable, as the case may be ("Confidential Information"), is and will at all times remain, the exclusive property of the Company and its collaborators, as applicable.

      **b.**     **Non-Disclosure of Confidential Information.**  Except as required in the course of my duties for Novartis, I will not, without Novartis' prior written consent, disclose to any-one outside Novartis nor use in any way other than in Novartis' business as authorized by Novartis, any Confidential Information, or any information or material received in confidence from third parties for or on behalf of the Company.  I acknowledge that this obligation continues throughout my employment with Novartis and after the termination of my employment with Novartis.  I further acknowledge that Confidential Information is unique, extraordinary in character and of great value to the Company.

      **c.**     **Non-Disclosure of Confidential Information of Third Parties.**  I will not disclose to Novartis, use in Novartis' business, or cause Novartis to use, any information or material that I know or have reason to know is confidential or proprietary to any third party and

which is obtained (i) prior to my employment by Novartis, or (ii) during my employment by Novartis, but that was disclosed by the third party to me for purposes unrelated to my employment at Novartis.  Further, I will not incorporate into any product, materials, information or documentation used and/or sold by the Company, any patented invention or process, copyrighted work of authorship or trade secret of any third party, unless such incorporation by the Company has been authorized by said third party or other party having the legal authority to do so.

        **d.**    **Non-Solicitation of Employees.**  During my employment with Novartis and for one (1) year thereafter, I will not, directly or indirectly, solicit or encourage any person to leave his or her employment with the Company or assist in any way with the hiring of any Company employee by any other business.

        **e.**    **No Prior Employment Restrictions**

Prior to commencing employment with the Company, I must disclose fully any agreements in which I have entered into with a prior employer which could, in any way, materially prevent or restrict my ability to perform the full range and scope of my duties for and assignment with the Company, either because of the subject matter covered by the pre-employment restriction, its geographical extent or its time provisions.  My failure to make full disclosure to the Company of any such pre-existing restraints prior to commencing employment will be grounds for termination for Cause.

    **7.**    **Intellectual Property.**

        **a.**    **Novartis' Business Area.**  The term "Novartis' business area" as used in this Agreement shall mean (i) any field of research or business in which Novartis is actually engaged, (ii) any field of research or business into which Novartis demonstrably anticipates entering, and (iii) any area of work to which I am assigned during my employment with Novartis, whether for Novartis or for any other Affiliated Entity.

        **b.**    **Ownership of Intellectual Property.**

           **(i)**    If, during my employment with Novartis, or within six (6) months after termination of my employment, I make, develop or conceive, solely or jointly with another, any idea, invention or discovery (patentable or not) or work of authorship which is related to Novartis' business area, or I make, develop or conceive any idea, invention or discovery (patentable or not) or work of authorship during work hours and/or while using the Company's equipment, supplies, facilities or Confidential Information (regardless of its relationship to Novartis' business area) I agree that all rights of ownership in any such idea, invention, discovery or work of authorship, and all patents, patent applications, designs, models, copyrights, trademarks domain names and records relating thereto (collectively, "Intellectual Property"), shall be the exclusive property of Novartis and shall be considered made on a "work for hire" basis.  Accordingly, I hereby assign and transfer, and to the extent any such assignment cannot be made at present, will assign and transfer, all my right, title and interest to all such Novartis Intellectual Property to Novartis or its designee.

           **(ii)**    I understand that the term "Intellectual Property" shall not include an invention for which no equipment, supplies, facility, or Confidential Information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of Novartis, or (ii) to Novartis' actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for Novartis or any of its affiliates.  I understand and agree that if the invention is covered by the conditions of (a) or (b) above, Novartis shall own all right, title and interest in the same and such invention shall be considered Intellectual Property and shall be subject to the obligations set forth in Section 7(b)(i), above.

(iii)    I agree to notify Novartis promptly in writing before the filing of any patent application for which I am an inventor but which is not assigned or obligated to be assigned to Novartis pursuant to the provisions of this Section 7(b)(ii) and that discloses or claims any invention that is conceived and/or reduced to practice and/or otherwise made, discovered, or developed while I am employed by Novartis.  All expenses therefore will be borne by me.  I understand and agree that I have no right to file a patent application or other application or registration related to Intellectual Property that is owned by or obligated to be assigned to Novartis under this Agreement.

c.    **Cooperation Concerning Intellectual Property.**  In connection with all Intellectual Property which is or will become the property of Novartis under Section 7(b) of this Agreement, I will, at Novartis' expense:  (i) keep full and accurate records regarding all such Intellectual Property, (ii) promptly disclose all such Intellectual Property to Novartis, (iii) promptly execute, on the Company's request, a specific assignment of all rights and title to Novartis or its designee, (iv) do anything else reasonably necessary to enable Novartis or its designee to secure a patent, copyright, trademark or other form of protection in the United States and in other countries, and (v) execute any documents deemed necessary or desirable by Novartis in connection with said Intellectual Property, including, but not limited to, the securing of patents, trademarks, copyrights, models, domain names, design registrations or  other forms of protection now or in the future available in the United States or any other country or region and extensions of any of the foregoing, perfecting Novartis' rights and title (or the rights or title of its designee) in any of the foregoing or any resulting litigation in regard thereto.  The obligations contained in this Section 7(c) shall continue after termination of my employment with Novartis.

d.    **Prior Inventions.**  I have set forth in Schedule A below all ideas, inventions, discoveries or works of authorship not subject to Section 7(b)(i) of this Agreement in which I have any right, title or interest, and which were made, discovered, developed or otherwise created by me (solely or jointly with others), or written wholly or in part by me, prior to my employment with Novartis, but neither yet published nor made the subject of any application for patent, copyright, trademark, model, design, domain name, registration or other form of protection filed in an agency, office or the like in any country or region having the authority to grant the same.

8.    **Access to and Return of Novartis' Property.**

a.    **Novartis' Property.**  I acknowledge that the following is Novartis' sole and exclusive property:    (i) all documents, correspondence, files, records, telephone records, recordings, accounts, notebooks, computer hardware, software and files, electronic mail, or other storage media and any copies thereof, containing, referring to or constituting   Confidential Information, as defined in Section 6(a) of this Agreement; (ii) all documents, correspondence, files, records, telephone records, recordings, accounts, notebooks, computer hardware, software and files, electronic mail, or other storage media and any copies thereof, whether or not containing, referring to or constituting Confidential Information, which were or are obtained or created at the expense of the Company using the Company's property or equipment, or during my work hours at Novartis; and (iii) all equipment, computers, cell phones and other communication devices, tablets, supplies, vehicles, furniture, file cabinets, lockers, product samples, books, periodicals and other materials provided to me by Novartis, in the course of my employment with Novartis, or at the Company's expense.

b.    **Access to Novartis' Property.**  I acknowledge and agree that Novartis shall have full right of access to all of Novartis' Property as defined in Section 8(a) of this Agreement, that I have no privacy rights with respect to any such property, and that I will turn over to Novartis any such property immediately upon Novartis' request.

9/12

-5-

          **c.**    **Return of Novartis' Property.**   I agree that upon the termination of my employment with Novartis, I will immediately return to Novartis any and all of Novartis' Property in my possession or under my control.

### 9.   Miscellaneous.

          **a.**    **Enforcement.**   I acknowledge that the provisions in this Agreement are reasonable and necessary for the protection of Novartis' business, that my breach of any provision in this Agreement will result in irreparable injury to Novartis' and/or the Company's business, and that Novartis' remedy at law for damages in the event of such breach will be inadequate.  Accordingly, I agree that, in addition to any other remedies to which Novartis may be entitled, Novartis shall be entitled to seek and obtain both preliminary and permanent injunctions to prevent and/or halt a breach or threatened breach of any covenant contained in this Agreement.

          **b.**    **Effect of Agreement.**   This Agreement does not create a contract of employment for any particular term, and shall not be deemed to alter the at-will nature of my employment with Novartis.  This Agreement may not be changed, other than in a written contract, signed by a duly authorized member of Novartis' Senior Management.  This Agreement shall supersede any other Employee Agreement, Employment At Will Agreement or other similar agreement previously executed by me as part of my employment with Novartis.

          **c.**    **Severability.**    If any provision or part of a provision of this Agreement is found to be in violation of law or otherwise unenforceable in any respect, the remaining provisions or parts of provisions shall remain unaffected and the Agreement shall be reformed and construed to the maximum extent possible as if such provision or part of a provision held to be in violation of law or otherwise unenforceable had never been contained herein.  Further, if any provision is held to be overbroad, a court may modify that provision to the extent necessary to make the provision enforceable according to applicable law and enforce the provision as modified.

          **d.**    **Applicable Law.**   This Agreement shall be construed, interpreted and enforced in accordance with the internal laws of the State of New Jersey, without regard to its conflicts of laws provisions.  I agree that the state and federal courts located in the State of New Jersey will have exclusive jurisdiction in any action, suit or proceeding based on or arising out of this Agreement.

          **e.**    **Successors and Assigns.**  This Agreement shall be binding upon my heirs, executors, administrators and assigns and shall be enforceable by Novartis and its successors and assigns.

### 10.   Employment At Will

Employment in any position at Novartis is "at-will."  Accordingly, employment is not guaranteed for any period of time, and both the employee and Novartis may terminate the employment relationship at any time and for any reason, with or without cause or notice.

The at-will employment status of an individual may only be changed by a written contract signed by a duly authorized member of Novartis' Executive Committee in which: (1) either the employee is referred to by name or the employee's position is deemed to be included as part of a collective bargaining agreement; and (2) the at-will employment status is rescinded.    No other statements, materials or policies provided by Novartis are intended to, or shall, alter the at-will nature of any employee's employment with Novartis.

**I have read, fully understand, and agree to be bound by all of the terms of this Agreement.**

Signed: _____          Date: Sept. 23, 2014

ALISHA ANN ALAIMO
Employee's Full Name

Schedule A

Prior Inventions (as defined in Section 7(d))

(If none write "none")

NONE
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(add additional pages as necessary)

Signed: _____          Date: Sept. 23, 2014

9/12

# EXHIBIT E

June 2, 2017


Fabrice Chouraqui
Head Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936



Dear Fabrice,

Please accept my letter of resignation from Novartis Pharmaceuticals Corporation.

Thank you for the opportunity to work as the CV Franchise Head over the past year and a half.  I have enjoyed this challenge and am grateful for the support to make it a turnaround success.  We should all be very proud of what has been accomplished.

I appreciate my long history with the organization and am appreciative for the experiences that have shaped me as a leader.  I will never forget this journey.  Novartis, the leadership and the people will always be in my heart.

My commitment during this transition period will be unwavering and I will do what is necessary to ensure it is smooth and that the team is communicated to in the right way.   I want to ensure that the business continuity remains strong and that the passing of my responsibilities is seamless.  I am happy to help in any way that I can.

Again, thank you, and please let me know how you would like to proceed.



Sincerely,



Alisha A. Alaimo
VP and Head, Cardiovascular Franchise

# EXHIBIT F

 NOVARTIS

**Novartis Pharmaceuticals Corporation**
One Health Plaza
East Hanover, NJ  07936

June 9, 2017

Ms. Alisha Alaimo
Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936

Dear Alisha,

Alisha, I am in receipt of your resignation letter confirming that on June 2, 2017 you notified the company that you are resigning from Novartis Pharmaceuticals Corporation to join another undisclosed pharmaceutical company. Based on the 60 day notice provision of your executive Employment Agreement, which you signed on September 23, 2014, your last day of employment with NPC will be August 2, 2017.  Additionally, please be reminded that under the terms of your contract, you are prohibited from working for another employer during the entirety of the 60 day notice period.

We also want to remind you of your Non-Competition obligation, which lasts for 6 months following your last day of employment with the company, your Non-Solicitation commitment, which lasts for 24 months after your last day with NPC, as well as the Confidentiality requirements set forth in your contract.

Sincerely,

Caryn Panavecchio
VP, Head of Human Resources

# EXHIBIT G





# Alisha A. Alaimo Appointed SVP of Biogen's US Therapeutic Operations

July 24, 2017 04:15 PM Eastern Daylight Time

CAMBRIDGE, Mass.--(BUSINESS WIRE)--Biogen (NASDAQ: BIIB) announced today the appointment of Alisha A. Alaimo to Senior Vice President of US Therapeutic Operations, where she will lead sales and marketing, market access, patient services and commercial operations and strategy.

Alaimo will join Biogen from Novartis, where she was Vice President and Head of its Cardiovascular Business Unit. At Biogen she will work to drive the uptake of the company's industry-leading portfolio of multiple sclerosis (MS) therapies and increase access for SPINRAZA®, the first and only approved treatment for spinal muscular atrophy. Alaimo will also work to prepare the US market for potential approvals of new therapies from across the company's late-stage neuroscience pipeline. She will report directly to Chief Executive Officer Michel Vounatsos.

"Alisha has a remarkable track record of success within highly competitive therapeutic areas. She joins Biogen at an important time as we work to build upon our MS leadership and define a future focused on bringing forward new therapies for neurologic and neurodegenerative diseases," said Vounatsos. "Her experience developing new markets for breakthrough therapies, commitment to patients and customer focus, and experience driving complex and dynamic organizations make her an ideal leader to help move Biogen forward."

Over a 17-year career at Novartis, Alaimo took on positions of increasing responsibility in the US, United Kingdom and Switzerland. Prior to heading the Cardiovascular Unit she oversaw the company's Neuroscience Business Unit.

"I am honored to join a company that has demonstrated unparalleled leadership and commitment in MS and continues to work relentlessly to transform treatment for patients," said Alaimo. "Biogen's focus on potentially transformative new medicines in neurology creates a unique opportunity to build and reach new markets in critical areas of unmet need."

Alaimo received a BS in Biology from Emory University.

### About Biogen
Through cutting-edge science and medicine, Biogen discovers, develops and delivers worldwide innovative therapies for people living with serious neurological and neurodegenerative diseases. Founded in 1978, Biogen is a pioneer in biotechnology, and today the company has the leading portfolio of medicines to treat multiple sclerosis; has introduced the first and only approved treatment for spinal muscular atrophy; and is at the forefront of neurology research for conditions including Alzheimer's disease, Parkinson's disease and amyotrophic lateral sclerosis. Biogen also manufactures and commercializes biosimilars of advanced biologics. For more information, please visit www.biogen.com. Follow us on social media – Twitter, LinkedIn, Facebook, YouTube.

## Contacts

Biogen.

MEDIA CONTACT:

Jason Glashow, +1 781-464-3260

public.affairs@biogen.com

or

INVESTOR CONTACT:

Mike Henke, +1 781-464-2442

IR@biogen.com

## Social Media Profiles

Follow us on Facebook

Follow us on Twitter

Follow us on LinkedIn

Follow us on YouTube