**Sean Mack**
Member of the Firm
smack@pashmanstein.com
Direct: 201.270.4919



August 25, 2017

<u>Via ECF</u>
Honorable Michael A. Hammer, U.S.M.J.
U.S. District Court, District of New Jersey
Martin Luther King, Jr. Federal Bldg. & Courthouse
50 Walnut Street, 2nd Floor
Newark, NJ 07102

RE:    Novartis Pharmaceuticals Corp. v. Alaimo
       Civil Action No. 2:17-cv-5774-ES-MAH

Dear Judge Hammer:

We represent Defendant Alisha Alaimo ("Alaimo") in the above-referenced matter. We submit this joint letter regarding three discovery disputes that the parties have been unable to resolve despite several email exchanges and telephonic meet and confers:
   (1) whether Joe Jimenez and Paul Hudson should be compelled to be produced for deposition;
   (2) whether the discovery and hearing schedule should be extended and deposition scheduled for Monday should be adjourned;
   (3) Novartis' refusal to produce two categories of documents.

We request a telephonic conference as soon as the Court is available.

Background: On August 10, 2017, Judge Salas granted Novartis' request for a temporary restraining order restraining Ms. Alaimo, a former senior executive of Novartis, from working for Biogen in the US. That TRO also set a preliminary injunction hearing date of October 3, 2017 and set an expedited discovery schedule with depositions to be concluded by September 14, 2017.

Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601

Phone: 201.488.8200
Fax: 201.488.5556
www.pashmanstein.com

August 25, 2017
Page 2



**(1) Deposition of Joe Jimenez & Paul Hudson**

<u>Ms. Alaimo's position</u>:

Novartis' TRO application was based in large part on its claim that Ms. Alaimo was exposed to confidential information during the last 18 months of her employment at senior executive meetings. Novartis emphasized that Ms. Alaimo participated in three meetings with "high level global executives", including with "Paul Hudson, the Global CEO of the Pharma Division" on February 1, 2017 and March 13, 2017 and the "most recent meeting was with Joe Jimenez, the Global CEO of Novartis, on April 27, 2017". After requesting Mr. Hudson and Mr. Jimenez's deposition so that I could question them about those meetings and their interactions with Ms. Alaimo, I was told "A decision has not been made whether to voluntarily produce Paul Hudson (who, as we mentioned, is not an employee of the Plaintiff)". Novartis has now confirmed that their client has ***decided*** not to produce either witness. Both witnesses reside in Switzerland, and compelling their deposition through the Hague Convention cannot be completed before the Preliminary Injunction hearing on October 3. We should not be limited to the witnesses that Novartis hand selects for us to depose, and because Novartis put these two "global executives" forward to prove their case, we should be entitled to depose them about precisely the meetings and discussions set forth in Novartis' TRO application.

<u>Novartis' position</u>:
**Ms. Alaimo's Request for the Depositions of Joe Jimenez and Paul Hudson**

**Novartis' position**:

Novartis objects to the Ms. Alaimo's request to take the depositions of Joe Jimenez and/or Paul Hudson for the following reasons:

- Neither Mr. Jimenez nor Mr. Hudson are employed by the Plaintiff, Novartis Pharmaceuticals Corporation. (Mr. Jimenez is CEO of Novartis AG, which is the Swiss parent company of the Plaintiff. Mr. Hudson is the CEO of Novartis Pharmaceuticals, a Swiss affiliate of the Plaintiff.) Accordingly, if Ms. Alaimo wants to take their depositions, she will need to issue subpoenas directly to them or their employers.

- Neither Mr. Jimenez nor Mr. Hudson live or work in the United States. Both men live and work in Switzerland, so Ms. Alaimo's demand that they travel to the United States for their depositions would create an undue burden.

- As Messrs. Jimenez and Hudson are both CEOs of their respective companies (neither of which is the Plaintiff in this action), their depositions would be so-called "apex depositions." The Apex Doctrine, which is applied by courts across the country, sets a higher standard for such depositions. "The standard by which



August 25, 2017
Page 3

the court will measure whether good cause exists to preclude an apex deposition, is whether the deponent has some unique, first-hand, non-repetitive knowledge of the relevant facts at issue." *HD Supply Waterworks Grp., Inc. v. Dir., Div. of Taxation*, 29 N.J. Tax 573, 588 (2017). In this case, there is no unique, non-repetitive, relevant information that will be gleaned from the depositions of Messrs. Jimenez and Hudson, since there were other high-level executives in the meetings where the CEOs were present, and those other executives (*e.g.*, Lisa Deschamps – who has been offered in lieu of Messrs. Hudson and Jimenez) are (1) far more accessible for depositions in the United States, and (2) are employees of the Plaintiff, over whom the Plaintiff exercises control for purposes of producing for depositions here. Accordingly, in light of the fact that Ms. Alaimo can discover the same information about relevant conversations from other witnesses, neither Messrs. Jimenez nor Hudson need to be subject to the burden of an international deposition.

**(2) Extending the Discovery Schedule**

Ms. Alaimo's position:

This purported issue is simply an excuse for Novartis to delay expedited discovery and to prejudice Ms. Alaimo by further extending the TRO. Novartis has been doing everything it can to delay the start of depositions and this is their most recent gambit. On August 14, I sent Novartis a list of nine fact witnesses I wanted to depose. Despite repeated demands to provide witness availability, it was not until 4:30pm this past Wednesday, after I threatened to call Your Honor if the list was not provided that day, that Novartis finally sent a list of "available dates." Novartis listed several witnesses as "available" as early as yesterday, today or Monday. When we spoke yesterday to set the schedule and I asked for Lisa Deschamps' deposition on Monday (she was identified as being available yesterday, today and Monday), Novartis' counsel balked and said they did not think they could prepare her in time and told me they would need to confirm all of the dates with their client – meaning that the "available" dates they had sent on Wednesday were a farce. Now faced with my demand to start depositions on Monday, they are seeking to delay.

There has been no "untold" delay by Defendant or any violation of the TRO. The Court's August 10 Order required the parties to "confer and arrange" production of Ms. Alaimo's laptop and external storage devices. At the time the order was entered, Defendant's computer forensic expert was in possession of the two external storage devices of which Defendant was aware at that time, and those devices were sent via overnight mail to Novartis' forensic expert that day. That same day, Ms. Alaimo delivered her laptop to our forensic expert – thereby, to the best of her knowledge at the time, fully complying with the Court's turnover order. Following the creation of a forensic image of the laptop, we identified an issue regarding production of that image to Novartis: namely, the existence of privileged material on the laptop and the resulting



image. We immediately contacted Novartis' counsel to confer regarding that issue on a call with Novartis' forensics expert. The parties agreed on a protocol for us to do a privilege review prior to turning over an image of the laptop. Immediately following our review of all contents of the laptop image for privilege, our forensics expert attempted to remove the privileged documents in the manner agreed to by counsel. As soon as it became clear that such removal was not possible, we contacted Novartis' counsel and advised them of same, and the parties agreed that Novartis' counsel would review the laptop image without reviewing any of the identified privileged files. A forensic image of the laptop was delivered Wednesday morning, August 23, the same date all documents were to be produced.

When the TRO was entered, Ms. Alaimo was in the process of moving from New Jersey to Boston and while unpacking after the move, she found two additional thumb drives. She has no knowledge of whether anything on them is relevant to this case, but immediately contacted me and arranged to turn them over. Images of those two devices were created, but given the privilege issues with the other devices, after we finished the privilege review on the laptop, we followed the same protocol previously agreed to and reviewed the images of the thumb drives for privileged materials. Those devices were delivered to Novartis' expert Kroll by overnight mail as soon as the privilege review was completed.

There has been no intentional violation of the TRO nor any delay in the production of the devices that could justify adjourning the current schedule. The materials contained on Ms. Alaimo's laptop and storage devices are irrelevant to the Novartis fact witnesses Ms. Alaimo seeks to depose next week, as none of those witnesses will have personal knowledge of what is contained on those devices. Novartis' review of those devices is completely separate from the testimony of its fact witnesses. Further, counsel for both parties has already tentatively agreed that their respective forensic experts will be deposed on the last day of depositions. If Novartis requires more time to review these materials before deposing Ms. Alaimo, Novartis' counsel is free to propose an alternate date for her deposition. The remainder of the discovery schedule, however, should not be impacted.

Novartis' position:
**Ms. Alaimo's Late Production of Electronic Devices and Novartis' Request for Short Extension**

**Novartis' position**:

In the Temporary Restraining Order entered by the Court in this action on August 10, 2017 (the "TRO"), the Court required, *inter alia*, Ms. Alaimo to turn over all storage devices in her possession as follows:

> ORDERED that, within one day of the date of this Order, the parties shall confer and arrange for the delivery of Ms. Alaimo's electronic devices, including USB



August 25, 2017
Page 5

drives in her possession, external hard drives, and Ms. Alaimo's personal computer to KrolLDiscovery.

Notwithstanding the TRO, in Defendant's Objections and Responses to Plaintiff's Document Requests, dated August 23, 2017 (the "Document Response"), Ms. Alaimo stated – for the first time – that there are additional devices that have not yet been produced, as follows:

> Defendant has provided a USB thumb-drive, external hard drive, and a forensic image of her laptop computer to Plaintiff for its forensic expert's review and analysis and <u>will be providing two additional pieces of recently located removable media shortly</u>.

Defendant's Objections and Responses to Plaintiff's Document Requests, Response Nos. 14 & 15.  Emphasis added.

The Court's TRO was clear:  Ms. Alaimo was to produce all "electronic devices, including USB drives."  Ms. Alaimo's Document Response demonstrates that she has not adhered to the TRO.[1]  Indeed, the two new electronic devices were only sent (via overnight delivery) to Novartis' forensic expert on Thursday, August 25, 2017, for a Friday delivery.  Novartis does not yet have access to the files on those USB drives and does not have any insight into their contents.

Ms. Alaimo's late disclosure of the two USB drives compounds the prejudice created by her late disclosure of her personal laptop.  Although the *existence* of the laptop was disclosed in a timely fashion following entry of the TRO (unlike the above-referenced devices), the laptop itself was not made available to Novartis until Wednesday, August 22 – <u>12 days after entry of the TRO</u>.  The laptop reportedly contains almost 350GB of data and around 1 million total files.  Although Novartis' forensics experts are working as quickly as possible, the contents of her laptop (and a hard drive containing copies of her laptop) are still unreviewable.  (Ms. Alaimo also previously produced a USB drive that only contained personal photographs.)

The contents of Ms. Alaimo's devices are expected to be among the most relevant evidence in this action, given Novartis' concerns that she, *inter alia*, took confidential

---

[1]     Ms. Alaimo's counsel proceeded in a unilateral fashion with respect to the handling of the USB devices, and thereby failed to adhere to the provision in the TRO requiring that "within one day of the date of this [August 10] Order, the parties shall confer and arrange for the delivery of Ms. Alaimo's electronic devices. . ."  Although counsel spoke and emailed numerous times about other matters this week, Ms. Alaimo's attorneys never mentioned the discovery of two new devices in those contemporaneous communications.

August 25, 2017
Page 6



information and began working for Biogen while she was still employed by Novartis. (Indeed, a preliminary review of other documents produced by Alaimo confirms that, in fact, she was working for Biogen while still employed by Novartis.)

Given the late production of Ms. Alaimo's electronic storage devices, and the time necessary to process information contained on those devices, Novartis is concerned that it will not have any time whatsoever to review the highly relevant files on Ms. Alaimo's devices before depositions are started and witnesses are prepared. In this regard, Ms. Alaimo has requested that Novartis start producing witnesses for their depositions on Monday, August 28. Given the newly-disclosed USB drives, however, Novartis rescinded its offer to make deponents available starting on Monday, and offered instead to extend the discovery deadline and preliminary injunction hearing date by 10 days to accommodate her delayed production, but Ms. Alaimo has refused to consider any extension. Instead, Ms. Alaimo seeks to have it both ways: She has unreasonably delayed her production of electronic devices, but expects to maintain her preferred deposition schedule.

Novartis declines at this juncture to seek sanctions for Ms. Alaimo's late production in response to the TRO, because – until the parties start taking depositions – there is minimal prejudice. However, Novartis will be prejudiced if it is required to attend depositions in a blind fashion – with Ms. Alaimo having full access to (and knowledge of) her own devices, and without any such ability by Novartis to review the same in a timely fashion. Thus, in order to avoid prejudice to Novartis, it proposes a practical resolution: Allowance of a short (*e.g.*, 10 day) continuance of the discovery deadline (currently set for September 14, 2017), and a commensurate adjustment to other dates in the schedule, including the preliminary injunction hearing (currently set for October 3, 2017).

**#3 Document Demands**
**Ms. Alaimo position**
Novartis has refused to produce two categories of documents. First, it has refused to produce any documents concerning its enforcement or lack of enforcement of non-compete agreements against senior executives who have attended the same executive meetings attended by Ms. Alaimo. The central theory of Plaintiff's case is that confidential information is discussed at the senior executive meetings Ms. Alaimo attended and that it takes appropriate steps to safeguard the confidentiality of that information, and so simply because she was at those meetings she has knowledge that must be restrained. According to their theory, the same argument would necessarily hold true for anyone who attended those meetings. Numerous male executives, who attended the same types of senior executive meetings, have left Novartis to work for competitors and we are unaware of any prior attempt by Novartis to enforce non-competition agreements. Novartis' prior failure to stop this same information from leaving Novartis to competitors when male executives left completely undermines its assertion that it has taken reasonable measures to



August 25, 2017
Page 7

preserve the confidential nature of the information shared at those meetings. Simply put, their claim is that 15 or so senior executives were exposed to the same confidential information at meetings; if half of them left with that information unfettered to disclose it to competitors and they selectively seek to enforce a noncompete to prevent only Ms. Alaimo from disclosing the confidential information, they have not taken reasonable measures to protect their confidential information.

Second, Novartis has refused to produce documents relating to changes to its strategic business plan for Neuroscience since Ms. Alaimo left. This document request was crafted to specifically challenge an argument made by Novartis' counsel to Judge Salas in chambers during the TRO argument – namely that one of the legitimate reasons for a six month non-compete is to give Novartis time to change its strategic plan for Neuroscience, so that it can pursue a plan that Ms. Alaimo does not know. Ms. Alaimo has been shut out of Novartis with no access to its information for almost three full months now; if counsel's argument were legitimate, there would be evidence by now of their attempts to change their strategic plan. We must be permitted access to the evidence to test the factual basis for counsel's argument to Judge Salas.

Novartis Position
**Ms. Alaimo's Document Request No. 5: Documents Concerning Enforcement of Other Restrictive Covenants**

**Novartis' position**:

In addition to Novartis' objections that Ms. Alaimo's request for documents concerning the enforcement of restrictive covenants against other Novartis employees is overly broad and unduly burdensome, Novartis' objected on the basis that the request is not reasonably calculated to lead to the discovery of admissible evidence. In this regard, the following analysis from *Laidlaw, Inc. v. Student Transp. of Am., Inc*., 20 F. Supp. 2d 727, 766 (D.N.J. 1998), explains why there is no relevance whatsoever to Novartis' decisions concerning other employees' restrictive covenants:

> *Lack of Consistent Enforcement of Stock–Option Non–Competes*
>
> Defendants note that Laidlaw has not consistently enforced other stock-option non-competes. . . . Although the Defendants do not rely on this fact in their briefing or in their proposed conclusions of law, the Court wishes to make clear that Laidlaw's actions (or lack thereof) in other instances do not amount to a waiver or estoppel of its contract rights. One district court considering this issue found that an employer's failure to enforce a restrictive covenant against similarly situated employees did not estop the employer from enforcing the covenant. In *Minnesota Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324 (D.Minn.1980), the court found:



August 25, 2017
Page 8

> All things considered, the failure of [the employer] to attempt to enforce similar covenants against other former employees is not overly probative of any intent to relinquish its contractual rights or to knowingly mislead [the employees] so as to estop [the employer] from enforcing the covenant in question. For the Court to hold otherwise would effectively place employers in the precarious position of being compelled to enforce all such restrictive covenants with respect to all its former employees, which might encourage attempts to restrain trade, and which might undermine labor relations.
>
> *Id.* at 336.  A similar rationale would apply here.  Defendants' suggestion would require an employer to enforce every restrictive covenant, without regard to cost-effectiveness or individual circumstances.  This is impractical and unfair, not only to Plaintiffs, but to other former employees, particularly here where the other former employees have not launched a collective effort that represents as great a competitive threat to Laidlaw as STA.  Whether a restrictive covenant may be enforced depends on its reasonableness under the particular circumstances.  *See Solari*, 55 N.J. at 576, 264 A.2d 53.  Plaintiffs may or may not seek to enforce other covenants, but the primary inquiry is whether enforcement of the covenant in this case is reasonable.

In light of the foregoing analysis, the fact that Novartis' has enforced (or not enforced) any other individual's restrictive covenant has no bearing on this Court's analysis of Ms. Alaimo's agreement and, therefore, such documents are irrelevant.


**Ms. Alaimo's Document Request No. 13:  Documents Concerning Changes Made to Novartis' Strategic Plan**

**Novartis' position**:

     Novartis objected to Ms. Alaimo's request for all documents concerning "changes made, since June 2, 2017, to the strategic plans, goals and milestones for neuroscience pipeline drugs for the next five years, from 2017-2022" on the basis that the request is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.
     As a threshold matter, Novartis declines to provide such sensitive information to any party who has left its employ, even under the protection of a confidentiality order.  In a case that focuses on concerns about whether Ms. Alaimo has compromised the confidentiality of information that she had access to *while* she was employed there, it is unreasonable to extend the period of time for disclosing highly-sensitive confidential and



August 25, 2017
Page 9

trade secret information about the company's plans that has *been created since her departure*.

      Ms. Alaimo argues that she is entitled to see the adjustments to Novartis' strategic plans after her departure because Novartis has explained that the 6-month noncompete period is justified, in part, by the need to give Novartis the *ability* to make adjustments to its plan that it may deem necessary based on her departure. Whether Novartis *actually* changes its strategic plan or not during that period is not the point: The 6-month window that Ms. Alaimo agreed to was a prospective view deemed acceptable by both parties of a reasonable time to make any adjustments, if necessary, to account for her departure.

      The underlying premise of Ms. Alaimo's argument that she is entitled to this set of documents is that Novartis has no legitimate business interest in enforcing a 6-month noncompete agreement. However, according to Ms. Alaimo's own document production, she has recently agreed to a *12-month* noncompete period with her new employer, Biogen. Accordingly, it is hypocritical for her now to suggest that a shorter, 6-month period is unreasonable and unjustified.

Thank you for Your Honor's attention in this matter.

Respectfully submitted,


/s/ Sean Mack
SEAN MACK

Encls.
cc: Daniel R. Levy, Esq. (via email, w/o encls.)
    James P. Flynn, Esq. (via email, w/o encls.)
    Russell Beck, Esq. (via email, w/o encls.)
    Stephen D. Riden, Esq. (via email, w/o encls.)
    Lauren Corbett, Esq. (via email, w/o encls.)